Judy Danelle Snyder, OSB No. 732834
Holly Lloyd, OSB No. 942979
**LAW OFFICES OF JUDY SNYDER**
4248 Galewood Street
Lake Oswego, OR 97035
Telephone: (503) 228-5027
judy@jdsnyder.com
holly@jdsnyder.com

Robert Alexander*
Joshua B. Shiffrin*
Joshua A. Segal*
Cole Hanzlicek*
**BREDHOFF & KAISER, P.L.L.C.**
805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
ralexander@bredhoff.com
jshiffrin@bredhoff.com
jsegal@bredhoff.com
chanzlicek@bredhoff.com
*admitted *pro hac vice*

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| BOARD OF TRUSTEES OF THE BAKERY AND CONFECTIONERY UNION AND INDUSTRY INTERNATIONAL PENSION FUND, | Case. No. 3:21-cv-00617-SI |
| Plaintiff, | |
| v. | **PLAINTIFF'S POST-TRIAL BRIEF** |
| UNITED STATES BAKERY; MOUNTAIN STATES BAKERIES LLC; CENTRAL CALIFORNIA BAKING COMPANY, | |
| Defendants. | |

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ................................................................................................ ii

**INTRODUCTION** ............................................................................................................... 1

**SUMMARY OF TRIAL TESTIMONY AND DOCUMENTARY EVIDENCE** .................... 3

  I.  USB history and acquisition of SSB's assets ........................................................... 3

  II.  SSB's Settlement Agreement with the Pension Fund ............................................... 18

  III. USB's takeover of SSB's business ........................................................................ 28

**DISCUSSION** .................................................................................................................. 30

  I.  USB is responsible for SSB's ERISA liabilities because it continued SSB's operations nearly unchanged with notice of those liabilities ................................................. 30

    A.  USB knew of SSB's assessed ERISA liabilities when it took over SSB's business. ...................................................................................................... 31

    B.  USB deliberately continued SSB's business nearly unchanged. ................................ 36

  II. USB's affirmative defenses premised on the Settlement Agreement fail ............................ 38

    A.  USB had no right to separate notice and an opportunity to cure SSB's default. ........ 39

    B.  Because SSB defaulted on its obligations under the Settlement Agreement, the Pension Fund may fully enforce its ERISA rights. ..................................................... 44

    C.  In the alternative, the Settlement Agreement must be set aside either as the product of fraud or as a transaction to evade or avoid withdrawal liability. .............. 46

      1.  SSB has admitted that it never intended to perform promises that it knew induced the Pension Fund to execute the Settlement Agreement, making the Agreement voidable for fraud. ................................................................ 47

      2.  The Settlement Agreement must be set aside under ERISA in light of SSB's deception, aided by its less than arm's-length relationship with USB. ................................................................................................ 56

**CONCLUSION** ................................................................................................................ 58

**CERTIFICATE OF SERVICE** ........................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Funding, LLC v. Linton*,
  290 A.3d 112 (Md. 2022) .........................................................................................53

*Amalgamated Lithographers of Am. v. Unz & Co.*,
  670 F. Supp. 2d 214 (S.D.N.Y. 2009).....................................................................43

*Bates v. Pac. Mar. Ass'n*,
  744 F.2d 705 (9th Cir. 1984) ...........................................................................35, 38

*Bd. of Trs. of Hotel & Rest. Emps. Loc. 25 v. Madison Hotel, Inc.*,
  97 F.3d 1479 (D.C. Cir. 1996).................................................................................44

*Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Centra*,
  983 F.2d 495 (3d Cir. 1992).....................................................................................58

*Bd. of Trs. of United Furniture Pension Fund A v. Premier Restoration Techs.*,
  2022 WL 2312329 (S.D.N.Y. June 28, 2022) ........................................................54

*Matter of Boydston*,
  520 F.2d 1098 (5th Cir. 1975) .................................................................................48

*Brager v. Friedenwald*,
  97 A. 515 (Md. 1916) ..............................................................................................53

*Broadley v. Mashpee Neck Marina, Inc.*,
  471 F.3d 272 (1st Cir. 2006)....................................................................................40

*Cent. Truck Ctr., Inc. v. Cent. GMC, Inc.*,
  4 A.3d 515 (Md. Ct. Spec. App. 2010)..............................................................50, 56

*Chi. Truck Drivers v. El Paso CGP Co.*,
  525 F.3d 591 (7th Cir. 2008) ...................................................................................57

*Clark v. Elza*,
  406 A.2d 922 (Md. 1979) ..............................................................................44, 45, 46

*Clayman v. Goodman Props., Inc.*,
  518 F.2d 1026 (D.C. Cir. 1973)..........................................................................41, 42

*Coal Res., Inc. v. Gulf & W. Indus., Inc.*,
  756 F.2d 443 (6th Cir. 1985) ...................................................................................56

*Colandrea v. Colandrea,*
  401 A.2d 480 (Md. Ct. Spec. App. 1979) ...........................................................................48

*Coleman v. Anne Arundel Cnty. Police Dep't,*
  797 A.2d 770 (Md. 2002) ...............................................................................................47

*Crane Ice Cream Co. v. Terminal Freezing & Heating Co.,*
  128 A. 280 (Md. 1925) ...................................................................................................41

*Cuyamaca Meats, Inc. v. San Diego & Imperial Cntys. Butchers' & Food Emps.'*
  *Pension Tr. Fund,*
  827 F.2d 491 (9th Cir. 1987) .....................................................................................57, 58

*D.C. Hardy Implement Co. v. S. Bend Iron Works,*
  31 S.W. 599 (Mo. 1895) ................................................................................................41

*Depasquale v. Blomquist,*
  2021 WL 1827203 (Md. Ct. Spec. App. May 7, 2021) .......................................................56

*Dierker v. Eagle Nat'l Bank,*
  888 F. Supp. 2d 645 (D. Md. 2012) ...............................................................................48

*EEOC v. Phase 2 Invs. Inc.,*
  310 F. Supp. 3d 550 (D. Md. 2018) ..............................................................................35

*EEOC v. Vucitech,*
  842 F.2d 936 (7th Cir. 1988) .........................................................................................38

*Einhorn v. M.L. Ruberton Constr. Co.,*
  632 F.3d 89 (3d Cir. 2011)..............................................................................................34

*Fall River Dyeing & Finishing Corp. v. NLRB,*
  482 U.S. 27 (1987)........................................................................................................38

*Fid. Deposit Co. of Md. v. Olney Assocs., Inc.,*
  530 A.2d 1 (Md. Ct. Spec. App. 1987) ........................................................................45, 46

*Field v. Mans,*
  516 U.S. 59 (1995).....................................................................................................50, 51

*GCIU-Emp. Ret. Fund v. Progress Printing Co.,*
  2021 WL 3912552 (C.D. Cal. May 10, 2021) ..................................................................43

*Goldstein v. Miles,*
  859 A.2d 313 (Md. Ct. Spec. App. 2004) ......................................................................50

*Greenfield v. Heckenbach,*
  797 A.2d 63 (Md. Ct. Spec. App. 2002) ......................................................................49, 55

iii

*Gross v. Sussex,*
    630 A.2d 1156 (Md. 1993) ........................................................................................51

*Grupo HGM Tecnologias Submarina, S.A. v. Energy Subsea, LLC,*
    2023 WL 242546 (11th Cir. Jan. 18, 2023) ...............................................................45

*Hauswald Bakery v. Pantry Pride Enters., Inc.,*
    553 A.2d 1308 (Md. Ct. Spec. App. 1989) ...........................................................45, 46

*Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan,*
    891 F.3d 839 (9th Cir. 2018) ........................................................................... *passim*

*I.W. Berman Props. v. Porter Bros.,*
    344 A.2d 65 (Md. 1975) ...........................................................................................45

*IUE AFL-CIO Pension Fund v. Herrmann,*
    9 F.3d 1049 (2d Cir. 1993) .......................................................................................57

*Moore v. Mohon,*
    514 S.W.2d 508 (Tex. Civ. App. 1974) ...................................................................42

*N.Y. State Teamsters Conf. Pension & Ret. Fund v. C&S Wholesale Grocers, Inc.,*
    24 F.4th 163 (2d Cir. 2022) ......................................................................................57

*Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.,*
    98 A.3d 645 (Pa. Super. Ct. 2014) ...........................................................................54

*NLRB v. Jeffries Lithograph Co.,*
    752 F.2d 459 (9th Cir. 1985) ....................................................................................36

*Nw. Adm'rs, Inc. v. N. Distrib., LLC,*
    2011 WL 252946 (W.D. Wash. Jan. 26, 2011) ........................................................43

*One-O-One Enters., Inc. v. Caruso,*
    848 F.2d 1283 (D.C. Cir. 1988) ..........................................................................50, 56

*Pac. Greyhound Lines v. Zane,*
    160 F.2d 731 (9th Cir. 1947) ....................................................................................55

*Paramount Pictures Corp. v. Johnson Broad. Inc.,*
    2006 WL 1406870 (S.D. Tex. May 19, 2006) ..........................................................54

*Price v. Highland Cmty. Bank,*
    722 F. Supp. 454 (N.D. Ill. 1989) ............................................................................48

*Pub. Serv. Comm'n of Md. v. Panda-Brandywine, L.P.,*
    825 A.2d 462 (Md. 2003) .........................................................................................41

*Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor*
  *Covering, Inc.*,
  801 F.3d 1079 (9th Cir. 2015) ................................................................ *passim*

*Rozen v. Greenberg*,
  886 A.2d 924 (Md. Ct. Spec. App. 2005) ........................................................50

*Saint Annes Dev. Co. v. Trabich*,
  2012 WL 135281 (D. Md. Jan. 13, 2012) ........................................................54

*Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*,
  22 F.3d 725 (7th Cir. 1994) ........................................................................57

*Sass v. Andrew*,
  832 A.2d 247 (Md. Ct. Spec. App. 2003) ........................................................47

*Schmidt v. Millhauser*,
  130 A.2d 572 (Md. 1957) ............................................................................49

*Seaboard Terminal & Refrigeration Co. v. Droste*,
  80 F.2d 95 (2d Cir. 1935) ............................................................................47

*Sec. Life Ins. Co. of Am. v. Meyling*,
  146 F.3d 1184 (9th Cir. 1998) ......................................................................44

*Sims v. Cordele Ice Co.*,
  46 S.E. 841 (Ga. 1904) ................................................................................42

*Skinner v. Northrop Grumman Ret. Plan B*,
  673 F.3d 1162 (9th Cir. 2012) ......................................................................40

*In re Svenhard's Swedish Bakery*,
  154 F.4th 1100 (9th Cir. 2025) ....................................................................42

*Trs. for Alaska Laborers-Constr. Indus. Health & Sec. Fund v. Ferrell*,
  812 F.2d 512 (9th Cir. 1987) ........................................................................36

*Trs. of Loc. 813 Pension Tr. Fund v. Argento Rubbish Removal, Inc.*,
  2023 WL 5961658 (E.D.N.Y. Aug. 21, 2023) ..................................................54

*Tsareff v. ManWeb Services, Inc.*,
  794 F.3d 841 (7th Cir. 2015) ............................................................33, 34, 36

*Tufts v. Poore*,
  147 A.2d 717 (Md. 1959) ............................................................................47

*Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*,
  532 U.S. 588 (2001)....................................................................................47

*White v. Shaffer,*
  99 A. 66 (Md. 1917) ........................................................................................40

*In re Yellow Corp.,*
  672 B.R. 219 (Bankr. D. Del. 2025) ...............................................................55

**Statutes**

11 U.S.C. § 108 ....................................................................................................43

29 U.S.C. § 1301 ....................................................................................................1

29 U.S.C. § 1392 ..................................................................................................57

29 U.S.C. § 1399 .....................................................................................19, 54, 55

29 U.S.C. § 1401 ..................................................................................................12

29 U.S.C. § 1405 ..................................................................................................55

**Other Authorities**

26 C.F.R. § 1.414(c)-2 ...........................................................................................1

Restatement (Second) of Contracts § 155 (1981) ...............................................40

Restatement (Second) of Contracts § 161 (1981) ...............................................49

Restatement (Second) of Contracts § 166 (1981) ...............................................40

Restatement (Second) of Contracts § 196 (1981) ...............................................55

Restatement (Second) of Contracts § 281 (1981) ..........................................44, 45

Restatement (Second) of Contracts § 380 (1981) ...............................................53

Restatement (Second) of Torts § 530 (1977) ................................................47, 48

Restatement (Second) of Torts § 540 (1977) .......................................................50

14 *Williston on Contracts* § 42:5 (4th ed.) .........................................................55

26 *Williston on Contracts* § 69:25 (4th ed.) .......................................................49

## INTRODUCTION

In this case, the Bakery and Confectionery Union and Industry International Pension Fund ("Pension Fund") asserts claims of successor liability against Defendants United States Bakery and two of its subsidiaries (collectively, "USB").[1] The record evidence easily establishes that USB is liable as a successor for the debts of Svenhard's Swedish Bakery ("SSB") under the framework established by the Ninth Circuit in *Resilient Floor Covering Pension Trust Fund Board of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079 (9th Cir. 2015), and *Heavenly Hana LLC v. Hotel Union & Hotel Industry of Hawaii Pension Plan*, 891 F.3d 839 (9th Cir. 2018).

Because the facts supporting the Pension Fund's affirmative case are almost entirely uncontested, the trial focused almost entirely on USB's affirmative defenses, all of which turn on a settlement agreement ("Settlement Agreement") that SSB convinced the Pension Fund to enter in April 2019. That Settlement Agreement allowed SSB to satisfy over $39 million in defaulted withdrawal liability under ERISA by making 240 monthly payments of $12,500, for a total of $3 million. As the overwhelming evidence at trial revealed, the Settlement Agreement itself was the product of SSB's three-year effort—undertaken on USB's advice and under its close, covert observation—to bargain down SSB's undisputed withdrawal liability. To win such a massive reduction of that undisputed liability, SSB pled poverty, threatening bankruptcy if the Pension Fund sought to enforce its ERISA rights immediately.

---

[1]  We refer to Defendants collectively as "USB" because they have admitted that they are businesses under common control that qualify as a "single employer" under ERISA. *See* Compl. ¶ 12 (Dkt. No. 1); Answer ¶ 12 (Dkt. No. 51); 29 U.S.C. § 1301(b)(1); 26 C.F.R. § 1.414(c)-2. Notice to any member of that "controlled group" is also "'notice to all members of the controlled group.'" *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan*, 891 F.3d 839, 846 (9th Cir. 2018) (quoting *Teamsters Pension Tr. Fund-Bd. of Trs. v. Allyn Transp. Co.*, 832 F.2d 502, 507 (9th Cir. 1987)).

When USB first began acquiring SSB's assets, it knew that SSB would trigger withdrawal liability when moving its operations with USB's assistance to Exeter, done in pursuit of millions in reduced costs, savings that convinced USB to buy SSB's business in the first place. Critically, however, USB also knew that this liability would become due *before* USB planned to take over SSB's business—gaining for itself the benefit of those anticipated savings, as well as any reduction in withdrawal liability that SSB persuaded the Pension Fund to accept. It is thus unsurprising that, as the trial demonstrated, USB closely monitored SSB's gambit to convince the Pension Fund to settle SSB's withdrawal liability for pennies on the dollar by falsely leading the Pension Fund to believe that such a settlement would permit SSB to remain in operation.

The evidence at trial also established that the parties to the Settlement Agreement—as well as USB—understood that this Agreement did not immediately extinguish SSB's ERISA debts to the Pension Fund, but rather *suspended* those obligations until SSB fully performed its contractual obligations to make 240 payments. Likewise, all parties—including, again, USB— understood that SSB's original ERISA debts would snap back if SSB defaulted on those contractual obligations. And after USB took over SSB's business and deprived SSB of any ability to pay its obligations, SSB did exactly that, defaulting almost immediately on its Settlement Agreement payments. That inevitable default reinstated SSB's ERISA liabilities and thus precipitated this case.

Ironically, USB never took advantage of its ample opportunities to ensure that SSB continued making payments under the Settlement Agreement that SSB extracted, under USB's watchful eye, from the Pension Fund on the basis of SSB's misrepresentations. The result is that USB is now responsible as SSB's successor for the full amount of the defaulted withdrawal liability. A more fair and equitable result can hardly be imagined.

**SUMMARY OF TRIAL TESTIMONY AND DOCUMENTARY EVIDENCE**

I.      **USB history and acquisition of SSB's assets**

A.      USB is a privately held corporation that produces and sells baked goods. Joint Stipulations ("Stip.") ¶ 9 (Dkt. No. 164). For decades, USB was dominated by Murrey R. ("Bob") Albers. Albers owns about 12% of the company; was USB's Chief Executive Officer from 1986 until 2024; continues to serve as the Chairman of its Board; and has long controlled a voting trust that holds all of USB's voting stock, permitting him to select USB's Directors who, in turn, must approve its acquisitions. Stip. ¶¶ 11-12; Tr. 52:16-53:1, 53:2-24 (Albers); Tr. 752:20-24 (Petitt).[2] With that control, Albers guided USB's most important decisions, including acquisitions. Tr. 752:4-21 (Petitt); Tr. 800:22-801:8 (Boness).

Under Albers's watch, USB pursued growth as a strategic imperative necessary to protect its position in a competitive market. Tr. 68:13-69:6 (Albers); Tr. 262:25-263:24 (Marc Albers); *see also* Tr. 803:12-22 (Boness) ("if you're not growing, you're dying" was USB's motto). USB pursued that strategy successfully, growing from annual revenues under $10 million in 1975 to nearly $1 billion in 2023 and expanding from manufacturing and selling only bread to also producing buns, pastries, and other items, manufactured at over a dozen facilities and distributed to customers across the country. Tr. 57:21-60:1 (Albers). The bulk of USB's growth derived from acquiring other baking companies via asset purchases by which USB immediately

---

[2] Although Albers claimed never to have voted the shares held in that voting trust, all three of USB's other stockholders, whose testimony was offered at trial, agreed that they have never voted their shares. Tr. 111:22-112:2 (Albers); 272:3-23 (Marc Albers); 754:23-755:19 (Petitt); 801:22-802:7 (Boness). Likewise, Albers claimed that USB's shareholders also must vote to approve its acquisitions. Tr. 111:14-21. Another USB shareholder contradicted that testimony, too. Tr. 802:8-11 (Boness).

incorporated the acquired business into USB's operations. Tr. 65:19-66:4 (Albers); Tr. 803:1-11,
804:15-805:11 (Boness).

**B.**      SSB was a pastry manufacturer that contributed to the Pension Fund on behalf of
employees at its facility in Oakland, California ("Oakland Facility"), represented by a Bakery
union local. Stip. ¶¶ 1, 25. In 2014, SSB was in such poor financial condition that it was
considering bankruptcy or selling its business. Tr. 586:19-587:22 (Kunkel). In March 2014, its
Chief Operation Officer, David Kunkel, called Albers to offer to sell SSB, informing him that
SSB was severely short on cash and was being cut off by its suppliers. Tr. 83:20-84:21 (Albers);
Tr. 534:20-535:22 (Kunkel). USB had never produced much pastry, so buying SSB would permit
USB to enter the pastry market with a high-quality product. *See* Tr. 58:14-21, 68:20-69:6,
82:7-15 (Albers). Based on its initial review, however, USB determined that SSB was in such
bad financial shape—and its Oakland Facility so antiquated—that it made little sense to buy the
company. Tr. 90:9-17, 104:18-22 (Albers); Tr. 815:22-816:14 (Boness). USB's interest in
acquiring SSB piqued, however, upon learning of SSB's plans to slash costs by moving
production from Oakland to its facility in Exeter, California ("Exeter Facility"), where SSB's
estimated labor costs would be 58% lower, generating savings that USB believed would amount
to $5 million per year. Tr. 105:7-17, 90:20-91:18 (Albers); Exs. 1, 2, at USB_117312. Albers
anticipated that those expected savings—in addition to $1.3 million per year in "synergies" from
moving to Exeter—were more than enough to overcome SSB's annual losses, which he
estimated at $1-3 million. Tr. 102:17-21, 105:18-23, 116:24-117:10 (Albers). Albers thus
expected that move to enable profits of up to $5 million per year.

That move to Exeter would come at some cost, however. USB understood that SSB
required two years to move its operations from the unprofitable Oakland Facility, delaying any

savings and extending SSB's losses. Ex. 2, at USB_117312; Tr. 127:19-128:8 (Albers). More

significantly, USB understood that "[t]he path that Svenhard's is on in closing the Oakland plant

with its Baker's union employees and staffing up the Exeter facility over the next two years with

Teamsters employees . . . will result in withdrawal liability to the Baker's union. The amount of

that liability is likely to be significant." Ex. 2, at USB_117312; *see also, e.g.*, Tr. 105:24-106:2

(Albers). USB had identified that anticipated withdrawal liability when it first began

investigating SSB's finances in March 2014, explaining to SSB's seemingly ignorant leadership

how to estimate its withdrawal liability. Tr. 94:20-95:8 (Albers); Tr. 558:11-17, 653:2-654:13

(Kunkel); Tr. 818:12-25, 819:1-8, 820:22-821:3 (Boness). Using limited data, USB estimated

that SSB's withdrawal liability might amount to $27 million or $30 million. Tr. 97:4-12,

119:16-24 (Albers); Tr. 819:17-22 (Boness); Tr. 904:11-23 (Petitt). Because USB understood

that such a liability could be paid off over 20 years, it believed that the cost-savings SSB

generated via its move would be more than enough to pay off that liability. Tr. 119:3-24

(Albers).

  USB thus devised a plan to reap the benefits of SSB's business—including SSB's

valuable brand and the profits USB expected the business to achieve in Exeter—without

becoming responsible for SSB's anticipated withdrawal liability. As Albers explained to USB's

Board, he sought to "end up in the future owning [SSB] outright, without ensuing any of their

financial issues." Ex. 1.

  In 2014, USB must have known that it could insulate itself from SSB's ERISA liabilities

if it purchased SSB's assets out of bankruptcy. USB had done exactly that in 2013, when it

purchased assets out of the Hostess bankruptcy, obtaining a court order immunizing itself from

Hostess's ERISA liabilities, even on a successorship theory. Stip. ¶¶ 145, 153; Ex. 65, at 14-15

(¶ 14); Tr. 79:16-22 (Albers). To purchase those assets, however, USB was forced to compete in a stalking-horse auction, which required USB to pay more than its initial bid. Stip. ¶¶ 146-150; Tr. 107:7-9 (Albers). And Hostess's assets went off the market during the pendency of its bankruptcy, losing market share. Tr. 107:3-13 (Albers); Tr. 393:22-394:8 (Marc Albers). Those risks persuaded USB not to seek to purchase SSB's assets out of bankruptcy. Tr. 106:25-107:19 (Albers). Indeed, Albers instructed Kunkel *not* to file for bankruptcy when Kunkel suggested that approach in their initial conversation about purchasing SSB's business. Tr. 535:15-24 (Kunkel).

In late March 2014, Albers emailed USB's Board to explain his two-part acquisition strategy, whereby USB would "buy the Exeter plant as one transaction and the rights to the brand as another." Ex. 1. He continued:

> We are going this route so that we will not be liable for their unfunded Bakers pension amount which we think they will trigger when they close the Oakland plant and move to Exeter. The end result is that we are trying to acquire the rights to the plant and the brand so if they don't make it as a company we will take it over a day or week after they shut the place down.

*Id*.

In early April 2014, a week after sending that email, USB and SSB executed a non-binding term sheet that fleshed out the structure Albers had described to his Board. *See* Ex. 3. Pursuant to that term sheet, USB would buy SSB's intellectual property ("IP") and the Exeter Facility, then license and lease those assets back to SSB for a five-year term. *Id.* The term sheet also contemplated a potential supplemental payment for the IP pursuant to a formula, depending on SSB's profitability during the license period. *Id*. ¶ 6.[3] Under USB's plan, SSB would close its

---

[3] While the term sheet also described a new agreement for USB to distribute SSB's products on a more beneficial, cost-plus basis, Albers acknowledged that this distribution arrangement was not particularly significant to USB. Tr. 135:16-136:16 (Albers). This admission directly contradicted USB's assertion, in its witness statements, that it would proffer testimony that USB's willingness

Oakland Facility—and thereby withdraw from the Pension Fund—yet continue to operate in Exeter for about three years under license and lease agreements with USB. SSB would thus incur withdrawal liability while it remained a going concern, which Albers believed would insulate USB from responsibility for that liability when it took over SSB's operations. Tr. 148:4-11 (Albers). Other witness testimony underscored USB's goal in implementing its complex 2014 acquisition structure. Kenneth Waltos, who voted to approve the acquisition as a Director, testified that USB's Board was told that the "convoluted" deal structure was motivated by "the unfunded liability" that Svenhard's would incur. Tr. 504:12-505:12 (Waltos). And USB's former CFO, Jerry Boness, who was not involved in structuring the deal but participated in its early implementation, understood that the acquisition structure sought to limit USB's exposure to SSB's financial issues. Tr. 826:1-7 (Boness).

As soon as the term sheet was executed, the parties began to implement it, starting with USB's immediate purchase of non-exclusive rights to SSB's recipes and an option to purchase the Exeter Facility for a combined price of $500,000. Stip. ¶¶ 33, 37; Exs. 77-78. Those transactions were hurried, Albers explained, because SSB's vendors were cutting it off, threatening the continued viability of SSB's business. Tr. 129:5-19 (Albers). USB was also "trying to get the hook into them," in Albers's words, Tr. 142:3-143:5 (Albers)—perhaps out of fear that Bimbo, a larger competitor, might swoop in to buy SSB with a higher offer, Tr. 403:15-404:4 (Marc Albers).

---

to support SSB was premised on the profitability of distributing SSB's products. Defs.' Witness Statements 4 (Dkt. No. 227). USB's live witnesses ultimately offered no such testimony, which would have been inconsistent with both Albers's admission and evidence that such distribution was not particularly lucrative. *See* Tr. 136:14-16, 138:13-140:2 (Albers); Ex. 157, at USB_116928.

USB and SSB executed a purchase agreement for the transfer of SSB's IP in April 2014, Ex. 82; licensed that IP back to SSB, Ex. 90; and concurrently drafted a lease agreement they anticipated executing once USB exercised its option to purchase the Exeter Facility, Ex. 89, at Sven0002430. USB planned to exercise that option only after SSB closed the Oakland Facility and moved production to Exeter. Tr. 771:16-772:3, 879:12-16 (Petitt). The draft lease and executed license were set to expire on July 31 and August 1, 2019, respectively. Ex. 89, at Sven0002430; Ex. 89, ¶ 6.1.

In executing its strategy, USB insisted that SSB keep secret the full relationship between the companies. "[F]rom day one," Kunkel testified, Albers "had instructed" SSB personnel "to keep our transaction confidential, not to let anybody know that they were buying us." Tr. 571:6-14 (Kunkel); *see also* Tr. 662:9-17 (Kunkel). Albers's direction was reinforced by the license agreement provision prohibiting SSB from revealing to third-parties, including creditors, the relationship between SSB and USB or even the existence of the license agreement. Stip. ¶¶ 131-32; Ex. 90, ¶ 9. Kunkel believed that one reason USB demanded such secrecy was its fear that the Pension Fund might seek to hold USB responsible for SSB's anticipated withdrawal liability. Tr. 661:17-662:8 (Kunkel).

Kunkel "kept that commitment" of secrecy he made to Albers. Tr. 571:9-10 (Kunkel). When Kunkel's friend of 40 years asked repeatedly whether USB had bought SSB, Kunkel lied to him, despite feeling "horrible about it." Tr. 573:6-574:15, 663:2-664:5 (Kunkel). Likewise, when USB instructed a third-party consultant—who USB had retained to inquire about potential improvements to the Exeter Facility—to pretend that the consultant was working for SSB in inquiries to Exeter city officials, Kunkel did not object, instead expressing "[t]hanks for the heads-up" about misleading public officials. Ex. 152; Tr. 938:19-941:9, 942:22-24 (Petitt).

C.       Once USB had, in Albers's words, "g[o]t the hook" into SSB, USB set about

enabling SSB's move from Oakland to Exeter, after which USB planned to exercise its option to

purchase the Exeter Facility—a facility that USB ultimately wished to operate for itself. Tr.

771:16-772:3, 879:12-16 (Petitt).

That aid included USB financing SSB's unprofitable operations in Oakland while it

prepared to relocate. Between late 2014 and early 2016, USB provided Svenhard's associated

Partnership—which owned the Oakland and Exeter facilities and leased them to SSB, Stip.

¶ 4—with $3.5 million in loans to cover SSB's operating expenses. Ex. 124, ¶ A; Tr. 867:16-22

(Petitt). USB also provided SSB with $2.6 million for severance payments and other payroll

expenses for workers laid off when the Oakland Facility closed. Ex. 124, ¶ D; Tr. 867:23-868:22

(Petitt). USB had set no cap on the financial support it would provide. Tr. 871:16-22 (Petitt).[4] As

the lender of last resort, USB feared that, if it failed to finance SSB, then SSB might shut down,

imperiling the move to Exeter and the value of the Svenhard's brand that USB planned to

exploit. Tr. 163:10-21 (Albers); Tr. 787:21-789:5, 860:21-23, 864:7-865:13 (Petitt).

USB also directly assisted in moving SSB's production to Exeter: It paid more than $1.5

million directly to third-party vendors to physically move SSB's equipment from Oakland and

install it in Exeter, Tr. 772:8-25, 775:14-23 (Petitt); provided equipment for SSB to use in

Exeter, such as a used oven that USB valued at $1.4 million, Tr. 775:24-776:24, 777:18-778:1

(Petitt); and retained a consultant to assist SSB in obtaining regulatory permits to operate that

oven, Tr. 776:25-777:17 (Petitt). USB even gave SSB a drawing for the layout of the Exeter

---

[4] Although Albers claimed to have set such a cap, he apparently failed to communicate it to
Petitt, who again contradicted Albers's claim. *Compare* Tr. 167:11-14 (Albers), *with* Tr.
871:16-22 (Petitt).

Facility's equipment. Tr. 778:3-17 (Petitt). USB provided all this support to ensure that SSB

actually completed its move to a fully-functioning bakery in Exeter, which USB understood

would be to its benefit once it took over and which it believed would have been delayed without

its intervention. Tr. 780:14-781:10, 782:11-13 (Petitt). In addition to enabling SSB's move, USB

also contractually required SSB to complete that move. Ex. 101, at USB_004731 (¶ 2.3); *see also*

Ex. 87, at 1; Ex. 89, ¶ 4(C).

    **D.**    In December 2015, SSB closed down its facility in Oakland and, early the next

year, completed its move to Exeter. Stip. ¶ 6; Tr. 872:22-873:8 (Petitt). USB then purchased the

Exeter Facility and leased it, with its equipment, to SSB for a period expiring July 31, 2019. Ex.

129, ¶ 1.5; Ex. 130, ¶ 2.

    The price USB paid to purchase the Exeter Facility (including its land, plant, and

equipment) was set by a formula incorporated into the option agreement. Ex. 128, ¶ 2; Ex. 77,

¶ 3. That formula was not based on a formal appraisal. Tr. 155:9-13 (Albers). And the final price

was far lower than the assets' actual value. All told, in April 2016, USB paid $6,633,517 for the

Exeter Facility, its equipment, and the 40 acres of land surrounding it, and the value of the used

oven USB moved into that Facility was $1,384,091. Stip. ¶¶ 158-61. Less than four years later,

USB estimated that the value of the Exeter Facility and equipment was $26.52 million—more

than three times higher the price USB had paid, plus the value of the oven—not including the

underlying 40 acres of land. Stip. ¶¶ 162-63.

    That discount on the price of the Exeter Facility parallelled USB's acquisition of Unified

Bakery in early 2017. There, USB's purchase price reflected a discount approximately equal to

the estimated value of Unified Bakery's unfunded pension liability. Stip. ¶¶ 154-57. In that

acquisition, however, USB *expressly* assumed Unified Bakery's pension obligations. Stip. ¶ 155.

**E.**      As USB had expected since 2014, SSB triggered withdrawal liability when it shut down its Oakland Facility, laying off the workers represented by the Bakery union local on whose behalf SSB was obligated to contribute to the Pension Fund. Stip. ¶¶ 25-28. In anticipation of that liability, Albers had instructed Kunkel to inform USB immediately once the Pension Fund assessed withdrawal liability, Tr. 187:24-25, 188:6-10, 190:22-191:1 (Albers); Tr. 560:11-561:7, 676:16-23, 677:2-12 (Kunkel), which was consistent with SSB's obligation, reflected in the Exeter lease, to share its communications with the Pension Fund, Ex. 89, at Sven0002444 (¶ 10.6); Ex. 129, ¶ 10.6; Ex. 4 (RFA 283-84). USB imposed that reporting obligation on SSB, Albers explained, to ensure that USB would have an opportunity to "review [any communication] to determine the legality of it" and to ensure that SSB was "not getting us into hot water." Tr. 157:17-158:1 (Albers).

Consistent with Albers's instructions, Kunkel sent USB a copy of the withdrawal-liability assessment on March 7, 2016, the same day SSB received it from the Pension Fund. Tr. 677:6-12 (Kunkel); Ex. 5. That assessment demanded payment of SSB's withdrawal liability in 240 monthly installments of $162,941 (amounting to just under $2 million per year), advised SSB of its statutory right to seek review of that assessment, and attached worksheets describing the Pension Fund's calculation of SSB's liability. Ex. 5; Ex. 22; Tr. 1002:7-1004:22 (Brock).

In the email transmitting that assessment to USB, Kunkel requested "a conference call to discuss our next move," Ex. 5, which USB's then-CFO, Michael Petitt, set up for the following day, Tr. 906:19-24 (Petitt). Albers, Kunkel, and Petitt participated in that call, which Kunkel understood as a strategy meeting on how to bargain down the withdrawal liability. Tr. 685:1-20 (Kunkel). Indeed, as early as April 2014, USB had advised Svenhard's to pursue discussions with the Pension Fund to reduce its withdrawal liability. Tr. 678:7-19 (Kunkel). USB repeated

that advice after the assessment issued. Tr. 161:4-9 (Albers); Tr. 688:10-15 (Kunkel); Tr. 907:13-18 (Petitt); Ex. 4 (RFA 24).

After that strategy meeting with USB, Kunkel drafted a letter, responding to the assessment by asserting that it would "be impossible for [SSB] to ever repay" its debt to the Pension Fund. Tr. 689:10-16 (Kunkel). Before sending that letter to the Pension Fund, he shared it with USB, seeking USB's feedback. Tr. 689:10-23 (Kunkel); Ex. 135. After a phone conversation between Petitt and another of SSB's principals, Michelle Svenhard-Barnett, Kunkel revised his letter—perhaps on Petitt's advice—to include an express request to the Pension Fund "to set up a time to discuss th[e]" withdrawal-liability assessment before sending the letter. Tr. 692:21-695:9 (Kunkel); Ex. 136.

**F.**    Thus began three years of discussions with the Pension Fund over SSB's ability to satisfy its withdrawal liability. During that time, SSB never asked the Pension Fund to review its assessment; never sought to challenge that assessment via arbitration; but never made a single payment, even after receiving from the Pension Fund a reminder of SSB's rights and notice that SSB was in default and risked acceleration of the withdrawal liability if it failed to cure within 60 days. Stip. ¶¶ 127-30; Exs. 23-25; *see also* Tr. 1030:22-1034:17 (Brock). The consequence of SSB's failure to challenge the assessment was that the assessed withdrawal liability was "due and owing" under 29 U.S.C. § 1401(b)(1). Tr. 1004:19-22 (Brock). SSB pled poverty, however, claiming that it was unable to pay its uncontested withdrawal liability and threatening to declare bankruptcy. *See, e.g.*, Exs. 23, 28. Kunkel's "pitch for settlement," he thus explained, was to persuade the Pension Fund that permitting SSB to pay a reduced amount to satisfy its withdrawal liability "would allow [SSB] to remain in operation" and thereby "keep our company alive." Tr. 697:2-7 (Kunkel); Ex. 28.

In response, the Pension Fund requested information concerning SSB's finances. Tr. 698:21-699:5 (Kunkel). Kunkel understood that the Pension Fund's requests both sought to evaluate SSB's ability to pay and to identify third parties that might be responsible for its withdrawal liability. Tr. 700:10-701:4, 707:13-25 (Kunkel). Kunkel was concerned in particular that SSB's relationship with USB might make USB itself responsible for SSB's ERISA debts or, at the very least, that the Pension Fund might seek payment from USB. Tr. 708:16-21, 713:3-10 (Kunkel). USB, he believed, shared the concern that it might be obligated to pay SSB's withdrawal liability. Tr. 678:25-679:3, 708:22-24 (Kunkel). In Kunkel's view, USB was thus "depending" on him to "resolve" the outstanding withdrawal liability to USB's benefit. Tr. 678:2-24 (Kunkel).

USB, for its part, monitored SSB's ongoing discussions with the Pension Fund, Tr. 908:4-6 (Petitt), facilitated by Kunkel's compliance with Albers's directive to share with USB all SSB's written communications with the Pension Fund, Tr. 690:22-691:1 (Kunkel).[5] Whenever the Pension Fund posed a question, Kunkel testified, he would "discuss it" with USB. Tr. 702:13-25 (Kunkel); *see also, e.g.*, Tr. 709:18-710:17, 718:7-12 (Kunkel); Tr. 907:23-908:3 (Petitt). When USB had not received an update on those discussions for some time, Petitt asked for one. Tr. 908:7-909:13 (Petitt). And Petitt kept USB's Board aware of the progress of those discussions, Tr. 909:14-17 (Petitt), as did Albers, *see* Ex. 166; Tr. 217:6-218:2 (Albers). At the same time, with respect to monitoring SSB's discussions with the Pension Fund, Albers directed SSB's leadership to "keep the emails to a minimum and have mainly phone calls instead," which

---

[5] *See, e.g.*, Tr. 689:24–691:4 (Kunkel) (SSB transmitting Ex. 135 (Pension Dep. Ex. 76) to USB); Tr. 696:1–11 (Kunkel) (SSB transmitting Ex. 143 (Defs.' Dep. Ex. 17) to USB); Tr. 713:11–25 (Kunkel) (SSB transmitting Ex. 154 (Pension Dep. Ex. 81) to USB); Exs. 156, 163, 266.

Kunkel understood was motivated by Albers's desire to minimize any paper trail concerning SSB's withdrawal liability. Ex. 6, at USB_001193; Tr. 705:25-706:15 (Kunkel). Indeed, Albers acknowledged that he would routinely destroy documents he received from SSB related to its discussions with the Pension Fund. Tr. 232:3-233:1 (Albers). He did so despite knowing that such materials are discoverable in litigation. Tr. 208:20-209:6 (Albers).

By monitoring SSB's discussions with the Pension Fund, USB knew that SSB's offer to pay a reduced amount to satisfy its withdrawal liability was premised on SSB's representation that doing so would help "to keep our company alive." Ex. 143; Tr. 696:1-11 (Kunkel) (testifying that SSB shared Ex. 143 (Defs.' Dep. Ex. 17) with USB). USB knew that the Pension Fund was seeking financial information concerning SSB, including its financial statements. Tr. 914:16-915:4 (Petitt); Exs. 154, 266. And USB knew that the Pension Fund was looking for third parties that might be held responsible for SSB's withdrawal liability, leading SSB to believe that the Pension Fund might seek payment from USB. Tr. 910:13-16, 910:24-911:2, 911:8-17 (Petitt); Ex. 6. Indeed, SSB forwarded to USB the Pension Fund's request for information specifically concerning its relationship with USB, Tr. 915:5-8 (Petitt); Ex. 266, and concerning potential controlled-group relationships SSB might have, which Albers forwarded to USB's general counsel, Ex. 262; Tr. 209:16-210:21 (Albers). USB, meanwhile, never authorized SSB to reveal to the Pension Fund all the contractual relationships between SSB and USB. Ex. 4 (RFA 291).

Although the trial evidence clearly demonstrated that USB monitored SSB's discussions with the Pension Fund, Albers vehemently denied doing so. According to Albers, he instructed USB personnel—including Petitt and his son, Marc Albers ("Marc")—not to confer with SSB about its discussions with the Pension Fund. Tr. 204:2-11 (Albers). And he repeatedly denied participating in calls set up to confer over those discussions or professed an inability to recall

those calls or the communications that precipitated them.[6] Both Petitt and Marc, however, denied that they were ever directed to ignore SSB's discussions with the Pension Fund. Tr. 391:3-8 (Marc Albers); Tr. 912:19-913:16 (Petitt). To the contrary, Petitt testified that Albers was just as involved as he was in monitoring those discussions, including receiving communications from SSB and participating in strategy calls. Tr. 911:23-912:18 (Petitt). And documentary evidence confirms Albers's repeated receipt of those communications, both from his own subordinates and from Kunkel, despite his desire to avoid a paper trail. *See, e.g.*, Exs. 7, 125, 126, 127, 135, 154, 156, 163. All that testimonial and documentary evidence that Albers monitored SSB's withdrawal-liability discussions with the Pension Fund makes his denials far from credible.

  **G.**  At the same time USB monitored SSB's discussions with the Pension Fund, it continued to prop up SSB's operations with financial assistance and, more importantly, by refraining from enforcing its default rights against SSB. "[F]ailure was not an option," Albers testified, "so our whole program was what do we need to do to keep it running until 2019." Tr. 175:10-14 (Albers); *see also* Tr. 174:1-5 (Albers). We recite here just a portion of that evidence.

  After SSB's move to Exeter, USB rescued SSB from the consequences of its default on a $3.5 million loan—secured by liens on the Exeter Facility—to Bay Commercial Bank, which gave up its liens and entered into a forbearance agreement with SSB on the basis of USB's execution of a $3.9 million letter of credit in favor of the Bank. Tr. 874:6-875:8 (Petitt); *see also* Ex. 124, ¶¶ F, 3, 5. The terms on which USB provided that letter of credit, as well as its outstanding loans, were governed by an Amended and Restated Loan Agreement and accompanying promissory note, which made both SSB and the Svenhard's Partnership directly

---

[6] Tr. 189:18-23, 191:2-20, 193:19-22, 199:11-25, 204:19-205:4, 209:7-15, 210:24-211:9, 211:11-212:9, 214:18-20, 219:15-22 (Albers).

liable for those debts. Ex. 124, ¶¶ A, 1. Making SSB responsible for debts that had originally

been incurred by the Partnership made sense given that USB believed that the Partnership "will

be going away once all assets are sold to us," as Petitt explained in an email. Ex. 121. Once the

Exeter Facility was sold, USB's leadership understood that the Partnership "would not have any

reason to be around," having sold its final asset, Tr. 428:23-429:16 (Marc Albers). The Restated

Loan Agreement thus ensured that an operating entity, SSB, would be responsible for debts

formally incurred, in the first instance, by the Partnership.

Under that Restated Loan Agreement, SSB and its Partnership agreed to certain

obligations, including repaying the loan on a set schedule; refinancing the outstanding debt to the

Bank by May 21, 2017; and satisfying certain financial performance metrics, including a 1:1

ratio of current assets to current liabilities. Ex. 124, ¶¶ 5, 6.2-6.8, 10; Tr. 876:5-878:9 (Petitt).

Failure to satisfy those obligations constituted default. Ex. 124, ¶ 7; Tr. 876:5-878:9 (Petitt). But

they did not satisfy those obligations. *See* Stip. ¶¶ 164-67; Ex. 147, ¶¶ 3-4; Tr. 878:13-24,

891:16-893:9 (Petitt).

Notwithstanding these defaults, USB refrained from enforcing its contractual right while

it waited for SSB to resolve its withdrawal liability with the Pension Fund. *See generally* Tr.

879:17-880:2 (Petitt). To be sure, both USB and SSB acknowledged that SSB's serial defaults

permitted USB to terminate SSB's license and lease agreements and to accelerate USB's

takeover of SSB's operations. Tr. 172:10-16, 173:17-23 (Albers); Tr. 671:7-14 (Kunkel). But

USB did not do so while SSB's discussions with the Pension Fund were ongoing. In response to

the Court's questions, Petitt acknowledged USB's belief that, if SSB resolved its outstanding

withdrawal liability via settlement, then USB might not be a successor to that debt. Tr. 880:3-7

(Petitt). Although USB recognized that its plan to maintain SSB's "same essential[] operations"

after the takeover generated a risk of successorship, it believed that an agreement between SSB and the Pension Fund would "have been beneficial" in avoiding that risk, as Petitt acknowledged in response to the Court's questions. Tr. 880:12-881:1 (Petitt).

But rather than hold SSB to its defaults and immediately take over its business in 2017 or 2018, USB resolved to keep SSB open by continuing to finance its operations. Tr. 171:22-172:3, 174:17-175:14 (Albers). After SSB defaulted on its own forbearance agreement, USB helped it to refinance with USB's preferred bank, Bank of America, supported by USB's now-unlimited guarantee, because SSB had no remaining assets to use as collateral. Tr. 170:19-171:17 (Albers); Tr. 892:4-13, 893:10-894:5 (Petitt); Ex. 159, ¶ 1. Then, in 2019, USB directly supported SSB by "prepaying" for $3,350,000 worth of pastries that USB planned to purchase later from SSB for its own distribution—essentially an interest-free loan. Tr. 930:21-932:6; 933:20-24, 934:18-935:7 (Petitt).

USB's support included episodes of deliberate dishonesty. For example, when USB guaranteed SSB's refinancing with Bank of America, it required SSB to execute a guaranty reimbursement agreement that USB knew contained the lie that SSB "represent[ed] and warrant[ed] that it is solvent." Ex. 160, ¶ 3. Petitt, who signed that agreement, understood that SSB was actually *in*solvent, Tr. 897:19-21 (Petitt), as did SSB itself, Tr. 666:15-18, 670:24-671:6 (Kunkel). Petitt also described USB's ongoing forbearance to SSB's auditors, which he understood would lead to the removal of a "going-concern" note from financial statements being circulated to SSB's creditors, including the Pension Fund. SSB's auditors had long applied a going-concern note to its annual financial statements, expressing "substantial doubt about [SSB's] ability to continue." Ex. 67, at 3, 18; Ex. 217, at 3, 16; Ex. 218, at 3, 16. In the spring of 2017—as SSB was seeking to refinance its debt and as the maturity date on USB's

loan to SSB was coming up—SSB's President reached out to Petitt, describing problems that the going-concern note generated for SSB's relationships with banks and suppliers. Tr. 890:3-25, 891:1-5 (Petitt). In response, Petitt spoke with SSB's auditors, telling them that USB had no intention to call its loan. Tr. 889:3-22, 891:1-11 (Petitt). In light of that statement, Petitt understood that the auditor would remove the going-concern note from SSB's 2016 financial statement, which is precisely what happened. Tr. 889:23-890:2, 891:12-15 (Petitt); Ex. 219.

In October 2018, SSB again asked Petitt to reach out to its auditors for the same reason. Tr. 900:14-901:6 (Petitt). And Petitt again told SSB's auditors that USB would continue to guarantee SSB's line of credit and had no intent to collect its debt within the next 12 months. Ex. 165; Tr. 902:10-25 (Petitt). But he did not reveal that SSB's license and lease agreements would expire in less than a year, after which USB planned to take over SSB's business.[7] SSB's auditor thus did not add a going-concern note to the 2017 financial statements issued on October 30, 2018. *See* Ex. 220.

## II.    SSB's Settlement Agreement with the Pension Fund

**A.**    While SSB and USB were engaged in the behind-the-scenes maneuvers described above, the Pension Fund proceeded according to its standard procedures for collecting withdrawal liability. This evidence was introduced through the testimony of Steve Brock, Manager of the Pension Fund's Administrative Services Department since 2004. Tr. 947:4-948:21, 955:22-956:8 (Brock).

When the Pension Fund assessed SSB's withdrawal liability on March 1, 2016, it used its standard template letter. Ex. 22; Tr. 1000:1-11 (Brock). That assessment letter identified SSB's

---

[7] Although Petitt purported to limit his answers to "the time frame of the 2017 year-end," the content of his communication extended beyond that limitation, including the fact that SSB's line of credit would be up for renewal "again in July 2019." Ex. 165.

withdrawal liability as $50,150,043. Ex. 22. But the Pension Fund never demanded that SSB pay

that amount, as Brock testified. Tr. 1001:7-1002:6 (Brock). Instead, that letter required SSB to

pay its withdrawal liability in 240 monthly installments of $162,941, consistent with the Pension

Fund's understanding of SSB's obligation under ERISA. Ex. 22; Tr. 1001:22-1002:6,

1158:23-1160:4 (Brock). As noted, SSB never challenged its withdrawal-liability assessment,

even after Brock reminded SSB of its right to do so. Ex. 24; Tr. 1030:22-1034:9 (Brock); Stip.

¶¶ 127-28; *supra* at 12. Because SSB also failed to make its required monthly payments, Stip.

¶ 129, the Pension Fund issued a default notice to SSB—again, using a template Brock has used

throughout his career, Ex. 25; Tr. 1005:12-1006:5, 1007:12-16, 1034:10-17, 1175:7-9 (Brock).

Consistent with ERISA, 29 U.S.C. § 1399(c)(5), that notice allowed SSB to cure its default

within 60 days or else risk owing the "entire amount" immediately. Ex. 25; Tr. 1005:23-1007:16

(Brock).

Brock testified without contradiction that the Pension Fund understood that the "entire

amount" referenced in the default notice is the sum total of the stream of monthly payments set

out in the initial withdrawal-liability assessment. Tr. 1007:17-1008:20 (Brock). In SSB's case,

the "entire amount" owed was approximately $39 million, calculated by totaling 240 monthly

payments of $162,941 with no present-value discount. Tr. 1007:17-1008:20, 1011:5-8 (Brock).

The undisputed testimony confirmed that the Pension Fund has previously sued other defaulting

employers on the same basis, demanding the full amount of the assessed monthly payments with

no present-value discount. Tr. 1009:14-22 (Brock).

In light of SSB's threat to file for bankruptcy, however, the Pension Fund considered

SSB's proposal to resolve its withdrawal liability with "a settlement amount of $3,000,000.00

payable at $12,500.00 per month for 240 months." Ex. 28. This was an offer Kunkel claimed was

necessary to "keep our company alive," Ex. 28—a claim that Brock understood to "indicate that

they [SSB] were going to operate for many years" for the obvious reason that SSB "would have

to stay in operation" to pay for 240 months, Tr. 1042:22-1043:11 (Brock). Rather than risk

SSB's bankruptcy—in which the Fund, as an unsecured creditor, might receive nothing—the

Pension Fund reviewed SSB's offer and requested financial information from SSB to evaluate

what it would be able to pay while remaining in business. Tr. 1041:20-1042:21, 1235:18-1237:14

(Brock). In doing so, the Pension Fund sought to maximize its return, consistent with its standard

practice for other financially-distressed employers. Tr. 1013:1-1017:19 (Brock).

In Brock's review of the financial information SSB provided, *see, e.g.*, Ex. 28, 29, 31,

40-42, 408, he learned that SSB was operating at a financial loss with limited assets, most of

which were pledged to other creditors, leading SSB's auditors to apply a going-concern note to

its financial statements from 2013 to 2015, Tr. 1050:5-1053:24 (Brock); Ex. 28, at

Fund_00002096, Fund_00002115; Ex. 29, at Fund_0000131_0003. The Partnership's 2015

statements offered Brock no comfort, revealing that the Partnership "didn't have much in assets"

that were not pledged to other creditors. Ex. 31, at Fund_00002378; Tr. 1058:7-1059:14 (Brock).

Indeed, a subsequent-event note indicated that the Partnership had sold the Exeter Facility and its

equipment, leaving it no valuable assets. Ex. 31, at Fund_00002378, 97; Tr. 1059:15-22 (Brock).

Consistent with those documents, Kunkel told Brock that all of SSB's and the Partnership's

assets were pledged to other creditors, and could not provide security for any potential

settlement. Ex. 34; Tr. 1066:8-22 (Brock).

The 2016 financial statements SSB provided the Pension Fund revealed a material change

in SSB's prospects. There, the auditor had removed the going-concern note, which suggested to

Brock that "[m]aybe operations are improving, and they would continue to operate." Tr.

1067:9-14 (Brock); Ex. 35. Interim financial statements for 2017 likewise revealed shrinking losses. Tr. 1082:24-1083:4 (Brock). While notes on SSB's 2016 financial statements also referenced, for the first time, an outstanding loan to USB and a forbearance agreement with a bank secured by USB's letter of credit, USB's status as a mere lender did not suggest to Brock that USB could be potentially liable for SSB's withdrawal liability. Ex. 35, at Fund_00001523_0012; Tr. 1069:2-15, 1082:6-11, 1241:1-16 (Brock). Out of concern that SSB's lenders might call their loans, however, Brock sought more information, both about USB's loan and the forbearance agreement. Ex. 44; Tr. 1078:11-1079:4 (Brock). Although Kunkel did not fully answer that question—omitting information concerning USB—SSB did not appear to have lost its financing. Ex. 45, at Sven010144; Tr. 1081:6-1082:5 (Brock).

By late 2017, the Pension Fund had resigned itself to entertaining a settlement, rather than pushing SSB into bankruptcy and risking receiving little or nothing. Tr. 1076:7-13 (Brock). After SSB's repeated delays in scheduling a call, the parties finally spoke in late September 2018. Ex. 49; Tr. 1084:15-1085:1 (Brock). Brock's notes from that call—which he testified were comprehensive—indicate that Kunkel revealed that USB had purchased the Exeter Facility, the sale of which to an unknown party had previously been disclosed only generally in SSB's financial statements. Tr. 1090:13-1091:4, 1091:16-21 (Brock); Ex. 49; Ex. 31, at Fund_002378. Because bakeries—including USB, Tr. 835:12-23 (Boness)—often operate out of leased facilities, and bakeries may sell their properties to generate cash, the transaction did not appear "unusual" to Brock. Tr. 1091:5-15, 1241:25-1242:4 (Brock). He believed that SSB could renew its lease or continue its operations in a new facility, much as it did when it moved to Exeter. Tr. 1204:19-22, 1242:5-9 (Brock).

Kunkel certainly gave Brock no reason to believe that SSB's operations would cease when its lease with USB expired. "[O]f course" the Pension Fund did not know that, Kunkel testified, agreeing that it "had no way of knowing that" fact. Tr. 721:17-722:2 (Kunkel). That was because Kunkel revealed only part of the truth about SSB's relationship with USB, withholding critical information—namely, that SSB had sold its IP to USB and was operating under a license set to expire in less than a year and, moreover, that USB planned to soon take over SSB's business. *See* Tr. 1091:16-21, 1243:21-23 (Brock). Soon after the September 2018 call, Kunkel sent Brock SSB's 2017 financial statements, which omitted any going-concern note and showed continued financial improvements, thereby reinforcing Brock's understanding that SSB would continue operating. Tr. 1094:2-17, 1094:23-1095:13 (Brock); Ex. 51. The Pension Fund was thus open to SSB's renewal of its prior settlement proposal. Ex. 54.

Crucially, throughout the protracted discussions, SSB withheld the extent of its relationship with USB, never revealing the sale of its intellectual property, Tr. 1130:15-1131:4 (Brock); never disclosing that its operations continued only because of its soon-to-expire IP license, Tr. 1131:5-12 (Brock); and never revealing that it was routinely updating USB on its discussions with the Pension Fund, Tr. 1133:10-15 (Brock). Instead, Kunkel refrained from revealing SSB's license agreement because he was "[d]irected not to" do so by USB. Tr. 687:6-22 (Kunkel). He disclosed only information that he was "authorized"—first by Svenhard-Barnett and then by USB—to provide to the Pension Fund. Tr. 711:5-712:1 (Kunkel).

**B.**    In April 2019, SSB's years-long discussions with the Pension Fund culminated in the execution of the Settlement Agreement. Under that Agreement, the Pension Fund permitted SSB to satisfy its defaulted withdrawal liability obligation by making 240 payments of $12,500. Ex. 8, ¶¶ 13-14. The same Agreement also resolved SSB's separate liability for $514,847.67 in

unpaid contributions owed on severance and vacation payouts provided to workers laid off from the Oakland Facility. To resolve that liability, SSB had to make monthly payments of $8,580.80 until the debt, plus interest, was amortized, a payment schedule that would run roughly seven years. Ex. 8, ¶¶ 11-12; Tr. 1114:25-1115:7 (Brock).

The recitals of that Settlement Agreement included the parties' shared understanding of the underlying facts. Tr. 1146:22-1147:3 (Brock). Among other matters, those recitals stated:

- Because SSB had never contested its withdrawal-liability assessment, that liability was "due and owing as demanded by the Pension Fund."

- Because SSB had failed to cure its default after receiving notice from the Pension Fund, the "Pension Fund is therefore entitled to demand payment of the full amount of the withdrawal liability ($39,105,840) with interest."[8]

- SSB also owed the Pension Fund $514,847 in delinquent contributions owed on "severance pay and compensation for vacation pay accrued in the final year of employment."

Ex. 8, ¶¶ 4, 6-7.

Kunkel understood that the Pension Fund was entering the Settlement Agreement only because he had convinced it that reducing SSB's monthly payments was necessary to keep SSB in operation. Tr. 721:9-15 (Kunkel). As Brock explained to Kunkel, "[t]he Fund recognizes the need for Svenhard's to continue operating and has designed a Settlement Agreement that will

---

[8] USB's counsel has suggested that Brock intentionally misled SSB by referencing the full amount of unfunded vested benefits ($50,150,043) in the Pension Fund's initial assessment and subsequent default notice. *See, e.g.*, Tr. 1167:20-1168:3 (Brock). As Brock explained without contradiction, however, both notices were drawn from templates that the Pension Fund has long used with withdrawing employers, *supra* at 18-19; they were not targeted efforts to mislead SSB. Tr. 1174:21-1175:9 (Brock). More importantly, Kunkel was not misled and expressed no surprise in reviewing the near-final Agreement, which recited the parties' common understanding that SSB's full liability was $39,105,840. Tr. 1238:9-22 (Brock). Nor did SSB react by changing the proposal it had previously made. Tr. 1238:23-1239:1 (Brock).

honor the monthly cash flow you have offered." Ex. 55. This understanding was expressly incorporated into the Agreement's recitals:

> Svenhard and [its associated] Partnership have provided extensive financial information to the Pension Fund showing that they have limited assets, most of which are pledged to other creditors. The Pension Fund has analyzed that financial information and has concluded that asserting the entire claim would almost certainly cause the secured creditors to assert their rights to Svenhard's assets, leaving little or nothing for the Pension Fund. The Pension Fund has therefore concluded that it is preferable to accept a schedule of payments . . . in order to collect *a stream of payments that Svenhard is likely to be able to pay while continuing to operate its business*.

Ex. 8, ¶ 8 (emphasis added).

Brock understood this recital to codify SSB's own "statement"—namely, its expressed intention "to stay in business and pay 240 months." Tr. 1112:12-15 (Brock). SSB's intention to perform was, of course, an essential component of the Agreement, as the recital stated; had the Pension Fund known that SSB would soon be out of business, it would not have executed an Agreement that SSB "couldn't honor." Tr. 1132:15-1133:3 (Brock).

 Kunkel nonetheless knew, when SSB executed the Settlement Agreement, that SSB would soon cease operations with no ability to satisfy its Settlement Agreement obligations. By April 2019, Kunkel had known for months that USB had already begun preparing to take over the Exeter Facility. Tr. 734:17-25 (Kunkel); Tr. 925:4-7 (Petitt). Indeed, USB was coordinating with Kunkel for a trip that very month to begin formulating plans for the takeover. Tr. 924:23-925:7 (Petitt). Once the license expired and USB took over the Exeter Facility, SSB would stop operating, losing its capacity to pay its contractual obligations. Tr. 697:11-18,

735:1-10, 736:4-8 (Kunkel). After the takeover, Kunkel acknowledged, "there would be no more Svenhard's as I knew it." Tr. 736:7-8 (Kunkel).[9]

As to the Agreement's specific terms, Kunkel intended that the Pension Fund would release its ERISA claim for defaulted withdrawal liability only *after* SSB had completed its schedule of monthly payments of $12,500. Tr. 730:16-731:2 (Kunkel). "[U]ntil the payments were made," he agreed that "the [P]ension [F]und still had an ERISA claim for withdrawal liability." Tr. 731:3-12 (Kunkel). Likewise, Kunkel intended that the Pension Fund would not release its claim to delinquent contributions until SSB had satisfied that liability via separate monthly payments of $8,580. Tr. 731:14-732:12 (Kunkel); Ex. 8, ¶ 11. Kunkel intended that this release of the Pension Fund's delinquent-contribution claim would *not* release the Pension Fund's separate withdrawal-liability claim, Tr. 732:13-733:2 (Kunkel), which SSB would discharge more than a decade later under the contractual schedule.

SSB's intent aligned perfectly with the Pension Fund's. As Brock testified, he insisted on an Agreement that would "preserve our ERISA rights," such that "[i]f this agreement is defaulted, we go back to the entire amount owed for withdrawal liability for the $39 million." Tr. 1104:6-16 (Brock). And Brock sought to ensure that the Fund's ERISA withdrawal-liability claims were retained until after SSB had fully performed. Tr. 1119:5-21 (Brock). Until that time,

---

[9] Kunkel putatively believed that USB would take over those contractual payments for SSB, as he testified. Tr. 697:23-698:4, 735:11-23 (Kunkel). But Kunkel never verified that belief by discussing it with USB. Tr. 735:24-736:3 (Kunkel). That purported belief was instead an assumption that Kunkel derived from "the structure of the whole purchase." Tr. 697:23-698:7 (Kunkel). And Kunkel's *conduct* belies his asserted belief: If he genuinely anticipated that USB would take on SSB's commitments under the Settlement Agreement when it took over the business, then he would have made arrangements for USB to do so. But he never made those arrangements. Tr. 1265:18-1266:21 (Petitt). Likewise, if Kunkel actually believed that USB would take over SSB's contractual obligations, it would contradict his "pitch" for settlement—that the Pension Fund needed to slash the obligation to an amount that *SSB* could pay *and continue in business*. *Supra* at 12.

he believed, the Pension Fund's ERISA enforcement rights would "still exist." Tr. 1119:22-1120:3 (Brock).

The express terms of the Settlement Agreement reflected the parties' intentions. That Agreement obligated the Pension Fund to execute releases of its separate claims to delinquent contributions and withdrawal liability only *after* SSB had completed specified monthly payments on a schedule of roughly 7 years and 20 years, respectively. Ex. 8, ¶¶ 11-14; Tr. 1114:25-1115:7 (Brock). And the Agreement appended a draft release for the Pension Fund's delinquent-contribution claim that emphasized, in italics, that it did "*not includ[e]* any of the obligations related to withdrawal liability," Ex. 8, at 8, which would not be discharged for another 13 years under the contractual schedule.

USB, for its part, shared most of SSB's understandings of the Settlement Agreement— except for Kunkel's belief (never expressed to the Pension Fund) that USB would be taking over SSB's obligations under that Agreement, Tr. 1269:7-20 (Petitt). As with all of its discussions with the Pension Fund, SSB had conferred with USB about the proposal that was ultimately memorialized in the Settlement Agreement. Tr. 915:9-17 (Petitt). On February 26, 2019, when the Pension Fund accepted that proposal to satisfy SSB's withdrawal liability with monthly payments of $12,500, moving the parties toward a final agreement, Kunkel immediately informed Petitt, who responded, "Really. Wow." Ex. 270; Tr. 915:21-916:6 (Petitt). And Kunkel sent a near-final draft of the Settlement Agreement to Petitt, who printed it out and walked it over to share with Albers. Ex. 7; Tr. 922:2-12 (Petitt).[10] Kunkel subsequently conferred with

---

[10] That near-final draft included the Pension Fund's counterproposal to require 360, rather than 240, monthly payments of $12,500. Ex. 7, at USB_003065. After SSB rejected that proposal, the parties reverted to SSB's original offer to make 240 such payments, as well as its request to adjust the interest rate applicable to the delinquent contributions. Tr. 1123:9-1125:8 (Brock). But

Petitt and Albers about that near-final draft. Tr. 722:3-723:1, 726:21-24 (Kunkel). In that meeting, Albers—for all his protestations that he was unwilling and uninterested in discussing SSB's communications with the Pension Fund—acknowledged directing Kunkel to "go settle." Tr. 218:16-219:13 (Albers); *see also* Tr. 723:15-725:10 (Kunkel). USB learned that SSB executed its Settlement Agreement soon thereafter. Tr. 924:8-15 (Petitt).

Based on Petitt's review of the near-final draft, he understood that the Pension Fund was willing to let SSB satisfy its withdrawal liability with lower monthly payments for the purpose of facilitating SSB's continued operations. Tr. 923:2-6 (Petitt). He understood that the Pension Fund would only release its withdrawal-liability claims after SSB had fully performed. Tr. 923:7-11 (Petitt). And he understood that the full withdrawal liability would snap back if SSB failed to perform. Tr. 923:23-924:2 (Petitt).

Petitt also understood that SSB—and its associated Partnership—would be unable to perform those obligations after USB took over SSB's business. He had long known that they had no assets, which was part of why they were unable to refinance SSB's debt without USB's guarantee. *See supra* at 15-17. And he understood that, after the license and lease agreements expired, SSB would be unable to remain in operation to fund its contractual obligation to the Pension Fund. Tr. 925:8-21 (Petitt). Neither Petitt nor Albers could explain how SSB would satisfy its obligations to the Pension Fund after USB took over SSB's business, and neither was

---

the structure proposed in that near-final draft—including the execution of releases only after SSB fully performed its payment obligations—and the language of its recitals and releases were retained verbatim in the final version of the Settlement Agreement. Tr. 1221:24-1222:3 (Brock); *compare* Ex. 55, *with* Ex. 8.

aware of any assets that would permit SSB or the Partnership to avoid defaulting on the

Agreement. Tr. 230:3-232:1 (Albers); Tr. 925:12-926:2; 925:22-926:2 (Petitt).[11]

## III.     USB's takeover of SSB's business

After USB learned of SSB's near-final agreement with the Pension Fund, it began

planning the details of taking over the Exeter Facility, with USB's management team making a

special trip to Exeter for that purpose in April 2019. Tr. 184:20-185:11 (Albers); Tr. 924:13-25

(Petitt). And USB made those plans with full knowledge of the risk that it might be deemed a

successor to SSB's liabilities. Tr. 880:12-21, 882:5-7 (Petitt). By at least April 2019, USB had

engaged separate outside counsel and knew of *Resilient Floor*—the leading Ninth Circuit case

describing the federal successorship doctrine applicable to withdrawal liability—which was

forwarded to USB in that month. Tr. 882:8-10, 883:16-884:23 (Petitt); Ex. 184, at 5. About a

week later, that same outside counsel sent an email to Petitt and Albers with the subject line,

"Memo Regarding Withdrawal Liability and Labor Risk." Ex. 184, at 6; Tr. 885:15-886:14

(Petitt). Attached to that email was a document entitled "Memo Regarding Taking Over

Operations at Exeter Facility." Ex. 184, at 6. Petitt, in turn, forwarded that memorandum to Todd

Cornwell—then USB's Co-President of Operations—because Cornwell was becoming more

involved in the business operated out of the Exeter Facility. Tr. 886:18-887:4 (Petitt). Whatever

those communications might have contained, they did not provide any information that was new

to USB, presumably because USB had long been aware of the risk of successorship liability. Tr.

888:11-17 (Petitt).

---

[11] USB had no basis to believe that the Svenhard family would be personally liable under the
Settlement Agreement, which referenced no such personal liability. *See* Exs. 7-8. Although some
members of the family were limited partners in the associated Partnership, Ex. 408, at 23-31,
limited partners are not personally liable for their partnership's debt, a fact that Petitt, as a
sophisticated certified public accountant, would have known.

USB ultimately took over SSB's business on November 4, 2019, following a series of short-term extensions of the license and lease agreements. Stip. ¶¶ 46-48. When USB took over, it *intended* to continue all the core elements of SSB's business: It deliberately sought to continue making SSB's pastries with no change in taste; to continue selling those pastries to customers who USB believed were devoted to the Svenhard's brand; and to continue marketing those products with that same brand. Stip. ¶¶ 49, 72, 74, 90, 97. USB intended to do those things by using the Exeter Facility, its equipment, and its employees, whose knowledge of SSB's products USB wished to retain. Stip. ¶¶ 53-54; Tr. 879:12-16 (Petitt). USB succeeded in achieving these objectives; indeed, it continued SSB's operations with virtually no changes in the first year after the takeover, retaining even much of SSB's basic business infrastructure. *See* Stip. ¶¶ 49-119. USB emphasized that continuity to SSB's customers. Its new operation's website stated:

> Our Svenhard's® pastries are crafted with the traditional old world recipes dating back to their Swedish origins from the end of the 19th century. Our bakers are dedicated to preserving the time honored quality and taste you have come to expect from Svenhard's® pastry for over 60 years.

Stip. ¶ 100.

SSB, for its part, defaulted on its first payment due to the Pension Fund after USB took over its business, Stip. ¶ 141, as USB must have expected, *supra* at 27-28. As the Settlement Agreement required, the Pension Fund informed SSB of that default by sending notice to the Exeter Facility, now being operated by USB, unbeknownst to the Fund. Stip. ¶ 142; Ex. 8, ¶ 16; Exs. 59-60. SSB, in turn, filed for bankruptcy on December 19, 2019—a single day before expiration of the cure period specified in the Agreement. Stip. ¶ 144; Ex. 8, ¶ 16. USB tracked the ensuing bankruptcy proceedings, including a declaration filed on January 21, 2020, explaining that SSB's default on the Settlement Agreement had precipitated its bankruptcy

petition. Tr. 926:5-21, 928:22-929:5, 1275:5-7 (Petitt); Ex. 249, ¶ 6. After learning of that

default, USB made no attempt to cure it. Tr. 1275:13-16 (Petitt).

Meanwhile, the Pension Fund filed its proof of claim in the bankruptcy proceedings and

initiated this lawsuit, asserting claims under ERISA. Ex. 61; Compl. (Dkt. No. 1).

## DISCUSSION

Under federal common law, successors can be held responsible for the ERISA liabilities

of their predecessors where (1) "there is substantial continuity in the business operations between

the predecessor and the successor" and (2) "the successor took over the business with notice of

the liability." *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor

Covering, Inc.*, 801 F.3d 1079, 1084 (9th Cir. 2015). The successor's mere *constructive* notice of

*potential* ERISA liabilities that the predecessor might later incur will satisfy that notice

requirement. *Heavenly Hana*, 891 F.3d at 847. Here, the evidence establishes that USB

deliberately continued SSB's business with full knowledge of its assessed ERISA liabilities,

giving USB substantial opportunities to protect itself from the known risks that it would become

liable as a successor. That evidence amply satisfies the federal successorship doctrine. For that

reason, USB may avoid responsibility for SSB's ERISA liabilities only by carrying its burden on

affirmative defenses arising from SSB's long-defaulted Settlement Agreement with the Pension

Fund. But USB comes nowhere close to carrying its burden on *any* of those defenses, each of

which is legally infirm and unsupported by the evidence.

I.    **USB is responsible for SSB's ERISA liabilities because it continued SSB's
operations nearly unchanged with notice of those liabilities.**

Ordinarily, "[t]he primary question in labor and employment successorship cases is

whether, under the totality of the circumstances, there is substantial continuity between the old

and new enterprise." *Resilient Floor*, 801 F.3d at 1090 (cleaned up). Here, however, USB has

effectively abandoned that issue. *Infra* at 36. Rather, USB seeks to challenge its notice of SSB's liabilities when it took over and continued SSB's business. We thus begin our discussion with notice under *Heavenly Hana*.

> **A.    USB knew of SSB's assessed ERISA liabilities when it took over SSB's business.**

**1.**    Out of "fairness to employers," federal law imposes a company's ERISA liabilities on successors only "when they took over the business with notice of the liability." *Resilient Floor*, 801 F.3d at 1092-93. As the Ninth Circuit held in *Heavenly Hana*, that standard is satisfied where the successor had constructive notice of the predecessor's potential, future withdrawal liability when it took over the business. 891 F.3d at 842. The Ninth Circuit explained that, "of the three relevant parties to successor withdrawal liability—the seller, the purchaser, and the pension plan—purchasers are in the best position to ensure withdrawal liability is accounted for during an asset sale," because purchasers have "the incentive to inquire about potential withdrawal liability in order to avoid unexpected post-transaction liabilities." *Id.* at 846-47. That constructive-notice standard, the Ninth Circuit added, also advances ERISA's purpose of "protect[ing] retirees and workers who are participants in such plans against the loss of their pensions." *Id.* at 845 (quoting legislative history).

Here, the trial established that in 2014—before purchasing any of SSB's assets—USB anticipated that SSB would incur withdrawal liability when it closed its Oakland Facility and shifted production to Exeter in pursuit of the savings that convinced USB to purchase SSB's business. To avoid that expected withdrawal liability, USB acquired SSB's business via a "convoluted" series of transactions designed to ensure, in Albers's words, "that we will not be liable for [SSB's] unfunded Bakers pension amount which we think they will trigger when they close the Oakland plant and move to Exeter." *Supra* at 6-7. After the Pension Fund assessed

withdrawal liability, SSB promptly shared the assessment with USB, as USB had required, and secretly kept USB updated on SSB's years-long effort, suggested by USB, to convince the Pension Fund to reduce that liability by pleading poverty. Indeed, SSB shared a near-final version of its Settlement Agreement with USB—and USB directed SSB to sign it. *Supra* at 26-27.

USB's actual knowledge of SSB's assessed withdrawal liability, alone, is enough to satisfy the successorship doctrine. But that knowledge also extended to USB's understanding of its own exposure as a successor if it substantially continued SSB's business: In April 2019, as USB was planning the details of taking over SSB's business, it received both a copy of *Resilient Floor* and legal advice to guide that takeover. *Supra* at 28. By comparison, in *Heavenly Hana*, the Ninth Circuit held that a successor had received fair notice of its predecessor's potential withdrawal liability even where the notice was merely "constructive" because that successor relied on incorrect legal advice and its predecessor's factual misrepresentations regarding potential liability. 891 F.3d at 848.

Here, USB previously argued that it had no notice of SSB's ERISA liabilities because it purportedly believed that SSB's Settlement Agreement with the Pension Fund extinguished those liabilities. But even if USB's legal misunderstanding of the Settlement Agreement were a defense—and it is not under *Heavenly Hana*, 891 F.3d at 848—the factual basis for that defense evaporated at trial: USB's own representative admitted that USB *knew* that the Settlement Agreement did not extinguish SSB's ERISA liabilities, which he acknowledged would snap back if SSB defaulted on its payment obligations under the Agreement. *Supra* at 27. That knowledge of SSB's potential withdrawal liability is more than enough to hold USB a successor under *Heavenly Hana*, 891 F.3d at 842, 848.

Even beyond that admission, the trial established that USB had at least constructive notice of SSB's imminent default of the Settlement Agreement after it took over SSB's business. That is so because USB understood that SSB retained *no* valuable assets, was insolvent, and could not refinance its substantial debt without USB's support. *Supra* at 15-17. When USB terminated SSB's license and lease agreements, SSB was deprived of its sole source of income, as USB also knew. *Supra* at 27-28. When asked how SSB would satisfy its obligations, under the Settlement Agreement, once USB took over SSB's business, USB's witnesses offered what they admitted was speculation that SSB's owners might make those payments out of their own personal assets. *Supra* at 27-28 & n.11. As noted at trial, however, that speculation was neither grounded in admissible evidence nor in reason; none of SSB's owners were individually party to the Agreement or general partners in the Partnership. *Supra* at 28 n.11. Whatever assets they might have squirreled away, they had no responsibility, or incentive, to make the payments required to avoid SSB's inevitable default of its Settlement Agreement.

Beyond the Ninth Circuit, courts applying the federal successorship doctrine have rejected the argument that a successor must have notice of post-purchase contingencies that might affect its predecessor's liability. In *Tsareff v. ManWeb Services, Inc.*, the Seventh Circuit reversed the district court's determination that a purchaser lacked notice where it did not know, until after the purchase, that its predecessor would waive what the district court credited as a valid defense to its assessed withdrawal liability. 794 F.3d 841, 849 (7th Cir. 2015). Requiring notice of post-purchase contingencies that might affect a defense to withdrawal liability, the Seventh Circuit explained, "does not find support in the policies underlying the imposition of successor liability," which require only providing the successor with "an opportunity to protect itself" from the predecessor's withdrawal liability when structuring its purchase and takeover. *Id.*

In this regard, the successorship doctrine recognizes that a purchaser with notice of its predecessor's liabilities can seek to "shield itself [from those liabilities] during negotiations" to purchase the predecessor, *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 96 (3d Cir. 2011), by bargaining for a reduced purchase price, among other possible protections, *see, e.g.*, *Heavenly Hana*, 891 F.3d at 846.

     2.      Here, USB had ample "opportunity to protect itself" from SSB's withdrawal liability, *Tsareff*, 794 F.3d at 849, which is all that the successorship doctrine's notice requirement seeks to safeguard. Indeed, USB *acted* on that opportunity, developing an acquisition strategy to account for SSB's anticipated liabilities. That strategy began by *deliberately* avoiding the known protections of purchasing SSB's assets via bankruptcy, which USB had used only the year before it began its slow-motion takeover of SSB. In that prior acquisition, USB had bought certain Hostess assets out of bankruptcy—obtaining a court order that expressly relieved USB of successor liability for Hostess's substantial withdrawal liability. When USB structured its purchase of SSB, however, it elected to avoid the costs of bankruptcy proceedings—which included competing on price and the risk of SSB discontinuing its operations—and instead sought a turnkey operation at a bargain price. *Supra* at 5-6. With that considered choice came the risk of losing the known protections of a bankruptcy court order.

        USB may well have won the bargain it sought. After all, it purchased the Exeter Facility and equipment for less than a third of the mere replacement value of those depreciating assets, according to USB's own estimate less than four years later. *Supra* at 10. That estimate is all the more remarkable because it excluded the value of the 40 acres of land that Defendants had purchased from SSB. Any such bargain would make USB's purchase of SSB's assets similar to its acquisition of Unified Bakery, *supra* at 10, consistent with the approach contemplated by

some courts, which theorize that a responsible purchaser with notice of the predecessor's liabilities will protect itself by purchasing at a discount, *see, e.g.*, *Heavenly Hana*, 891 F.3d at 846.

When USB decided to avoid bankruptcy in pursuit of a bargain, Albers also believed that the cost savings he expected SSB to achieve in Exeter would be enough to offset the withdrawal liability that USB knew that move would trigger. *Supra* at 5. When planning USB's acquisition of SSB, Albers expected the move to Exeter to generate annual cost savings of up to $6.3 million per year. *See supra* at 4. Those savings would be more than enough to cover both Albers's estimates of SSB's annual losses *and* its assessed withdrawal liability. *Supra* at 4-5. SSB may not have achieved those savings, Albers testified, "but I knew that we could." Tr. 120:19-121:4 (Albers). Perhaps Albers was wrong. But such a miscalculation would not relieve USB of risks that it knowingly assumed in reaping the benefits of operating SSB as a continuing enterprise.

Indeed, federal law is clear that a successor will be held responsible for its predecessor's known debts even if it failed to protect itself adequately. Where a successor "may not have used [its] notice to negotiate lower prices" from its predecessor, the Ninth Circuit long ago observed, that notice still permitted the successor to "consider . . . shap[ing] its [business] practices to avoid any potential problems." *Bates v. Pac. Mar. Ass'n*, 744 F.2d 705, 710 (9th Cir. 1984), *cited in Resilient Floor*, 801 F.3d at 1093. Failure to do so may be bad business, but whether the purchaser made a bad business decision is "immaterial" where it had "the opportunity" to protect itself "and the sophistication to uncover the possible need to do so." *EEOC v. Phase 2 Invs. Inc.*, 310 F. Supp. 3d 550, 571 & n.11 (D. Md. 2018) (reasoning that the successor's failed efforts to protect itself "actually demonstrate the fairness of holding [it] liable as a successor"). Indeed, "[s]hielding a successor employer from liability when the company had knowledge of the

potential liability and still had" the power to protect itself "runs counter to the

policies underlying the doctrine of successor liability." *Tsareff*, 794 F.3d at 849.

In short, USB had more than fair notice of SSB's ERISA liabilities when it took over

SSB's business and, as we show below, *deliberately* continued that business in every material

way.

### B.    USB deliberately continued SSB's business nearly unchanged.

As noted, the "primary question" in ERISA successor liability cases is usually whether

"there is substantial continuity between the old and new enterprise." *Resilient Floor*, 801 F.3d at

1090 (cleaned up). Here, that "primary question" is easily answered: USB has *stipulated* to facts

establishing that, for at least a year after taking over SSB's business, USB continued to sell to the

same customers the same pastries produced at the same facility using the same equipment and

most of the same employees, supervisors, suppliers, and business infrastructure as SSB, while

marketing those products with similar branding. Stip. ¶¶ 49-119.[12] Indeed, in USB's opening

statement, it acknowledged as much. Tr. 39:5-8 (USB's Counsel) ("Did [USB] take over

operations in a way that showed substantial continuity between the operations immediately

before it took over on November 4th of 2019 and after? Probably so.").

Still, USB insists that it would be unfair to hold it responsible for SSB's ERISA liabilities

because "Svenhard's customer base could only support payment of a fraction of Svenhard's

statutory liability." Defs.' Trial Br. 13 (Dkt. No. 175). USB purports to root that argument in "the

logic of *Resilient Floor*," which emphasized that "one of the most important factors in

---

[12] Courts have found substantial continuity on far less robust showings. *See, e.g.*, *Trs. for Alaska Laborers-Constr. Indus. Health & Sec. Fund v. Ferrell*, 812 F.2d 512, 516 (9th Cir. 1987); *NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 463-66 (9th Cir. 1985); Pl.'s Mot. Summ. J. 20-23 (Dkt. No. 116) (collecting additional authorities).

determining substantial continuity is whether the successor is able to take advantage of an inherited customer base." *Id.*

That argument badly misunderstands *Resilient Floor*, as we have previously explained. *See* Pl.'s Summ. J. Resp. Br. 46-47 (Dkt. No. 131). Most obviously, *Resilient Floor* simply evaluated "whether the successor deliberately takes over basically the same body of customers" from the predecessor as a part of its substantial continuity analysis. 801 F.3d at 1095 (cleaned up).[13] Here, USB has stipulated that it not only continued SSB's business, but also did so intentionally, despite having received legal advice about the risk of successorship and despite actual knowledge of SSB's assessed withdrawal liability. *Supra* at 11, 16-17, 28-29.

"Imposing successor liability under those circumstances is fair," the Ninth Circuit explained in *Resilient Floor*, "because a successor 'well aware' of its predecessor's liability is able to consider that information before deciding to continue the predecessor's business." 801 F.3d at 1093 (quoting *Bates*, 744 F.2d at 710). Where, as here, "putative successors . . . rely on insider knowledge, similar public presentation, and deliberate continuity of business operations to corner their predecessor's market share" or otherwise "'ma[ke] a conscious decision'" to

---

[13] USB also misreads *Resilient Floor* in another way, contending that the Ninth Circuit emphasized the importance of "an inherited customer base" because it "was a source for generating revenues used to pay contributions and later withdrawal liabilities." Defs.' Trial Br. 13. But *Resilient Floor* emphasized stability of the customer base only in the context of the special ERISA rules for withdrawal liability in the *construction industry*, which relieve withdrawing employers from withdrawal liability in certain circumstances. 801 F.3d at 1089. Those rules assume that pension plans in the construction industry will enjoy a stable "base of construction projects" even as transient participating employers come and go, diminishing the importance of assessing withdrawal liability to protect the financial health of such multiemployer plans. *Id.* at 1089, 1095-96. In that context, the Ninth Circuit reasoned that it would be particularly unfair to *a pension plan* to permit a successor to poach its predecessor's customers—and their construction projects—without contributing to the plan; it was for this reason alone that *Resilient Floor* held continuity of customers particularly salient in the construction industry. *Id.* at 1095-96. Fairness to *successors*—which USB highlights in its argument—has absolutely nothing to do with the court's emphasis on continuity of customers.

continue their predecessor's business, "the equitable origins of the successor liability doctrine support the conclusion that the successor must pay withdrawal liability." *Id.* at 1096 (quoting *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41 (1987)). Letting USB escape successor liability for its deliberate continuation of SSB's business would, in the Ninth Circuit's words, permit USB to "reap[] a windfall." *Resilient Floor*, 801 F.3d at 1093. *Resilient Floor* thus reinforces the fairness of holding USB liable as SSB's successor.

At risk of overkill, we also note that USB is directly implicated in SSB's withdrawal liability in the first place, making it all the more fair to hold USB responsible for that liability. After all, USB enabled—even contractually compelled—SSB to make a move from Oakland that USB *knew* would trigger withdrawal liability, all in pursuit of cost savings that USB wished to enjoy once it took over SSB's business. *Supra* at 4-5, 9-10. Obtaining those savings, along with SSB's valuable brand, was precisely what motivated USB's purchases in the first place. Given USB's extensive involvement in that move, it has "little claim to being a stranger" to SSB's ERISA liabilities. *Bates*, 744 F.2d at 710. To put it mildly, USB is "at least somewhat implicated" in the move that generated those liabilities. *EEOC v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988). It is therefore eminently fair to hold USB responsible for the liabilities it knowingly helped to trigger.

## II.    USB's affirmative defenses premised on the Settlement Agreement fail.

As noted, SSB's Settlement Agreement with the Pension Fund contained a provision governing default: "[T]he Pension Fund may declare a default under this Agreement by sending written notice to *Svenhard*. If *Svenhard* does not cure that default within five business days after the date of that written notice, the Pension Fund may declare the unpaid debt immediately due and owing." *See* Ex. 8, ¶ 16 (emphases added). When SSB failed to make its monthly payment in

December 2019, the Pension Fund followed the terms of that provision, sending notice of default to SSB at the Exeter Facility—which was then, unbeknownst to the Pension Fund, under USB's control. *Supra* at 29-30. Because that default was not cured within the prescribed period, the Pension Fund's ERISA rights snapped back, as we show below.

USB nevertheless bases its affirmative defenses on seeking to resurrect that long-defaulted Settlement Agreement. We address each of these defenses below.

### A.     USB had no right to separate notice and an opportunity to cure SSB's default.

USB's first affirmative defense is premised on its supposed entitlement to "the same kind of notice and opportunity to cure that was given to [SSB]." Tr. 42:24-43:1 (USB's Counsel). But that entitlement finds no support in the language of the Settlement Agreement, which requires formal notice only to SSB, not to all unknown parties that might later become responsible for the defaulted liability. USB has never cited *any* legal authority supporting its asserted entitlement to its own separate notice and opportunity to cure SSB's default—not in its summary judgment papers, not in its trial memorandum, not in its argument at trial. *See* Defs.' Mot. Summ. J. 11-12, 19 n.12 (Dkt. No. 123); Defs.' Trial Mem. 17-18 (Dkt. No. 175); Tr. 1346:18-1347:14 (USB's Counsel). Although we have long pointed out that defect, *see* Pl.'s Summ. J. Resp. Br. 41-42 (Dkt. No. 131), USB has never remedied it. Instead, in response to the Court's request for legal authority, USB resorted to a broad appeal to "equity," as it had before, and "logic." Tr. 1346:25-1347:14 (USB's Counsel); Defs.' Trial Mem. 18.

As we show below, neither "equity" nor "logic" supports USB's asserted right to separate notice and opportunity to cure SSB's default.

1.     "Under general fairness considerations," as the Court has explained, "there was so much involvement by US Bakery in the terms and conditions and the details that went into the

settlement agreement behind the scenes between US Bakery and Svenhard's. If US Bakery wanted to ensure that it would receive notice of Svenhard's default, that could easily have been added to the settlement agreement" before it was finalized. Tr. 1347:19-25. Doing so, however, would have revealed to the Pension Fund that USB wanted notice because it would soon be taking over SSB's business, endangering the sharply reduced payment arrangement that SSB sought and ultimately convinced the Pension Fund to accept. For that reason, it is perhaps "understand[able] why [USB] didn't want to take the chance of adding" itself to the Agreement as a notice recipient, Tr. 1347:25-1348:1, opting instead for the secrecy required to secure an Agreement that the Pension Fund would surely have rejected if USB's true role had been revealed. But USB's demand for the Court to reform that Agreement to include a provision that USB "had an opportunity" to request but "chose not to" do so for strategic reasons is in no way equitable. Tr. 1348:10-13.

Unsurprisingly, principles of equity confirm that USB's preference for secrecy precludes reforming the Settlement Agreement's notice provision. "[R]eformation is proper only in cases of fraud and mistake." *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1166 (9th Cir. 2012). In those circumstances, "reformation is normally appropriate where the language somehow fails to express the actual intention of the parties and is conformed merely to reflect their actual intent or, where the contents have been fraudulently misrepresented by one party, to conform the contract to the terms conveyed to the defrauded party." *Broadley v. Mashpee Neck Marina, Inc.*, 471 F.3d 272, 275 (1st Cir. 2006) (citing, *e.g.*, Restatement (Second) of Contracts §§ 155, 166); *accord, e.g.*, *White v. Shaffer*, 99 A. 66, 69 (Md. 1917). Certainly, equity does not permit reforming the Agreement to add a notice provision for USB's benefit that the parties to

the Agreement never so much as contemplated, because *USB*, for its own strategic reasons, declined to propose it to them.

2.    Failing to find any case law supporting its argument, USB falls back on the "logic" of the successorship doctrine, arguing that, if it is "in essence the same entity" as SSB, then it should obtain the benefit of SSB's Agreement. Tr. 1347:8-14 (USB's Counsel). But USB already *has* received the benefit of that Agreement, which made default conditional on SSB's— not USB's—failure to cure following notice of a missed payment. If the Pension Fund had not satisfied that notice condition by failing to give *SSB* notice, then USB might be able to defend itself by asserting that the Agreement remained in effect, suspending the Pension Fund's ERISA rights. In this regard, the "logic" of the successorship doctrine is merely that USB is jointly and severally liable for SSB's ERISA debts, not that the Pension Fund owes USB its own separate notice of SSB's default.

And if more were needed, basic principles of contract law confirm the defect in USB's "logic." It is blackletter law that, where a contract is premised on the peculiar circumstances or creditworthiness of one of the contracting parties, a third party—which may enjoy very different financial resources—may "not enforce the contract" by standing in the shoes of the original party, even if the stranger receives a purported assignment of rights under the contract or is an undisputed legal successor to that party. *Crane Ice Cream Co. v. Terminal Freezing & Heating Co.*, 128 A. 280, 283-84 (Md. 1925); *see also, e.g.*, *Clayman v. Goodman Props., Inc.*, 518 F.2d 1026, 1035 & nn. 58-59 (D.C. Cir. 1973) (collecting cases).[14]

---

[14] Courts have applied that rule to contracts that extend credit or provide "discount advantages" based on creditworthiness, *D.C. Hardy Implement Co. v. S. Bend Iron Works*, 31 S.W. 599, 599-600 (Mo. 1895), or where the "choice of the person" "was an ingredient of the bargain," *Pub. Serv. Comm'n of Md. v. Panda-Brandywine, L.P.*, 825 A.2d 462, 470 & n.4 (Md. 2003)

This rule would, if necessary, apply here. The Pension Fund entered the Agreement only because of SSB's "limited assets," as the Agreement's recitals explain. Ex. 8, ¶ 8. Testimony at trial further confirmed that understanding. *Supra* at 23-24. Even without the benefit of that testimony, the Ninth Circuit recently concluded that the Pension Fund executed that Agreement "expressly because of Svenhard's poor financial condition," holding on that basis that the Agreement was a financial accommodation that could not be assumed by SSB and assigned to USB under a parallel provision of the Bankruptcy Code. *In re Svenhard's Swedish Bakery*, 154 F.4th 1100, 1105 (9th Cir. 2025). Because the Settlement Agreement "involv[ed] a highly personal element" concerning SSB's limited finances, the "substitution of another in [SSB's] stead does not legally suffice." *Clayman*, 518 F.2d at 1035.

**3.** Next, USB's argument for a separate formal notice and an opportunity to cure ignores the fact that it received *actual* notice of SSB's default, but still failed to cure. As the Court itself pointed out, Tr. 1330:14-1331:6, the Pension Fund's notice of default was *received* at the Exeter Facility after USB had taken it over, *supra* at 29; *see also supra* at 1 n.1 (notice to one member of controlled group is notice to all). Even if USB neglected to read the default notice it received—as USB's counsel has represented, Tr. 1333:15-20 (USB's Counsel)[15]—Petitt

---

(quoting *Macke Co. v. Pizza of Gaithersburg*, 270 A.2d 645, 646-47 (1970)). That rule is just as applicable where a third party seeks to enforce a contract it inherited as where it seeks to enforce a contract it was assigned. *See, e.g.*, *Moore v. Mohon*, 514 S.W.2d 508, 513 (Tex. Civ. App. 1974) ("[W]e believe the same reasons for not enforcing a contract involving extension of credit wherein the assignee of the purchaser by voluntary assignment seeks enforcement thereof, likewise apply to the situation in the case at bar, wherein the executrix of the deceased purchaser seeks enforcement of a contract involving extension of credit."); *Sims v. Cordele Ice Co.*, 46 S.E. 841, 842-43 (Ga. 1904) (a "purely personal" contract "became extinct" on the obligor's death and "did not pass to his administrators as an asset of his estate").

[15] USB declined the Court's invitation to present testimony rebutting the inference that—despite its demonstrated interest in reviewing communications between SSB and the Pension Fund—it never opened that notice. Instead, it offered the designated deposition testimony of a single

acknowledged that USB had actual notice of that default by at least January 21, 2020, when it received Kunkel's declaration stating that SSB's bankruptcy "was immediately precipitated by the Debtor's default on a settlement agreement with its former union on account of pension liability." Ex. 249, ¶ 6; *supra* at 29-30.

Importantly, when USB received that declaration in January 2020, SSB's deadline to cure its default had not yet run. Because SSB filed its bankruptcy petition one day before the expiration of the Agreement's five-day cure period, the Bankruptcy Code extended that cure period a further 60 days to February 18, 2020. 11 U.S.C. § 108(b). Despite *actual* knowledge of SSB's default with roughly a month left to cure, USB—a sophisticated party represented by experienced counsel—sat on its hands. *Supra* at 30.

USB refused to act on its knowledge of SSB's default even after it received notice via the Pension Fund's Complaint in this case. If equity somehow required the Pension Fund to notify USB of SSB's default, as USB insists, then service of the Complaint would satisfy that requirement. Under ERISA, there "appears to be a uniform body of law" concluding that "the filing and service of a civil complaint constitute sufficient [statutory] notice" generally, *Nw. Adm'rs, Inc. v. N. Distrib., LLC*, 2011 WL 252946, at *2, 3 (W.D. Wash. Jan. 26, 2011) (collecting cases), and in the successorship context specifically, *GCIU-Emp. Ret. Fund v. Progress Printing Co.*, 2021 WL 3912552, at *6 (C.D. Cal. May 10, 2021). "Due to the remedial purpose of ERISA and the MPPAA, the MPPAA's notice provisions are liberally construed to protect pension plan participants." *Amalgamated Lithographers of Am. v. Unz & Co.*, 670 F. Supp. 2d 214, 224-25 (S.D.N.Y. 2009) (quotation omitted). Those same remedial purposes also

---

former employee who was *personally* unaware of the default. Defs.' Suppl. Dep. Designations (Phillips Dep. Tr. 187:25-188:8) (Dkt. No. 220). The limits of a single employee's knowledge comes nowhere close to establishing that USB *itself* was unaware of the notice it received.

inform the equities of the federal successorship doctrine, s*ee, e.g.*, *Heavenly Hana*, 891 F.3d at

845, which USB has invoked here. Yet, even after receiving formal notice via the Complaint,

USB did not seek to cure within the five days prescribed by the Agreement.

**B.     Because SSB defaulted on its obligations under the Settlement Agreement, the Pension Fund may fully enforce its ERISA rights.**

USB has previously argued that the Settlement Agreement was a "novation" that

immediately extinguished the Pension Fund's ERISA rights, including the federal successorship

doctrine set out above. But *all* the evidence at trial—including the language of the Agreement,

the intentions of its negotiators, and even USB's understanding—has conclusively established

that the Agreement is a defaulted accord that preserved the Pension Fund's ERISA rights. USB

has not, however, expressly abandoned its contention that the Agreement is a novation. In an

abundance of caution, we thus briefly rebut that lingering argument.

At common law,[16] "[a]n accord is a contract under which an obligee promises to accept a

stated performance in satisfaction of the obligor's existing duty," performance of which

"discharges the original duty." Restatement (Second) of Contracts § 281(1) (1981); *accord Clark*

*v. Elza*, 406 A.2d 922, 925-26 (Md. 1979). Where the obligor breaches the accord by failing to

perform, "the obligee may enforce either the original duty or any duty under the accord."

---

[16] The Settlement Agreement is expressly "governed by federal law to the extent applicable." Ex. 8, ¶ 18; *see also Bd. of Trs. of Hotel & Rest. Emps. Loc. 25 v. Madison Hotel, Inc.*, 97 F.3d 1479, 1485–86 (D.C. Cir. 1996) (federal law governs settlement agreement expressly permitting enforcement of ERISA rights after breach). That provision invokes the "nationally uniform federal common law" developed by courts to implement ERISA. *Sec. Life Ins. Co. of Am. v. Meyling*, 146 F.3d 1184, 1191 (9th Cir. 1998) (cleaned up). That federal common law incorporates the general principles codified in the Restatement (Second) of Contracts, among other common-law sources, absent a contrary statutory policy. *See, e.g.*, *id.* (relying on the Restatement). But the Court need not evaluate USB's continued insistence that Maryland law applies because, as shown in the text, that law mirrors federal common law in every relevant respect.

Restatement (Second) of Contracts § 281(2); *accord Hauswald Bakery v. Pantry Pride Enters., Inc.*, 553 A.2d 1308, 1311 (Md. Ct. Spec. App. 1989). The opposite of an accord is a "novation," which operates where "the parties intend[] the new agreement itself to constitute a substitute for the prior claim" and "the substituted contract immediately discharges the original claim." *Fid. Deposit Co. of Md. v. Olney Assocs., Inc.*, 530 A.2d 1, 5 (Md. Ct. Spec. App. 1987). "Under such an arrangement, since the original claim is extinguished at the time the substitute agreement is made, recovery is limited to the substituted contract." *Id.* at 5-6.

The law disfavors construing settlement agreements as novations, presuming that they are accords "unless there is *clear* evidence to the contrary." *Clark*, 406 A.2d at 926 (emphasis added); *accord Grupo HGM Tecnologias Submarina, S.A. v. Energy Subsea, LLC*, 2023 WL 242546, at *3 (11th Cir. Jan. 18, 2023) (per curiam) (federal common law applied to maritime contracts). To overcome that presumption, "the party asserting [novation] must establish *clearly* and satisfactorily that there was an intention, concurred in by all the parties, that the existing obligation be discharged by the new obligation." *I.W. Berman Props. v. Porter Bros.*, 344 A.2d 65, 70 (Md. 1975) (emphasis added).

Here, the language and structure of the Settlement Agreement establish that it was intended to be an accord. Under its terms, the Pension Fund did not release its ERISA claims upon execution; rather, the Settlement Agreement's release provisions make clear that the Pension Fund would not release its ERISA claims until *after* SSB *fully* performed its reduced payments over 20 years. Ex. 8, ¶¶ 12, 14. Likewise, the language of the first of the two releases appended to the Agreement—the release pertaining to SSB's delinquent contributions, which it would obtain after about seven years of payments—made clear that it did "*not includ[e]* any of the obligations relating to withdrawal liability," expressly preserving the Pension Fund's

withdrawal-liability claims until SSB had made an additional thirteen years of payments. Ex. 8, at Ex. A (emphasis in original); *supra* at 26. Where, as here, a settlement agreement clearly provides for a release that would "not take effect until *after* the mutual promises were performed," it is an accord. *Olney*, 530 A.2d at 8 (citing *Clark*, 406 A.2d 922).[17]

That language conveyed precisely the shared intention of Brock and Kunkel, who negotiated the Agreement on behalf of SSB and the Pension Fund. *Supra* at 25-26. Even USB's corporate representative, Petitt, shared that understanding. *Supra* at 27. USB thus cannot overcome the presumption in favor of accords by establishing at all, let alone by clear evidence, that any party involved in the Settlement Agreement—not the Pension Fund, not SSB, not even USB's own representative, who silently monitored the discussions—intended to extinguish the Pension Fund's ERISA rights as soon as it was executed.[18]

### C. In the alternative, the Settlement Agreement must be set aside either as the product of fraud or as a transaction to evade or avoid withdrawal liability.

As we have shown, the Settlement Agreement—as a long-defaulted accord—does not protect USB. For that reason, the Court need go no further to conclude that USB has failed to establish its affirmative defenses. But even if USB *had* carried its initial burden on a Settlement Agreement-based defense, that affirmative defense would still fail: If USB were permitted to advance rights under SSB's Settlement Agreement, then that Agreement would need to be set aside on either of two alternative grounds. First, SSB never intended to perform its obligations

---

[17] By contrast, a settlement agreement structured so that the release "precede[s] the performance by either party," discharging the existing claim immediately, is a novation. *Id.*

[18] USB has previously argued that the Pension Fund affirmed the Agreement in its proof of claim in the bankruptcy and in its conduct in this case. When an accord is breached, however, the obligee's "election between inconsistent or alternative remedies need not be made until after judgment is rendered." *Hauswald Bakery*, 553 A.2d at 1311-13 (collecting cases); *see also infra* at 52-54 (listing reasons the Pension Fund never affirmed the Settlement Agreement).

under the Agreement, rendering it voidable as the product of fraud. Second, the Agreement is a

deceptive transaction to avoid withdrawal liability, which ERISA precludes.

> **1.     SSB has admitted that it never intended to perform promises that it knew induced the Pension Fund to execute the Settlement Agreement, making the Agreement voidable for fraud.**

"[A] promise made by a promiser who intends not to perform is an actionable deceit."

*Seaboard Terminal & Refrigeration Co. v. Droste*, 80 F.2d 95, 96 (2d Cir. 1935) (L. Hand, J.);

*see also Tufts v. Poore*, 147 A.2d 717, 723 (Md. 1959) ("Maryland has adopted the

overwhelming majority rule of the American courts in holding that fraud may be predicated on

promises made with a present intention not to perform them."). That rule recognizes that,

"[s]ince a promise necessarily carries with it the implied assertion of an intention to perform[,] it

follows that a promise made without such an intention is fraudulent." Restatement (Second) of

Torts § 530 cmt. c (1977), *quoted in Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532

U.S. 588, 596 (2001). The victim of that fraud may seek redress because the false promise,

"which the promisor never intended to perform . . . induce[s] the promisee to do something he

would not otherwise have done." *Sass v. Andrew*, 832 A.2d 247, 262 (Md. Ct. Spec. App. 2003)

(quotation omitted). That fraud must be established by clear and convincing evidence. *Coleman

v. Anne Arundel Cnty. Police Dep't*, 797 A.2d 770, 786 (Md. 2002).

Here, SSB promised to make payments for *20 years*. Ex. 8, ¶ 13. The recitals to that

Agreement specified that its very purpose was to facilitate SSB "continuing to operate its

business." Ex. 8, ¶ 8. And the Pension Fund relied on SSB's representation that it would remain

in business and perform its contractual obligations, as Brock testified and as Kunkel recognized.

*Supra* at 23-24. Indeed, Kunkel intentionally induced that reliance; his "pitch for settlement," he

admitted, was to persuade the Pension Fund that settling would "keep our company alive" and

operating. *Supra* at 12. But when SSB executed the Agreement in April 2019, it *knew* that it

would soon close down. *Supra* at 24-25. SSB's knowledge that it would soon cease operations—contradicting the foundational premise of the Agreement and depriving SSB of the funds necessary to perform its promises—is evidence enough of its fraud. [19]

Kunkel's admission—that SSB *understood* that it would have no ability to make the 240 monthly payments it had committed to tendering—confirms that fraud. "Of course" SSB could not make those payments, he testified; "[t]here would be no Svenhard's as I knew it." Tr. 736:4-8 (Kunkel). A "party's admission in testimony can be clear and convincing evidence" of fraud. *Price v. Highland Cmty. Bank*, 722 F. Supp. 454, 460 (N.D. Ill. 1989) (Posner, J.), *aff'd*, 932 F.2d 601 (7th Cir. 1991); *see also Colandrea v. Colandrea*, 401 A.2d 480, 486-87 (Md. Ct. Spec. App. 1979). This scenario is thus identical to the recognized fraud of a businessperson executing an agreement based on the representation "that his company is expected to continue its operation well into the future," despite "know[ing] that the plant will be closed" in short order. *Dierker v. Eagle Nat'l Bank*, 888 F. Supp. 2d 645, 652 (D. Md. 2012) (Maryland law) (cleaned up).

USB seeks to meet this clear evidence of fraud by positing four arguments. None is viable, as we explain below.

**a.**     USB first contends that SSB lacked fraudulent intent because Kunkel seemed to believe that SSB's contractual obligations would be performed—albeit by USB, rather than SSB. Even if that belief were credited, it would not negate SSB's fraud because the Agreement accommodated *SSB's* constrained financial circumstances, not USB's. *See supra* at 41-42 (third

---

[19] *See, e.g.*, Restatement (Second) of Torts § 530 cmt. d ("The intention [not to perform] may be shown by any other evidence that sufficiently indicates its existence, as, for example, the certainty that [the promisor] would not be in funds to carry out his promise."); *Matter of Boydston*, 520 F.2d 1098, 1101 (5th Cir. 1975) ("Where hopeless insolvency at the time of the purchases makes payment impossible, fraudulent intent may be inferred.").

party cannot be assigned another's financial accommodation). Kunkel certainly knew that the Pension Fund would never have executed the Agreement if it knew that USB stood behind that obligation all along. Indeed, Kunkel himself testified that he *deliberately* refrained from revealing to the Pension Fund his supposed belief that USB would assume SSB's contractual obligations, citing Albers's instruction to keep the relationship between USB and SSB secret. Tr. 698:8-14 (Kunkel). He remained silent even though the Agreement's recitals *expressly* confirmed that the Pension Fund entered the Agreement only to accommodate SSB's "limited assets." Ex. 8, ¶ 8. This evidence alone confirms the fraud: Where "one party knows that the other is mistaken as to a basic assumption, [the other party] is expected to disclose the fact that would correct the mistake." Restatement (Second) of Contracts § 161 cmt. d.

In any event, Kunkel's purported belief that USB would pay SSB's contractual obligations is not credible. Kunkel claimed that he never discussed that belief with USB. *Supra* at 25 n.9. Petitt, by contrast, had a different recollection, testifying in response to the Court's question that USB had specifically told Kunkel that USB would not be responsible for making SSB's contractual payments. Tr. 1265:18-1266:21 (Petitt). Consistent with Petitt's recollection—but inconsistent with Kunkel's—Kunkel made no arrangements for USB to make the payments that he supposedly believed it would tender after taking over SSB's business. *Supra* at 25 n.9.[20]

**b.**    Next, USB faults the Pension Fund for failing to uncover SSB's fraud before executing the Settlement Agreement. On USB's account, the Pension Fund lacked "justifiable

---

[20] Even on Kunkel's own account, his unverified and undisclosed assumption that USB would pay SSB's debts was reckless, which is enough to establish fraudulent intent. *See Schmidt v. Millhauser*, 130 A.2d 572, 575 (Md. 1957) ("reckless indifference to truth" satisfied fraudulent intent); *Greenfield v. Heckenbach*, 797 A.2d 63, 74 (Md. Ct. Spec. App. 2002) (same); 26 *Williston on Contracts* § 69:25 (4th ed.) ("the weight of modern authority" recognizes fraud where a party makes a statement without "a reasonable basis for the representation sufficiently aggravated to amount to intent to deceive so as to induce action by the recipient").

reliance" on SSB's representations and contractual commitments because it was on "inquiry notice" that USB would soon take over SSB's business, which the Pension Fund supposedly would have learned had it "investigate[d] further." Tr. 1349:1-15 (USB's Counsel).

That argument misunderstands the law. In Maryland, like the majority of jurisdictions, the law "is generally consistent with § 540 of the *Restatement (Second) of Torts*: 'The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.'" *Rozen v. Greenberg*, 886 A.2d 924, 931 (Md. Ct. Spec. App. 2005) (quoting Restatement (Second) of Torts § 540); *see also, e.g.*, *Field v. Mans*, 516 U.S. 59, 70 (1995) (relying on § 540 as expressing "the most widely accepted distillation of the common law").[21] This rule is consistent with the parties' obligations under ERISA: Pension funds "cannot be asked to investigate sales rumors, track down the identity of all potential purchasers, avoid confidentiality or contract interference concerns, and send notice of its (publicly-available) funding status directly to potential purchasers," as the Ninth Circuit explained in *Heavenly Hana*, 891 F.3d at 847 (cleaned up). The peculiar circumstances of this case thus make the ordinarily applicable rule—that a

---

[21] USB has cited three cases to support its contrary understanding of the law, but none comes close to endorsing USB's arguments. One held only that an allegedly fraudulent statement did not constitute a promise because the statement was so "vague and indefinite" that it did not express "a firm intention." *Goldstein v. Miles*, 859 A.2d 313, 332 (Md. Ct. Spec. App. 2004) (quotation omitted). Another merely rejected, under the parol evidence rule, a fraud claim premised on a promise omitted from a contract that contained an integration clause. *See One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988). And USB's third case followed the other two in alternative holdings, reasoning both that "[t]here was no evidence" that the allegedly fraudulent statement was ever made and that, in any event, it was unreasonable to rely on such representations because they were not incorporated into a final agreement that contained an integration clause. *Cent. Truck Ctr., Inc. v. Cent. GMC, Inc.*, 4 A.3d 515, 523-25 (Md. Ct. Spec. App. 2010).

defrauded party may justifiably rely on factual representations even where investigation would reveal their falsity—*more* applicable, not less so.

Even if the law were otherwise, USB proffered no evidence putting the Pension Fund on "inquiry notice" that USB would soon take over SSB. For completeness, we briefly address the best that USB has mustered.

First, USB asks the Court to infer that its ownership of SSB's former assets was publicly available in the registries of the U.S. Patent and Trademark Office or the Tulare County Recorder, even though it offered no proof that its ownership was properly recorded. Even if USB had offered such proof, it would hardly matter: Under the common law, the Supreme Court has explained, a buyer of land may rely on the seller's representation that the land is unencumbered, "even if [the buyer] could have 'walk[ed] across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage." *Field*, 516 U.S. at 70 (quoting Restatement (Second) of Torts § 540 illustration 1); *accord, e.g.*, *Gross v. Sussex*, 630 A.2d 1156, 1167 (Md. 1993).

Second, SSB's disclosures that it had borrowed money from USB and leased the Exeter Facility from USB did not put the Pension Fund on any kind of inquiry notice. Lenders are not liable for their debtors' ERISA liabilities, Brock explained. *Supra* at 21. And leasing production assets is common in the baking industry; USB itself leases some of its own facilities. *Supra* at 21. The Pension Fund thus had no reason to believe that SSB's lease would not be renewed or, failing that, that its operations would continue elsewhere. In fact, the final financial statements SSB provided to the Pension Fund removed—on the basis of USB's secret assistance—the going-concern note that the auditor had previously applied to SSB's financial statements, suggesting confidence in its ongoing operation.

Finally, USB ignores the trial record by insisting that Kunkel would have revealed USB's imminent takeover of SSB's operations if the Pension Fund had only asked him about that plan directly. Tr. 1360:17-20 (USB's Counsel). Kunkel testified that, on USB's instructions, he deliberately withheld from the Pension Fund the details of SSB's relationship with USB. *Supra* at 22. Kunkel's silence was not merely motivated by USB's instructions; he also understood that the Pension Fund would seek to hold USB responsible for SSB's debt, potentially undermining any deal he might have otherwise obtained. *Supra* at 13, 22. If anything, the trial record suggests that, if directly asked, Kunkel would have continued to deceive, just as he acknowledged previously lying to a friend who asked him repeatedly and "straight out what USB's relationship was with Svenhard's." *See* Tr. 573:6-574:15 (Kunkel); *see also* Tr. 663:2-664:5 (Kunkel).

    **c.**      Next, USB contends that the Pension Fund should be precluded from seeking to rescind the Settlement Agreement because, USB argues, the Pension Fund later affirmed that Agreement—first in its proof of claim in SSB's bankruptcy proceedings and later in its Complaint and initial disclosures in this case. Whether the Pension Fund "affirmed" the Settlement Agreement is completely irrelevant because, under the law of accords, the Pension Fund enjoyed the right under the agreement to pursue both its ERISA rights *and* its contractual rights, selecting its remedy only after winning a judgment. *See supra* at 46 n.18. As explained below, however, USB's contention is wrong on its own terms.

    When the Pension Fund filed its allegedly "affirming" documents, it did not yet have *actual* knowledge of SSB's fraud, making it impossible for the Pension Fund to knowingly affirm a fraudulently-induced contract. Under the common law, "[t]he power of a party to avoid a contract for . . . misrepresentation is lost if after he *knows* . . . of the misrepresentation if it is fraudulent, he manifests to the other party his intention to affirm it or acts with respect to

anything that he has received in a manner inconsistent with disaffirmance." Restatement

(Second) of Contracts § 380 (emphasis added). Although Maryland courts have never expressly

endorsed that section of the Restatement, they have never rejected it. To the contrary, they

appear to follow the same rule, having long conditioned ratification of a contract induced by

alleged fraud on "full knowledge of the facts." *Brager v. Friedenwald*, 97 A. 515, 524 (Md.

1916); *see also Access Funding, LLC v. Linton*, 290 A.3d 112, 146-47 (Md. 2022) (rejecting the

argument that a party had ratified a court-approved agreement by suing only for damages, not

rescission, where allegedly defrauded party was unaware of fraud before executing agreement

and receiving judicial approval of it).

There is no evidence that the Penson Fund had actual knowledge of USB's fraud before

late in the discovery phase of this case, postdating all the allegedly "affirming" acts to which

USB points. Mere knowledge of the agreements between SSB and USB—which emerged in

SSB's bankruptcy proceedings, before the Penson Fund filed its Complaint—certainly was not

enough to establish SSB's fraud, which turns on SSB's knowledge, when it executed the

Settlement Agreement, that its operations would soon cease. The Penson Fund learned of that

fraud only in Kunkel's deposition in 2023.

According to USB, the Penson Fund's proof of claim, Complaint, and initial disclosures

each affirmed the Settlement Agreement because they each seek only contract—not ERISA—

damages. That argument is based on USB's *legal* assertion that defaulted withdrawal liability

must be discounted to present value. Uncontroverted trial testimony, however, established that

when it entered the Settlement Agreement, the Penson Fund *believed* that it was entitled, under

ERISA, to the undiscounted amount of defaulted withdrawal liability identified in that

Agreement: Brock testified that the Penson Fund calculated the amount of that liability

according to its ordinary practice, which it has applied in past litigation. *Supra* at 19. It follows that the Pension Fund's pursuit of the amount of defaulted withdrawal liability it believes it is owed *under ERISA* does not evince any intent to forego its ERISA rights in favor of only contractual remedies.[22]

Because the Court has bifurcated these proceedings, it need not decide now whether the Pension Fund is correct that defaulted withdrawal liability owed as damages under 29 U.S.C. § 1399(c)(5) need *not* be discounted to present value. We emphasize, however, that the Pension Fund's belief about its statutory rights is entirely reasonable. Consistent with that belief, federal courts often conclude that defaulted employers owe accelerated withdrawal liability equal to the absolute value of assessed installment payments without discounting to present value.[23] And courts routinely enforce contractual acceleration provisions that, like ERISA's acceleration provision, do not expressly require present-value discounting, even in the face of the claim that such acceleration constitutes an unreasonable penalty. *See, e.g.*, *Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.*, 98 A.3d 645, 657-58 (Pa. Super. Ct. 2014); *Saint Annes Dev. Co. v. Trabich*, 2012 WL 135281, at *4-5 (D. Md. Jan. 13, 2012). These cases recognize that "making all payment due immediately, without any discount to present value, is precisely what any acceleration clause is intended to do." *Paramount Pictures Corp. v. Johnson Broad. Inc.*, 2006 WL 1406870, at *4 (S.D. Tex. May 19, 2006).

---

[22] The Pension Fund subsequently amended the damages disclosure to which USB points. *See* Ex. 193.

[23] *See, e.g.*, *Trs. of Loc. 813 Pension Tr. Fund v. Argento Rubbish Removal, Inc.*, 2023 WL 5961658, at *5 (E.D.N.Y. Aug. 21, 2023) (default judgment) (accelerated defaulted withdrawal liability equal to the sum of total installment payments due over 20 years); *Bd. of Trs. of United Furniture Pension Fund A v. Premier Restoration Techs.*, 2022 WL 2312329, at *3 (S.D.N.Y. June 28, 2022) (default judgment) (same).

USB, for its part, has never cited any case holding that ERISA requires a present-value discount for defaulted withdrawal liability under 29 U.S.C. § 1399(c)(5). To be sure, USB contended that a recent decision in the *Yellow* bankruptcy case would require such a discount. Tr. 1374:24-1375:24 (USB's Counsel). But that decision long postdates any of the Pension Fund's alleged affirming acts, making it irrelevant to the Pension Fund's *intent* in seeking undiscounted defaulted liability in SSB's bankruptcy and in this litigation. Still worse, USB misreads the *Yellow* case. At most, *Yellow* observed—but did not hold—that an entirely different provision of ERISA that is inapplicable here, 29 U.S.C. § 1405(e), "appears" to require a present-value discount, which the bankruptcy court instead imposed pursuant to a separate provision of the Bankruptcy Code. *In re Yellow Corp.*, 672 B.R. 219, 236, 242 (Bankr. D. Del. 2025). Here, by contrast, the Pension Fund's claim is governed only by 29 U.S.C. § 1399(c)(5), which permits pension funds to "require immediate payment of the outstanding amount of an employer's withdrawal liability." *Yellow* did not purport to interpret that provision.

**d.**    Finally, USB points to Paragraph 24 of the Settlement Agreement, in which the parties waived their right to unknown claims. Ex. 8, ¶ 24. It is blackletter law, however, that such a waiver is only valid "[i]n the absence of actual fraud." *Pac. Greyhound Lines v. Zane*, 160 F.2d 731, 736 (9th Cir. 1947). That rule is consistent with the broader principle "that no agreement of the parties can preclude th[e] defense [of fraud]." 14 *Williston on Contracts* § 42:5 (4th ed.); *accord, e.g.*, Restatement (Second) of Contracts § 196; *Greenfield*, 797 A.2d at 76-77.

USB seeks to sidestep that rule by characterizing Paragraph 24 as "a no-reliance clause" that it claims is "an absolute bar to the counterparty saying that they relied on particular materials or particular representations or even failures to disclose." Tr. 1350:11-14 (USB's Counsel). For support, USB cites cases holding that contractual integration clauses, combined with the parol

evidence rule, preclude plaintiffs from asserting that they were defrauded on the basis of representations *excluded* from the express language of their contracts. *See One-O-One*, 848 F.2d at 1287 (silence in face of integration clause); *Cent. Truck*, 4 A.3d at 524 (unreasonable reliance on accuracy of financial statements that "were not incorporated" into an agreement with an integration clause).

Here, by contrast, SSB's fraud turns on obligations and representations expressly *included* in the Settlement Agreement. Specifically, that fraud arises from SSB's intent not to perform its *express* obligation to pay for 240 months in light of its knowledge that it would soon stop operating, despite an *express* contract recital that the Agreement was premised on SSB's "continuing to operate its business." Ex. 8, ¶¶ 8, 13. The Agreement's waiver provision is inapplicable to those representations; by its terms, that provision does *not* waive claims related to "matters expressly represented or recited in this Agreement." Ex. 8, ¶ 24.[24]

* * *

In sum, USB cannot escape the conclusion that SSB's *admitted* fraud would, if the Court needed to reach the issue, make the Settlement Agreement voidable.

## 2. The Settlement Agreement must be set aside under ERISA in light of SSB's deception, aided by its less than arm's-length relationship with USB.

"If a principal purpose of any transaction is to evade or avoid" withdrawal liability, then ERISA mandates that such "liability shall be determined and collected . . . without regard to such

---

[24] Even if the Agreement's language were not so clear, case law would confirm that integration provisions do not preclude fraud claims premised on express contractual promises and recitals. *See, e.g.*, *Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 756 F.2d 443, 446-47 (6th Cir. 1985); *Depasquale v. Blomquist*, 2021 WL 1827203, at *11-12 (Md. Ct. Spec. App. May 7, 2021) (distinguishing *Central Truck* on the basis of "direct violation of the covenants in the sales agreement").

transaction." 29 U.S.C. § 1392(c). That evade-or-avoid provision seeks to "discourage[]" employers from "attempt[ing] to shirk their [ERISA] obligations through deceptive transactions." *Chi. Truck Drivers v. El Paso CGP Co.*, 525 F.3d 591, 596 (7th Cir. 2008). In this respect, the provision "is essentially punitive," imposing "withdrawal liability for '*any*' purposely evasive or devious transaction." *Resilient*, 801 F.3d at 1094. Consistent with that purpose and the statute's plain language, it "requires only that *a* principal purpose of the [transaction] be to escape withdrawal liability. It needn't be the only purpose." *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994).

Courts apply the statute's broad language carefully to avoid invalidating sincere business decisions, but will enforce the provision against "transactions which are less than bona fide and arm's length." *Cuyamaca Meats, Inc. v. San Diego & Imperial Cntys. Butchers' & Food Emps.' Pension Tr. Fund*, 827 F.2d 491, 499 (9th Cir. 1987) (quoting legislative history); *see also IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1058 (2d Cir. 1993) (a "transaction [that] was not the typical asset sale but one structured to circumvent the mandates of a federal statute and to defraud a pension fund" where it included purchase at a deflated price and side deals with the asset's former owner, could be subject to the "evade or avoid" provision). Indeed, in "exceptional circumstance[s]—involving fraud, or an employer who is otherwise working *with* a non-employer to make recovery on withdrawal liability unavailable"—a multiemployer plan may even sue the purchaser of a withdrawing employer's assets under ERISA's evade-or-avoid provision. *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. C&S Wholesale Grocers, Inc.*, 24 F.4th 163, 173 (2d Cir. 2022).

Of course, not all agreements that reduce withdrawal-liability obligations can be set aside under the evade-or-avoid provision. The Third Circuit, for example, held that a bona fide

settlement agreement could not be set aside as a transaction to evade withdrawal liability where the employer settled for the purpose of "avoid[ing] the possibility of a larger adverse verdict at trial." *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 506 (3d Cir. 1992). In *Centra*, however, the pension plan's entitlement to withdrawal liability was legally dubious, having been disallowed in a prior bankruptcy proceeding of which the plan claimed it lacked notice. *Id.* at 499. For that reason, the settlement agreement—like most *bona fide* settlement agreements—compromised a *contested* withdrawal-liability claim. *See id.*

Here, by contrast, the Agreement was not a bona fide settlement of a disputed claim; SSB acknowledged that it had no defense to its withdrawal liability. The Agreement was instead executed on the false premise that SSB induced—likely with USB's knowledge—that it could remain in operation to make reduced payments. *Supra* at 12-15, 23-24. That conduct was highly deceptive, and SSB's relationship with USB was hardly at arm's length. Indeed, it was at Albers's direction to maintain strict secrecy that Kunkel deliberately refused to disclose SSB's full relationship with USB, much like SSB made false representations about its solvency at USB's behest, even in formal legal documents. *Supra* at 17, 22.

The Settlement Agreement was thus no "bona fide, arm's-length" exchange, but was instead tainted by the sort of "deceptive" conduct targeted by the evade-or-avoid provision. *Cuyamaca*, 827 F.2d at 499. It must be set aside.

## CONCLUSION

For all these reasons, USB should be held liable for SSB's withdrawal liability and delinquent contributions in an amount to be established in the second phase of these bifurcated proceedings.

 DATED: January 22, 2026                          Respectfully submitted,

                                                                    */s/Joshua A. Segal*

Robert Alexander*
Joshua B. Shiffrin*
Joshua A. Segal*
Cole Hanzlicek*
**BREDHOFF & KAISER, P.L.L.C.**
805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
ralexander@bredhoff.com
jshiffrin@bredhoff.com
jsegal@bredhoff.com
chanzlicek@bredhoff.com
*admitted *pro hac vice*

Judy Danelle Snyder, OSB No. 732834
Holly Lloyd, OSB No. 942979
**LAW OFFICES OF JUDY SNYDER**
4248 Galewood Street
Lake Oswego, OR 97035
Telephone: (503) 228-5027
judy@jdsnyder.com
holly@jdsnyder.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Joshua A. Segal, hereby certify that on this 22nd day of January 2026, I caused a true

and correct copy of the foregoing PLAINTIFF'S POST-TRIAL BREIF to be served via

electronic mail on the following counsel of record:

    Steven M. Wilker
    steven.wilker@tonkon.com

    Zachary W.L. Wright
    zach.wright@tonkon.com

    Jeffrey G. Bradford
    jeff.bradford@tonkon.com

    Christopher Pallanch
    christopher.pallanch@tonkon.com

DATED: January 22, 2026

                                          */s/Joshua A. Segal*
                                          Joshua A. Segal