**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**BOARD OF TRUSTEES OF THE BAKERY AND CONFECTIONERY UNION AND INDUSTRY INTERNATIONAL PENSION FUND,**

Plaintiff,

v.

**UNITED STATES BAKERY; MOUNTAIN STATES BAKERIES LLC;** and **CENTRAL CALIFORNIA BAKING COMPANY,**

Defendants.

Case No. 3:21-cv-617-SI

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Judy Danelle Snyder and Holly Lloyd, LAW OFFICES OF JUDY SNYDER, 4248 Galewood Street, Lake Oswego, OR 97035; and Robert Alexander, Joshua B. Shiffrin, Joshua A. Segal, and Cole Hanzlicek, BREDHOFF & KAISER PLLC, 805 Fifteenth Street NW, Suite 1000, Washington, D.C. 20005. Of Attorneys for Plaintiff Board of Trustees of the Bakery and Confectionery Union and Industry International Pension Fund.

Steven M. Wilker, Zachary W.L. Wright, Christopher J. Pallanch, and Jeffrey G. Bradford, TONKON TORP LLP, 1300 SW Fifth Avenue, Suite 2400, Portland, OR 97201. Of Attorneys for Defendants United States Bakery, Mountain States Bakeries LLC, and Central California Baking Company.

**Michael H. Simon, District Judge.**

The Bakery and Confectionery Union and Industry International Pension Fund (“Pension Fund”) is a multiemployer, defined-benefit pension plan under the Employee Retirement Income

Security Act ("ERISA"). The Pension Fund is administered by Plaintiff Board of Trustees,[1] as fiduciary for employees who work under collective bargaining agreements negotiated with local unions affiliated with the Bakery, Confectionery, Tobacco Workers & Grain Millers International Union ("Bakery Union"). The Bakery Union represented employees who worked at Svenhard's Swedish Bakery ("Svenhard's") at its facility in Oakland, California. Svenhard's withdrew from the Bakery Union when it relocated to its facility in Exeter, California. Svenhard's then became liable for a significant withdrawal liability under ERISA and liability for pension contributions based on severance payments and pro-rata vacation payments due under its collective bargaining agreement with the Bakery Union ("delinquent contributions").

The Pension Fund alleges that Defendants United States Bakery ("USB") and its subsidiaries Mountain States Bakeries LLC ("MSB"), and Central California Baking Company ("CCBC") (collectively, "Defendants" or "USB"[2]) are liable under ERISA as successors to Svenhard's for the withdrawal liability and liability for delinquent contributions.[3] The Pension Fund also claims that Defendants are liable under ERISA's "Evade or Avoid" provision, because USB purchased Svenhard's assets through transactions with the "principal purpose" to "evade or

[1] For purposes of this Findings of Fact and Conclusions of Law, the Court uses the term "Pension Fund" to refer to Plaintiff Board of Trustees, which administers the Pension Fund and thus performs the actions of the Pension Fund.

[2] For purposes of this Findings of Fact and Conclusions of Law, the Court refers to Defendants collectively, regardless of which entity engaged in specific conduct or signed a particular agreement.

[3] The Pension Fund contends that MSB and CCBC are jointly and severally liable with USB as companies that are under common control with or alter egos of USB. Defendants do not dispute that MSB and CCBC are under common control of USB, and they generally refer to themselves jointly as "Defendants." Defendants also admitted in their Answer that if 29 U.S.C. § 1301(b) were to apply to them, they "would be considered to be in trades or businesses under common control with each other." ECF 51 ¶ 12.

avoid" withdrawal liability.[4] At trial, Defendants asserted the affirmative defenses of waiver and discharge, based on a settlement agreement in April 2019 between the Pension Fund and Svenhard's ("Settlement Agreement").[5]

The parties agreed that the matter would be tried to the Court and requested that liability be bifurcated from damages, which the Court allowed. In Phase I, liability, the Court held a six-day bench trial beginning November 3, 2025. Four witnesses testified live and five witnesses testified through deposition testimony. The parties submitted closing briefs in January 2026. Having weighed and evaluated all the evidence and considered the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law under Rule 52(a) of the Federal Rules of Civil Procedure.[6] For the reasons that follow, the Court finds in favor of Plaintiff.

---

[4] 29 U.S.C. § 1392(c).

[5] After the Settlement Agreement was fully executed, Svenhard's made six timely payments to the Pension Fund. In December 2019, after the USB Entities took control of the Exeter facility and the full transition occurred under all the agreements Svenhard's had signed over the years, Svenhard's had no remaining assets and defaulted on the Settlement Agreement. The Pension Fund sought payment and Svenhard's filed for bankruptcy. Several lawsuits followed, including this one, after the Pension Fund learned about USB and its connection to Svenhard's. In the bankruptcy proceeding, Svenhard's and USB reached a "compromise" in which USB and Svenhard's would settle their litigation on the condition that Svenhard's be allowed to "assume" the Settlement Agreement and "assign" it to USB. *In re Svenhard's Swedish Bakery*, 154 F.4th 1100, 1103 (9th Cir. 2025), *cert. denied sub nom. Svenhard's Swedish Bakery v. Bakery & Confectionery Union*, 2026 WL 1463180 (U.S. May 26, 2026). The bankruptcy court denied Svenhard's motion to assume and assign on two grounds, the United States Bankruptcy Appellate Panel for the Ninth Circuit affirmed on one of those grounds, and the Ninth Circuit affirmed on the other ground. *Id.* at 1103-04, 1106. The Ninth Circuit concluded that the Settlement Agreement "constitutes a 'financial accommodation' that is not assumable or assignable under § 365(c)(2)" of the Bankruptcy Code. *Id.* at 1104.

[6] In addition, any Finding of Fact that constitutes a Conclusion of Law is hereby adopted as a Conclusion of Law, and any Conclusion of Law that constitutes a Finding of Fact is hereby adopted as a Finding of Fact.

## FINDINGS OF FACT

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court finds the following facts by a preponderance of the evidence or, as relevant and expressly indicated, clear and convincing evidence.

### A. Credibility of Witnesses

The Court received live testimony from Murrey R. ("Bob") Albers, Michael Petitt, Jerry Boness, and Steven Douglas Brock. The Court received deposition testimony from Duane Kenneth Waltos, Jr., David C. Kunkel (individually and as the designated witness under Rule 30(b)(6) for Svenhard's), Marc Albers, Kenneth Hall, and Diana Phillips. The Court finds these witnesses generally to be credible, with one exception. Much of the testimony of Bob Albers was contradicted by the sworn testimony of other witnesses, documents received in evidence, and by Bob Albers' previous sworn testimony, which was received only for impeachment purposes. For much of this disputed testimony, Bob Albers had problems with his recollection or otherwise did not adequately explain the inconsistency. The Court thus finds more persuasive the contradictory evidence.

### B. Relevant Entities

1. Svenhard's was a privately held corporation that previously produced and sold pastries, first out of a commercial baking facility in Oakland, California, and then out of a similar facility in Exeter, California.[7]

2. Before April 24, 2014, Svenhard's was owned by three individual shareholders, Ronny D. Svenhard, V. Marianne Wyndham, and Borje N. Svenhard. After a transfer of stock made during the transactions with USB, Svenhard's was owned by five individual shareholders,

[7] Joint Stipulation ("Stip.") ¶ 1 (ECF 164).

each with the following ownership percentage: Ronny D. Svenhard (42%), Michelle Svenhard-Barnett (19%); David Kunkel (19%); V. Marianne Wyndham (10%); and Borje N. Svenhard (10%).[8]

3. A separate entity, Svenhard's Partnership, L.P.,[9] owned the Oakland facility and the Exeter facility (until it was purchased by Defendants) and leased those facilities to Svenhard's.[10]

4. Before 2015, Svenhard's was a party to a series of collective bargaining agreements with Local 125 of the Bakery Union ("Local 125").[11]

5. USB is a privately held corporation headquartered in Portland, Oregon, that primarily produces, distributes, and sells baked goods.[12]

6. USB is governed by a Board of Directors ("Board"), elected by its shareholders, that must approve USB's acquisitions.[13]

7. Bob Albers served as Chief Executive Officer of USB from 1986 to 2024 and serves as Chairman of the Board.[14]

---

[8] *Id.* ¶¶ 2-3, 5, 32.

[9] For purposes of this Findings of Fact and Conclusions of Law, the Court refers to both Svenhard's entities collectively as "Svenhard's," regardless of which entity engaged in specific conduct or signed a particular agreement.

[10] *Id.* ¶ 4.

[11] *Id.* ¶ 25.

[12] *Id.* ¶ 9.

[13] *Id.* ¶ 10.

[14] *Id.* ¶ 11.

8. From at least 2014, through at least 2023, Bob Albers managed a voting trust that held all of USB's outstanding shares. Bob Albers controlled the voting of the voting trust—the other members did not vote their shares.[15]

9. USB pursued a growth strategy to protect against competition, primarily through acquisitions of other bakeries.[16] USB grew from having total annual revenues of around $10 million in 1975 to nearly $1 billion in 2023.[17]

10. USB usually purchased other bakeries through asset or stock purchases in which the purchased companies immediately were run by USB, the employees became USB employees, and the union contracts were with USB, even if USB kept the original brand name for its value. These generally were normal purchases, although Defendants did purchase the assets of entities relating to Hostess Brands, Inc. ("Hostess") out of bankruptcy, which insulated USB from Hostess's withdrawal liability.[18]

11. From at least 2004 until the present, USB has made contributions to the Pension Fund on behalf of certain employees as a participating employer in the Pension Fund.

12. MSB is an Oregon limited liability company, formed and controlled by USB. USB is the sole member and owner of MSB.[19]

---

[15] *Id.* ¶ 12; Tr. 271:25-272:23 (Marc Albers); 754:25-755:19 (Pettit); 801:25-802:7 (Boness).

[16] Tr. 68:10-25 (Bob Albers); 262:25-263:24 (Marc Albers); 803:8-22 (Boness).

[17] Tr. 57:21-58:5, 59:20-23, 60:25-61:3 (Bob Albers).

[18] Tr. 65:3-66:4 (Bob Albers); 804:12-805:14 (Boness); Stip. ¶¶ 145-47, 151.

[19] Stip. ¶¶ 15-16.

13. MSB owns, but does not operate, all the intellectual, personal, and real property USB purchased from Svenhard's.[20]

14. CCBC is a privately held Oregon corporation that USB formed in September 2019 for the purpose of operating the pastry business Defendants planned to operate out of the Exeter facility using assets purchased from Svenhard's. USB is CCBC's sole shareholder and owner. CCBC has never had a board of directors.[21]

**C. Svenhard's Deal with USB and Subsequent Operations**

15. By September 2013, Svenhard's was in severe financial difficulty. Its only hope of avoiding closure, bankruptcy, or a sale was to move its operations to Exeter, where it believed it would realize significant cost savings.[22]

16. Svenhard's financial situation, however, did not improve and in March 2014, it reached out to USB regarding a potential sale or other financial arrangement.[23]

17. USB was interested in a deal based on Svenhard's projected savings from its move from Oakland to Exeter. On March 28, 2014, Bob Albers suggested structuring a deal with separate purchases of the Exeter facility, its equipment, and Svenhard's intellectual property. He explained: "We are going this route so that [USB] will not be liable for [Svenhard's] unfunded Bakers pension amount which [USB] think[s] [Svenhard's] will trigger when they close the Oakland plant and move to Exeter."[24]

---

[20] *Id.* ¶ 17.

[21] *Id.* ¶¶ 20-21.

[22] Tr. 595:16-597:9 (Kunkel).

[23] Tr. 533:7-19, 534:19-535:13 (Kunkel); Ex. 1.

[24] Ex. 1.

18. USB did not want Svenhard's to file bankruptcy. This was because doing that might have a negative effect on Svenhard's brand and because USB had experienced the "downsides" of buying out of bankruptcy the previous year when it purchased the Hostess assets, including that there was a competitive bidding process and USB had to increase its bid. Indeed, Bob Albers specifically instructed Svenhard's Kunkel not to file bankruptcy when Kunkel raised that as an option under which USB could purchase Svenhard's.[25]

19. On April 2 and 3, 2014, USB and Svenhard's signed a "Transaction Background and Summary of Terms" ("Term Sheet"), which described a five-year plan and multiple transactions by which USB would purchase Svenhard's assets. This Term Sheet explained that USB would purchase the Exeter facility and lease it back to Svenhard's and purchase Svenhard's "trademark and recipes" and license those back to Svenhard's. The document added that USB would become the exclusive distributor of Svenhard's products in USB's markets, at a discounted price. Svenhard's was allowed to run the company for five years, and it might obtain an extra payment at the time of the transition of operations to USB, depending on the profitability of Svenhard's during these five years of continued operation.[26]

20. USB's Board member Waltos explained that USB was hopeful that Svenhard's would turn around their operations within five years based on the final payment incentive because "it's always better to take over a successful running company than the other way around."[27] Waltos also testified that the five-year delay and having Svenhard's continue to run

---

[25] Stip. ¶¶ 148-49; Tr. 106:25-107:19 (Bob Albers); Tr. 535:15-20 (Kunkel); Ex. 181 ¶ 3.

[26] Ex. 3; Stip ¶ 32.

[27] Tr. 503:19-20 (Waltos); *see also* Tr. 827:19-23 (Boness testifying that the structure of the deal was to ensure USB took over a profitable company).

operations was intended to ensure that USB was not visibly connected to Svenhard's because of its "unfunded liability."[28]

21. USB's Board held a meeting on April 11, 2014, to discuss the purchase of Svenhard's assets.[29] Waltos recalled that one Board member questioned the "convoluted arrangement," as this transaction was "not as clean" as USB's other purchases. Ultimately, it was approved by a unanimous vote.[30]

22. "[F]rom day one," Bob Albers "instructed" Kunkel and Svenhard-Barnett "to keep our transaction confidential" and "not to let anybody know that [USB] was buying [Svenhard's]."[31] Bob Albers also requested that Svenhard's "keep the emails to a minimum and have mainly phone calls instead."[32] Kunkel understood this request was because Bob Albers did not want a paper trail about Svenhard's withdrawal liability.[33] Because of Defendants' requirement for confidentiality, when USB's competitor Bimbo USA ("Bimbo") was visiting the Svenhard's plant, Kunkel warned USB, who also had an employee there. Kunkel noted that usually he kept Bimbo "confined" but warned USB not to "let [Bimbo] know [the employee is]

---

[28] Tr. 505:4-12 (Waltos).

[29] Ex. 2.

[30] Tr. 504:1-22 (Waltos).

[31] Tr. 571:6-9 (Kunkel); *see also* Ex. 4 (RFA 291).

[32] Ex. 6.

[33] Tr. 705:25-706:15 (Kunkel).

with USB." USB responded that it would warn the employee to "stay clear and dress appropriately with no emblems."[34]

23. Also because of Bob Albers' requirement of confidentiality, Kunkel repeatedly lied to a "friend[] that [Kunkel] had known for 40 years in the business," an employee of Bimbo. This person repeatedly asked Kunkel during the five years about rumors that USB was buying Svenhard's; Kunkel lied, responding that "no," USB was not buying Svenhard's and that "we were running our company just as always."[35]

24. Consistent with the need to keep Defendants' involvement secret, in March 2017, when Defendants were investigating possibly expanding production at the Exeter facility, they instructed their vendor, the Austin Group, to inquire with the City of Exeter regarding requirements and logistics under the name of Svenhard's. When Defendants notified Kunkel of this, he responded: "Thanks for the heads-up . . . ."[36]

25. Although Defendants portrayed the need to inquire with the City of Exeter as if Svenhard's still owned the facility as necessary because City officials were familiar with Svenhard's, the Court does not find that to be credible for several reasons. First, Svenhard's had never operated in Exeter or made the facility workable before USB's purchase, so it is questionable how Svenhard's had any such connection with City officials. Second, Defendants were the owners of the facility and intended to operate there after they took over Svenhard's in 2019. It is not credible that they were unwilling to create a relationship with the City, as a new

---

[34] *See* Ex. 174; Tr. 570:14-571:14, 572:23-573:6 (Kunkel). The Court finds the facts of ¶ 22 by clear and convincing evidence.

[35] Tr. 573:6-574:15 (Kunkel). The Court finds the facts in ¶ 23 by clear and convincing evidence.

[36] Ex. 152.

owner in the City and soon-to-be operator, versus they simply wanted to keep their relationship with Svenhard's confidential. Third, if the connection with the Svenhard's name was important to get City approval, Defendants could have inquired as the owner of the building, pointing out that their tenant is Svenhard's.[37]

26. By the time of the April 2014 transactions with Svenhard's, USB believed that Svenhard's would owe the Pension Fund significant withdrawal liability when Svenhard's closed the Oakland facility and moved production to the Exeter facility.[38] Indeed, Bob Albers suggested to Svenhard's that it would owe significant withdrawal liability.[39] Bob Albers also explained to Svenhard's that it might be able to negotiate down its withdrawal liability with the Pension Fund.[40]

27. Beginning in 2014, Svenhard's entered into a series of transactions with as described in the Term Sheet, selling to USB Svenhard's recipes, intellectual property, equipment at the Exeter facility, and the Exeter facility itself. Svenhard's licensed and leased those assets until November 4, 2019, when USB would fully take over ownership and operations. Several of the agreements were amended or were extended through short-term extension agreements.[41]

---

[37] The Court finds the facts in ¶ 25 by clear and convincing evidence.

[38] Exs.1, 2 at 3-5; Stip ¶ 30.

[39] Tr. 557:18-560:18 (Kunkel).

[40] Tr. 560:11-18, 678:7-19 (Kunkel); *see also* Ex. 4 (RFA Nos. 23-24). The Court finds the facts in ¶ 26 by clear and convincing evidence.

[41] *See, e.g.*, Exs. 77, 78, 82, 87, 89, 90, 120, 124, 128, 129, 130, 186; Stip. ¶¶ 33-40, 42, 44, 47.

28. Svenhard's intellectual property sold to Defendants included recipes, formulas, and product specifications for all Svenhard's products and Svenhard's trademark.[42] The parties signed initial agreements transferring Svenhard's intellectual property in April 2014.[43] These early agreements stated that the final purchase would occur at "closing," after an appraisal was completed. The parties closed the sale of Svenhard's intellectual property on August 1, 2014, for a total purchase price of $3.5 million.[44]

29. Svenhard's also sold to Defendants certain equipment from Svenhard's Oakland facility, which was later relocated to Exeter. Svenhard's then leased back this equipment.[45]

30. The License Agreement between Svenhard's and USB contained confidentiality provisions, which prohibited Svenhard's from informing third parties, including its creditors, that it had sold its assets to Defendants without Defendants' permission or that Svenhard's had entered into the License Agreement. Defendants never gave such permission to Svenhard's, and Svenhard's never asked.[46]

31. Because of the forced secrecy and Svenhard's seemingly normal operations for five years after USB and its subsidiaries bought Svenhard's assets, to the "outside world . . .

---

[42] Stip. ¶ 38.

[43] *See* Stip. ¶¶ 37-38; Exs. 78 (recipes and processes, April 3, 2014), 82 (trademark and other intellectual property, April 25, 2014).

[44] Stip. ¶ 39; Ex. 89.

[45] Stip. ¶¶ 42, 44; Exs. 120, 130.

[46] Stip. ¶¶ 131-33, Ex. 90 ¶ 9.

nothing changed at Svenhard's."[47] That included the Pension Fund when Svenhard's was negotiating the Settlement Agreement.

32. At the time Svenhard's sold its intellectual property to Defendants, Svenhard's had a secured line of credit with Bay Commercial Bank ("Bay Commercial"). This security agreement included a provision giving Bay Commercial a priority secured interest in Svenhard's intellectual property. Svenhard's owed money to Bay Commercial at the time of the sale to Defendants, and thus Bay Commercial was supposed to have a priority interest in the key asset that Svenhard's sold to Defendants. Kunkel stated in his declaration submitted to the bankruptcy court that he believed Defendants wanted their ownership to remain confidential: (1) to avoid Bay Commercial discovering the purchase and causing Svenhard's breach its the security agreement with Bay Commercial; (2) to allow Defendants to learn how to produce and market Svenhard's product line; and (3) because of Defendants' concern about successor liability, particularly with respect to Svenhard's anticipated unfunded pension liability upon Svenhard's closing its Oakland facility and withdrawing from the union.[48]

33. Svenhard's closed its Oakland facility in December 2015, laying off its unionized Oakland employees. At that time, Svenhard's withdrew from the Pension Fund, within the meaning of ERISA Section 4203, 29 U.S.C. § 1383.[49] The Exeter facility was fully functioning by April 1, 2016, when Defendants purchased the facility and its equipment and leased it back to

[47] Ex. 181 ¶ 17.

[48] Ex. 181 ¶¶ 11, 17.

[49] Stip. ¶¶ 27-28.

Svenhard's, with the lease expiring July 31, 2019.[50] The lease was later extended through November 2019.[51]

34. Under Svenhard's collective bargaining agreement with Local 125, the closure of the Oakland facility required Svenhard's to make severance and vacation payments to certain employees, and pension contributions to the Pension Fund based on those severance and vacation payments.[52] USB provided funding enabling Svenhard's to pay the employees the required severance and vacation payments.[53] Svenhard's, however, failed to pay the ensuing obligation to the Pension Fund from those payments, creating the "delinquent contributions."

35. Bob Albers required Svenhard's to send Defendants every communication received from the Pension Fund relating to withdrawal liability, including "immediately" forwarding the Pension Fund's withdrawal assessment.[54] Indeed, the Real Estate Lease Agreement for the Exeter facility included an express provision requiring that *all* communications from the Pension Fund be forwarded to Defendants within 30 days.[55] Svenhard's complied, sending to USB the Pension Fund's March 2016 demand letter, settlement negotiation requests for information, all draft and final settlement agreements, and all related

---

[50] *See* Tr. 872:19-873:8 (Pettit); Exs. 129-30.

[51] Stip. ¶¶ 47-48.

[52] Stip. ¶ 29.

[53] Ex. 124 ¶ D; Tr. 867:23-868:22 (Petitt).

[54] Tr. 643:7-11, 677:2-15 (Kunkel).

[55] Stip. ¶ 126; Ex. 129 ¶ 10.6.

information. USB and Svenhard's also had multiple meetings and conferences to discuss Svenhard's potential withdrawal liability and negotiations with the Pension Fund.[56]

36. Although Svenhard's continued to operate at a loss after April 2014, "every time" it asked USB for money until the publicly disclosed transition of ownership in November 2019, USB provided Svenhard's with the requested funds.[57] For example, between late 2014 and early 2016, USB provided $3.5 million in loans to cover Svenhard's operating expenses and $2.6 million for the severance payments and other payroll expenses for workers laid off when the Oakland Facility closed.[58]

37. USB structured its business relationship with Svenhard's to enable Svenhard's to survive until Svenhard's obtained a signed settlement agreement with the Pension Fund providing for a substantially reduced and compromised withdrawal liability. As characterized by Marc Albers, "failure was not an option" and USB had to do whatever it took "to stop [Svenhard's] from failing and going bankrupt or ceasing operation."[59] USB provided millions in loans to Svenhard's, Svenhard's defaulted on those loans, and USB did not pursue a default or any other collection activity.[60]

38. In addition to repeatedly providing loans to Svenhard's that it never called, USB intervened in Svenhard's other financial relationships. In February 2016, when Svenhard's

[56] *See, e.g.*, Tr. 905:11-908:12, 911:3-913:3, 915:5-17, 922:2-19 (Pettit); Exs. 5, 7, 125-27, 135, 154, 156, 163, 259, 262, 266, 270.

[57] Tr. 616:4-18 (Kunkel).

[58] Ex. 124 ¶¶ A, D; Tr. 867:16-868:22 (Petitt).

[59] Tr. 175:10-14 (Bob Albers); *see also* Tr. 171:22-172:3 (Bob Albers).

[60] Stip. ¶¶ 164-69.

defaulted on its multi-million line of credit with Bay Commercial, Bay Commercial entered into a forbearance agreement with Svenhard's after USB provided a $3.9 million letter of credit from Bank of America in favor of Bay Commercial. USB also provided a second letter of credit from Bank of America, in the amount of $1,332,991, in favor of Svenhard's worker's compensation insurer. At that time, Svenhard's owed USB $6,593,332. Nonetheless, USB orchestrated more than $5 million in additional debt owed by Svenhard's to USB. USB and Svenhard's signed an amended loan agreement, which set performance and repayment obligations with specific deadlines, but within a short period, Svenhard's was unable to meet them. USB, however, still did not call any loan or otherwise pursue any action in response to Svenhard's default.[61]

39. Within 17 months, United Commercial Bank (formerly Bay Commercial) declared Svenhard's default under the forbearance agreement. USB again intervened, providing an unconditional guaranty to Bank of America so it would provide a line of credit sufficient to pay off United Commercial Bank.[62]

40. For this transaction, USB had Svenhard's sign a Guaranty Reimbursement Agreement and a further amended loan agreement.[63] The Guaranty Reimbursement Agreement contained a statement that Svenhard's "represents and warrants that it is solvent."[64] But at that time, both USB and Svenhard's *knew* that Svenhard's was not solvent. Indeed, the amended loan agreement itself described Svenhard's approximately $2.8 million debt owed to USB, and both

---

[61] *See* Ex. 124; Tr. 873:9-20, 874:6-875:19, 876:5-878:16, 880:22-881:9 (Pettit).

[62] Exs. 159-60; Tr. 668:12-23 (Kunkel).

[63] Exs. 159-60.

[64] Ex. 160 ¶ 3.

parties knew Svenhard's had no assets. Thus, USB required Svenhard's to make a false statement.[65]

41. USB also provided Svenhard's with financial assistance in early 2019 by "prepaying" for $3,350,000 worth of pastries that USB planned to purchase later from Svenhard's for its own distribution. Unlike the loans USB provided to Svenhard's, USB's prepayments did not charge interest. At the time of the full ownership transition to USB, Svenhard's still owed about $1.25 million from the product prepayment.[66]

42. USB further helped Svenhard's by interfering with Svenhard's accounting firm's (RINA) "going concern" note in Svenhard's consolidated financial statements. For Svenhard's 2013, 2014, and 2015 financials, RINA included a going concern note, stating that Svenhard's had a "net capital deficiency" that, along with "the uncertain conditions that the Company face[d] regarding its loan agreements, raise[d] substantial doubt about its ability to continue as a going concern."[67] But for Svenhard's 2016 and 2017 financials, Pettit provided assurance to RINA that USB would fund Svenhard's for the year to persuade RINA to remove the going concern note. Svenhard's requested this help from USB because the going concern note was making it difficult for Svenhard's to work with other vendors and lenders.[68] This change, however, provided a misleading picture of Svenhard's financial state.

---

[65] Ex. 159 ¶ 3; Tr. 896:2-897:21 (Pettit); Tr. 666:15-18, 670:7-671:6 (Kunkel).

[66] Tr. 930:21-935:7 (Petitt).

[67] Exs. 67, 217-18.

[68] Exs. 219-20 (financials), 165 (email to RINA); Tr. 671:24-674:23, 701:19-702:11 (Kunkel); 890:3-891:15, 900:14-901:12 (Pettit).

43. Svenhard's 2016 and 2017 financial statements, in addition to no longer having the "going concern" note, mentioned USB for the first time. They identified USB as a guarantor for the bank and worker's compensation insurance lines of credit, and a direct lender. These financial statements also noted that Svenhard's leased "various facilities and equipment," but did not identify USB as the owner.[69]

44. By April 11, 2019, USB was aware of the Ninth Circuit's *Resilient Floor Covering*[70] decision relating to successor liability for withdrawal liability. As shown in USB's privilege log, USB had its attorneys specifically analyze its takeover of Svenhard's under *Resilient Floor*.[71] Pettit forwarded the resulting legal analysis to Todd Cornwell, then-Co-President of Operations at USB, because Mr. Cornwell was becoming more involved in the business at the Exeter facility.[72] Pettit responded to outside counsel on May 23rd in an email with the subject "Plan for Exeter facility."[73] USB had long been aware of the potential risk of successorship liability.[74]

---

[69] Exs. 219-20.

[70] *Resilient Floor Covering Pension Trust Fund Board of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079 (9th Cir. 2015).

[71] Ex. 184; *see also* Tr. 882:5-10 (Pettit stating that when Defendants took over Svenhard's operations, he knew of the risk that USB could be held liable as a successor and knew about *Resilient Floor*).

[72] Tr. 886:15-887:4 (Pettit).

[73] Ex. 184; Tr. 887:8-15 (Pettit). But

[74] Tr. 888:3-22 (Pettit).

### D. Svenhard's Liability to and Negotiations with the Pension Fund

#### 1. Withdrawal Liability Assessment

45. Brock was the Manager of the Pension Fund's Administrative Services Department since 2004. He handled the assessment of Svenhard's withdrawal liability. He also drafted the demand letters.[75]

46. In a demand letter dated March 1, 2016, but received by Svenhard's on March 7th, the Pension Fund described Svenhard's withdrawal liability under ERISA ("Withdrawal Liability Assessment Letter") and attached the Pension Fund's calculation.[76] The Withdrawal Liability Assessment letter explained that Svenhard's owed $50,150,043, but under ERISA's statutory 20-year cap, the liability was payable in monthly installments of $162,941 for 240 months.[77] This yielded a total obligation equals $39,105,840. The Pension Fund demanded, consistent with ERISA, that Svenhard's make its first monthly payment by May 1, 2016, or it would be in default and the full amount would accelerate and become due.[78]

47. The Withdrawal Liability Assessment Letter also explained that Svenhard's had the right under ERISA to: (1) ask the Pension Fund to review any specific matter relating to its withdrawal liability and schedule of payments; (2) identify any inaccuracy in the Pension Fund's calculation; and (3) furnish any additional relevant information.[79] Svenhard's never requested

---

[75] Tr. 1001:5-6; 1007:23-25; 1008:23-1009:13 (Brock).

[76] Exs. 5, 22.

[77] Ex. 22.

[78] *Id.*

[79] *Id.*

review of any matter, challenged the Pension Fund's calculation, or requested arbitration on the matter.[80]

48. Svenhard's forwarded the letter to USB the same day that Svenhard's received it.[81]

49. Svenhard's responded to the Pension Fund on April 29, 2016, stating that if it had to pay the withdrawal liability it would "create a severe hardship that w[ould] put [Svenhard's] in a position where [its] only recourse w[ould] be to file Bankruptcy."[82] Before responding, Kunkel forwarded to USB a draft of Svenhard's response to the Pension Fund.[83] Svenhard's asked for USB's input.

50. Brock responded to Svenhard's April 29th email by pointing out that Svenhard's did not request review, and reminding Kunkel of Svenhard's rights under ERISA.[84]

51. Svenhard's did not make the May 1, 2016 required payment to the Pension Fund.[85]

52. On June 6, 2016, the Pension Fund sent Svenhard's a letter describing its default on the withdrawal liability ("Notice of Default"). The Notice of Default reiterated that Svenhard's was obligated to pay $162,941 for 240 months. It explained that Svenhard's had 60

[80] Stip. ¶¶ 127-28.

[81] Ex. 5.

[82] Ex. 136.

[83] Ex. 135.

[84] Ex. 24.

[85] Stip. ¶ 134.

days to cure its default, or Svenhard's would owe the full amount, plus interest from December 4, 2015.[86]

53. The Pension Fund's demand letters referenced "the entire amount" due, after describing the 240 monthly payments. This reference was not to the overarching amount of $50,150,043, but reflected the statutorily capped amount of $39,105,840 (240 months times $162,941 monthly payment),which was the total amount that Brock understood the Pension Fund could request under ERISA.[87]

54. In preparing the two demand letters, Brock used template forms.[88] He did not draft the letter to confuse Svenhard's or to demand the full approximately $50 million liability versus the $39 million required under ERISA's statutory cap.

55. Brock also believed that in the event of a default, the Pension Fund did not offer any present-value discount, unlike in the event of an employer who prepays its liability.[89]

56. Svenhard's did not make any payment on the withdrawal liability within the required 60 days.[90]

**2. Contribution Liability Assessment**

57. The Pension Fund communicated with Svenhard's several times from December 2015 through April 2016 regarding Svenhard's liability for the delinquent

[86] Ex. 25; Stip. ¶¶ 129-30.

[87] Tr. 1001:7-8, 1001:22-1002:6, 1007:17-1008:20 (Brock).

[88] Tr. 1000:1-5, 1002:7-21, 1005:12-22 (Brock).

[89] Tr. 1010:24-1011:8 (Brock).

[90] Stip. ¶ 134.

contributions. On April 21, 2016, Svenhard's emailed the Pension Fund, proposing a payment plan for the delinquent contributions.[91]

58. On June 2, 2016, the Pension Fund sent Svenhard's a letter stating that Svenhard's owed $514,847.67 for the delinquent contributions. The Pension fund accepted the amount due calculated by Svenhard's. The Pension Fund offered to receive from Svenhard's four monthly payments of $128,711.92, plus interest, beginning July 1, 2016.[92]

**3. Settlement Negotiations Between Svenhard's and the Pension Fund**

59. The settlement negotiations were primarily conducted by Kunkel, the then-Chief Operating Officer at Svenhard's, and Brock.

60. On July 13, 2016, Svenhard's responded to the Pension Fund's Notice of Default with a settlement offer. Svenhard's stated that the withdrawal liability would force it into bankruptcy, and "[i]n an effort to keep [the] company alive," offered to pay $3 million, through 240 equal monthly payments of $12,500.[93] At this time, however Svenhard's knew it had sold all its assets and the original five-year plan called for USB taking over its assets and operations in 2019, making it impossible for Svenhard's to pay installments for 240 months.

61. Brock responded by requesting financial information from Svenhard's, to assess how much Svenhard's could afford to pay. Svenhard's provided its financial statements, ownership information, and other requested data. These negotiations and the information that Svenhard's provided to the Pension Fund continued for three years.[94] When completing the

---

[91] Stip. ¶¶ 123-24.

[92] Ex. 15; Stip. ¶¶ 124-25.

[93] Exs. 23, 28.

[94] *See, e.g.*, Exs. 18, 28, 29, 30, 31, 32, 35-48, 50-51, 54, 196, 426, 427.

Pension Fund's Basic Questionnaire, Svenhard's identified the cause of the withdrawal liability as Svenhard's closing its facility and relocating to a new facility.[95] This was technically accurate. Svenhard's, however, did not identify that it had sold all its assets, which was a separate potential reason for withdrawal, because it sold those assets well before the move.[96] Although technically true that the withdrawal liability was triggered by Svenhard's move to Exeter, the move was demanded and funded by USB, which had purchased Svenhard's assets. Additionally, during the negotiations and provision by Svenhard's of information to the Pension Fund, Kunkel understood that the Pension Fund was seeking information about Svenhard's ability to pay and evaluating whether there were any potential third parties to cover the unfunded pension liability.[97] Thus, Svenhard's response was intentionally misleading by failing to identify that it had sold its assets at this point.[98]

62. Brock's goal was to maximize revenue for the Pension Fund, and he knew that forcing a company into bankruptcy might result in less or even no recovery for the Pension Fund.[99] After reviewing Svenhard's 2013-2015 financials, Brock concluded that Svenhard's assets were pledged to others and that Svenhard's was operating at a loss.[100]

63. Brock later reviewed Svenhard's 2016 financials. He was encouraged to see that the "going concern" note was removed, as that suggested that "[m]aybe operations are

---

[95] Ex. 28 at 45-46.

[96] *Id.* at 47.

[97] Tr. 700:10-701:4 (Kunkel).

[98] The Court finds the facts in ¶ 61 by clear and convincing evidence.

[99] Tr. 1014:5-18 (Brock).

[100] *See, e.g.*, 1050:10-1052:4.

improving, and they would continue to operate."[101] Brock saw the new information in the 2016 financials that USB secured a line of credit for Svenhard's and had even loaned money to Svenhard's, but that did not suggest to him that USB could be liable under ERISA for Svenhard's withdrawal liability.[102] He did, however, seek more information on these debts from Kunkel, to ensure that they were not about to be called and push Svenhard's out of business.[103]

64. In September 2018, Brock and Kunkel had a telephone conference. Kunkel finally disclosed that USB had purchased the Exeter facility, but did not disclose that it had purchased Svenhard's recipes and intellectual property.[104] Brock did not find the sale and leaseback of the Exeter facility unusual, because he had seen other bakeries sell property to raise cash and then lease it back under a landlord/tenant relationship. This also did not cause Brock to believe that USB might be potentially liable for Svenhard's withdrawal liability.[105] This assessment by Brock was reasonable, because bakeries will sometimes lease facilities—indeed, USB itself has leased a facility.[106]

---

[101] Tr. 1067:9-14 (Brock).

[102] Tr. 1069:2-15, 1082:6-11, 1241:1-16 (Brock).

[103] Ex. 44; Tr. 1078:11-1079:4 (Brock).

[104] *See* Ex. 49.

[105] Tr. 1090:21-1091:15, 1241:17-1242:16 (Brock).

[106] Tr. 835:12-23 (Boness). The Court finds the facts in ¶ 64 by clear and convincing evidence.

65. On December 3, 2018, Brock met with Kunkel and another Svenhard's employee and reached a settlement agreement in principle, with the further understanding that Svenhard's would send a formal written settlement proposal to the Pension Fund within 10 days.[107]

66. On December 10, 2018, Svenhard's sent the formal settlement proposal to the Pension Fund. Svenhard's offered the same payment terms that it had offered in its first letter—$3 million, through 240 equal payments of $12,500. For the delinquent contributions, Svenhard's offered the same $514,847.67, payable over 60 months.[108]

67. While settlement negotiations were concluded between Svenhard's and the Pension Fund, Svenhard's continued to obtain loans from USB, including on February 6, 2019.[109]

68. As Svenhard's and the Pension Fund were finalizing their settlement agreement, and after December 2019 when it was clear that Svenhard's and the Pension Fund would agree upon a significantly compromised withdrawal liability amount, USB started gearing up for its final takeover of Svenhard's. On February 6, 2019, Kunkel emailed Bob Albers in follow up to Bob's visit to Svenhard's and noted that Kunkel believed a Svenhard's employee would be willing to "stay on" and "help [USB] in any way he could."[110] Additionally, USB Board members discussed the takeover of Svenhard's at the March 13, 2019 USB Board Meeting. Bob Albers reported that the leases and license to Svenhard's were set to expire on July 31, 2019.[111]

---

[107] Ex. 56 at 1.

[108] Ex. 54.

[109] Ex. 168.

[110] Ex. 169.

[111] Ex. 239.

69. On February 26, 2019, the Pension Fund responded to Svenhard's settlement proposal, attaching a draft settlement agreement. Brock accepted Svenhard's proposal of $12,500 per month, but countered that payments should be made for 360 months, rather than 240 months. Brock also added interest to the delinquent contributions, because the Pension Fund had an interest policy that required its application.[112]

70. Kunkel immediately forwarded to USB the draft settlement agreement containing the counteroffer terms.[113] Pettit brought it to Bob Albers.[114] Svenhard's and USB personnel then set up a conference call the next day.[115] On that call, Bob Albers insisted that Kunkel refuse to accept the longer term of 360 months for payments and that the Pension Fund needed to stick to the agreement as discussed in December, even when others explained the risk that the Pension Fund might withdraw from settlement discussions.[116]

71. Bob Albers had visited Svenhard's in February 2019, and on March 15, 2019, he directed that USB personnel go to Svenhard's facility to "'dive into' their operations to learn more and set up a plan on the upcoming transition." The meeting was set for April 2nd and 3rd.[117] Pettit agreed that "by April 2019, USB was in the process of gearing up to take operational control."[118]

---

[112] Ex. 430.

[113] Ex. 7.

[114] Tr. 922:2-12 (Pettit).

[115] Ex. 270; *see also* Tr. 722:3-23 (Kunkel).

[116] *See* Tr. 723:15-725:2 (Kunkel).

[117] Exs. 270, 273.

[118] Tr. 924:16-19 (Pettit).

72. As the Pension Fund was pushing to finalize a settlement agreement with Svenhard's, on April 8, 2016, Kunkel requested USB's input to on what to do.[119]

73. USB continued to discuss Svenhard's, including at an April 10, 2019 conference.[120]

74. Kunkel then sent to the Pension Fund a response to its draft settlement agreement that same day, April 10th. Kunkel insisted on the original 240-month term for the withdrawal liability, and that the interest rate on the delinquent contributions be reduced to 5.25%.[121]

75. Brock responded the next day, April 11th, accepting the terms and asking for addresses for notices.[122]

76. Kunkel provided the information,[123] and the Settlement Agreement was finalized.[124] Svenhard's, however, insisted on including Ronny Svenhard's personal address in the notice provision, along with the Svenhard's Exeter facility.[125] The Court finds this was because Svenhard's knew at the time of signing that soon USB would be operating out of the Exeter facility and Svenhard's would no longer be in business, so providing notice directly to Ronny Svenhard ensured Svenhard's would receive any notices. This, however, was not disclosed to the Pension Fund.

---

[119] Ex. 195.

[120] Ex. 171.

[121] Ex. 56.

[122] Ex. 57.

[123] Ex. 172.

[124] Ex. 8.

[125] Exs. 8, 172.

77. Under the Settlement Agreement, Svenhard's was required to pay $12,500 each month for 240 months for the withdrawal liability and $8,580.80 per month on the delinquent contributions until that debt, with 5.25% interest, was paid, which would take about seven years.[126]

78. The recitals in the Settlement Agreement stated the facts as understood by the parties.[127] The recitals included a summary of the amounts due and Svenhard's default.[128] The parties then explained that Svenhard's never asked for review of the assessment liability under 29 U.S.C. § 1399(b)(2), did not cure the default after notice, and thus the full amount of $39,105,840 was due.[129] The recitals continued, explaining:

> Svenhard and the Partnership have provided extensive financial information to the Pension Fund showing that they have limited assets, most of which are pledged to other creditors. The Pension Fund has analyzed that financial information and has concluded that asserting the entire claim would almost certainly cause the second creditors to assert their rights to Svenhard's assets, leaving little or nothing for the Pension Fund. The Pension Fund has therefore concluded that it is preferable to accept a schedule of payments on the terms provided herein, *in order to collect a stream of payments that Svenhard is liable to be able to pay while continuing to operate its business*.[130]

79. At the time that Svenhard's signed the Settlement Agreement on April 12, 2016, Kunkel knew that USB would shortly take over Svenhard's and that Svenhard's would not be continuing as a business or able to pay the monthly payments on the withdrawal liability or the

---

[126] Ex. 8.

[127] *See* Tr. 1146:22-1147:3 (Brock).

[128] Ex. 8 ¶¶ 2-5.

[129] *Id.* ¶ 6.

[130] *Id.* ¶ 8 (emphasis added).

delinquent contributions.[131] Indeed, by then he had known for a "couple of months" that USB would soon take over Svenhard's operations.[132] But Kunkel also knew that the Pension Fund believed that Svenhard's would stay in operation for 30 years because of the concessions made in, and the terms of, the Settlement Agreement.[133] He knew that the Pension Fund "of course" was unaware that Svenhard's was operating with only a license for its intellectual property, and one that was about to expire.[134] Kunkel intentionally had never told Brock about the sale of Svenhard's intellectual property or the license, because he was "directed not to" by USB.[135] And Brock confirmed that he had not learned that information, from documents, Svenhard's, or anyone else, and that the Pension Fund would not have entered into the Settlement Agreement if it had known that Svenhard's had sold its intellectual property or was operating through a license that was set to expire in 2019, because Svenhard's could not "honor" the agreement.[136]

80. Kunkel stated that he believed that USB would take over Svenhard's payments, but he never discussed that with USB.[137] Given how the entire deal between USB and Svenhard's was structured to avoid USB having any liability for the unfunded pension amounts, the Court does not find this statement credible for several reasons. First, Kunkel never spoke

---

[131] Tr. 734:17-735:10; 736:4-8 (Kunkel).

[132] Tr. 924:23-925:7 (Pettit).

[133] Tr. 721:9-15 (Kunkel).

[134] Tr. 721:17-25 (Kunkel).

[135] Tr. 686:24-687:22 (Kunkel).

[136] Tr. 1130:20-1133:3 (Brock). The Court finds the facts of ¶ 79 by clear and convincing evidence.

[137] Tr. 735:11-736:3 (Kunkel).

with anyone at USB about this purported assumption nor made any effort to set up a transition of the payments. Second, as the settlement negotiations were wrapping up, the transition to full USB takeover was being finalized, yet Kunkel never disclosed to the Pension Fund that USB would be taking over payments within a few months. Third, Kunkel knew the extreme lengths that USB went to so it would not have to pay the unfunded pension liability. Indeed, in January 2017, he discussed this issue with Svenhard-Barnett and helped her draft an email to Pettit.[138] The email sent to Pettit noted that the Pension Fund had asked about the ownership of Svenhard's and any guaranties, thus "digging to see if there [we]re any monies they c[ould] tap into," which made her "concerned" about USB's potential liability.[139] In helping to draft this email, Kunkel was concerned that USB may be liable, and knew that becoming liable for unfunded pension liability was a concern of USB's.[140] Fourth, Pettit "made comments over time" to Kunkel that Svenhard's, and not USB, would be responsible for the payments to the Pension Fund under the Settlement Agreement.[141]

81. Pettit confirmed that he, Bob Albers, and Todd Cornwell all had the understanding that Defendants would not take over Svenhard's monthly payment.[142]

---

[138] Ex. 6.

[139] Ex. 6.

[140] Tr. 708:16-24 (Kunkel).

[141] Tr. 1266:11-1267:22 (Pettit).

[142] Tr. 1269:7-20 (Pettit).

82. Defendants also knew that Svenhard's would be unable to make the payments described in the Settlement Agreement because Defendants were aware that Svenhard's would have no assets and be out of business within a few months.[143]

**E. Svenhard's Closure and Defendants' Assumption of Svenhard's Operations**

83. On November 4, 2019 (the "Transition"), Defendants assumed full operational control of Svenhard's business and the Exeter facility.[144]

84. At the time of the Transition, Defendants planned to sell the products produced at the Exeter facility to the same customers and distributors who had purchased them in the previous year, and in the following year, that is precisely what happened.[145]

85. Defendants offered employment to all but four of the approximately 200 Svenhard's employees, in their same or similar positions. Defendants also sought to rehire former Svenhard's employees who had left. More than 90 percent of Svenhard's former employees accepted employment with Defendants, including most of Svenhard's supervisory and back-office staff. Defendants used the Svenhard's hire date for seniority and vacation calculation.[146]

86. Defendants signed a collective bargaining agreement with the same Teamsters local that had represented certain employees at the Exeter Facility before the Transition, using

[143] Tr. 734:17-735:10; 736:4-8 (Kunkel).

[144] Stip. ¶¶ 8, 48.

[145] Stip. ¶¶ 49-50.

[146] Stip. ¶¶ 65-68.

the previous collective bargaining agreement as a template. Defendants also used the same temporary staffing agency that Svenhard's had used.[147]

87. At the time of the Transition, Defendants intended to make the same products as Svenhard's. For at least three years, Defendants used Svenhard's recipes and formulas.[148]

88. Defendants used the same equipment that Svenhard's had used, making only a small number of upgrades, including a make-up line purchased from Rheon for which negotiations had started with Svenhard's.[149]

89. Defendants used the Svenhard's trademark and the name "Svenhard's" on all products for at least three years and in Defendants' marketing materials. Defendants believed that the name "Svenhard's" was well known, with a devoted customer base.[150]

90. After the Transition, Defendants largely sought to retain the same suppliers as Svenhard's and use the same proprietary ingredients. For at least a year, Defendants used the same suppliers as Svenhard's for 90% of its ingredients.[151]

91. For a few years after the Transitions, Defendants used the same accounting and procurement software, general computer system, email domain, and information technology infrastructure vendor as Svenhard's had used.[152]

---

[147] Stip. ¶¶ 65-68.

[148] Stip. ¶¶ 72-74.

[149] Stip. ¶¶ 81-83, 88.

[150] Stip. ¶¶ 91-96, 99.

[151] Stip. ¶¶ 101-03, 107.

[152] Stip. ¶¶ 113-14, 116-19.

92. As of October 2019, Defendants estimated that the replacement value of the Exeter Facility building was $16.32 million and its equipment value was $10.2 million. Defendants had paid $5,942,646 for the Exeter facility and equipment, and an additional $690,871 for equipment moved from Oakland to Exeter. These figures did not include the value of the approximately 40 acres of land on which the Exeter facility sat.[153]

**F. Svenhard's Default on the Settlement Agreement**

93. Svenhard's paid the Pension Fund under the Settlement Agreement for six months and then missed its very first payment after Defendants took over.[154]

94. The Pension Fund promptly notified Svenhard's of its default by sending notice to Ronny Svenhard and to the Exeter facility, which at this time (unbeknownst to the Pension Fund) was owned and operated by Defendants.[155] This notice stated that Svenhard's had five business days to cure the default or the full amount of the debt owed would become due.[156]

95. Svenhard's filed for bankruptcy on December 19, 2019—one day before the expiration of the cure period specified in the Settlement Agreement and the Pension Fund's notice of default.[157]

96. USB quickly learned about the bankruptcy and tracked it.[158]

---

[153] Stip. ¶¶ 158-60, 162-63.

[154] *See* Stip. ¶¶ 140-41.

[155] Ex. 59-60.

[156] Ex. 59.

[157] Stip. ¶ 144; Ex. 8.

[158] Tr. 926:11-21 (Pettit).

97. The Pension Fund filed its Proof of Claim in the bankruptcy proceedings, citing and attaching the Settlement Agreement.[159]

98. The Pension Fund filed its Complaint in this case on November 10, 2020.[160] It asserted three claims under ERISA. The Pension Fund stated in its claim for the delinquent contributions that the Settlement Agreement constituted a "novation" of its rights under ERISA. But the claim proceeded to only cite ERISA and assert rights under ERISA. The Court finds the statement that the Settlement Agreement served as a "novation" (versus an accord) was an unintentional a mistake made by the Pension Fund.[161]

99. Kunkel testified regarding his knowledge that Svenhard's could not comply with the Settlement Agreement at his deposition on June 8, 2023.

## CONCLUSIONS OF LAW

### A. Legal Standards

#### 1. Withdrawal Liability Generally

The Ninth Circuit has explained the basics of multiemployer pension plans and the need for withdrawal liability:

> A multiemployer pension plan typically covers the employees of two or more unrelated companies—usually engaged in the same type of business in the same geographic area—in accordance with a collective bargaining agreement. The employees' unions negotiate employer contributions to support the pension plan.

[159] Ex. 61.

[160] Ex. 418.

[161] As discussed below, the Court finds that the Settlement Agreement is void due to fraud and, independently, must be set aside under ERISA. Therefore, the Court declines to reach the issue whether the Settlement Agreement was an "accord" or a "novation." Thus, the Pension Fund's mistake does not affect the Court's reasoning.

> Such plans are generally covered by the Multiemployer Pension Plan Amendment Act ("MPPAA" or "the Act"), which revised the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1301(a)(3). The Act provided a series of amendments to ERISA aimed at minimizing the adverse consequences that resulted when individual employers terminated their participation in, or withdrew from, multiemployer plans. The concern was that a significant number of multiemployer plans were experiencing extreme financial hardship as a result of individual employer withdrawals from the plans, which saddled the remaining employers with increased funding obligations.
>
> To minimize these risks, the Act requires that when an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, the employer is liable to the plan for withdrawal liability. 29 U.S.C. § 1381(a). The withdrawal liability equals the allocable amount of unfunded vested benefits, with specified statutory adjustments. *Id.* § 1381(b)(1).

*Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Hawaii Pension Plan*, 891 F.3d 839, 842 (9th Cir. 2018) (cleaned up).

**2. Successor Liability under ERISA and MPPAA**

In *Resilient Floor*, the Ninth Circuit developed the "successorship doctrine" for when "a participating employer sells its assets" and "the asset purchaser may be liable for the employer's withdrawal from a multiemployer plan." *Heavenly Hana*, 891 F.3d at 842. Under this doctrine, a "successor" employer may be held liable for withdrawal liability "so long as the successor took over the business with notice of the liability." *Resilient Floor*, 801 F.3d at 1084. Notably, "constructive notice of withdrawal liability is sufficient to trigger successor withdrawal liability." *Heavenly Hana*, 891 F.3d at 847.

"The primary question in [labor and employment] successorship cases is whether, under the totality of the circumstances, there is 'substantial continuity' between the old and new enterprise." *Resilient Floor*, 801 F.3d at 1090 (alteration added in *Resilient Floor*) (quoting *Haw. Carpenters Tr. Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 294 (9th Cir. 1987)); *see*

*also Heavenly Hana*, 891 F.3d at 842 (stating that asset purchasers are successors if they are "substantial continuations" of the entity purchased). In evaluating "substantial continuity," courts address the following, non-exhaustive factors:

> [Whether] there has been a substantial continuity of the same business operations[;] [whether] the new employer uses the same plant; [whether] the same or substantially the same work force is employed; [whether] the same jobs exist under the same working conditions; [whether] the same supervisors are employed; [whether] the same machinery, equipment, and methods of production are used; and [whether] the same product is manufactured or the same service [is] offered.

*Resilient Floor*, 801 F.3d at 1090-91 (alterations added in *Resilient Floor*) (quoting *NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459 (9th Cir. 1985)). The Ninth Circuit also added that court should consider "whether the body of customers is the same." *Id.* at 1091.

Regarding constructive notice, the Ninth Circuit has explained that:

> Constructive notice would only exist when three conditions are met: (1) the purchaser qualifies as a successor; (2) the relevant pension plan is underfunded; and (3) a purchaser using reasonable care or diligence would have discovered the withdrawal liability. Additionally, successor liability would only be imposed when it is fair to do so. The fairness requirement stems from the fact that "the origins of successor liability are equitable," making "fairness [ ] a prime consideration in its application." *Resilient Floor*, 801 F.3d at 1091 (quoting *Sullivan* [*v. Dollar Tree Stores, Inc.*], 623 F.3d [770,] 782 [9th Cir. 2010]). Even when the requirements for constructive notice are met, in certain instances fairness could militate against imposing successor liability.

*Heavenly Hana*, 891 F.3d at 847 (first alteration in original, citation alteration added).[162]

Generally, however, fairness to employers turns on notice, because "[w]ith that protection, the

[162] The Ninth Circuit also discussed the "controlled group" standard in the context of constructive notice, explaining that the law does not allow employers to "fractionalize" to avoid liability and that it previously held for withdrawing employers that "notice to the withdrawing employer is notice to all members of the controlled group." *Heavenly Hana*, 891 F.3d at 845-46. Plaintiffs rely on this standard in asserting notice and liability for all Defendants.

liability could be reflected in the price [the successor] pays for the predecessor's business assets." *Resilient Floor*, 801 F.3d at 1093 (cleaned up).

### 3. Fraudulent Inducement under Maryland Law

"Fraud in the inducement is one theory or means of committing fraud and has the same elements as fraud." *Access Funding, LLC v. Linton*, 482 Md. 602, 654 (2022), *as modified on reconsideration* (Mar. 16, 2023) (citation omitted). "Fraudulent inducement refers to a situation where a person is induced by some fraudulent representation or pretense to execute the very instrument which is intended to be executed. It occurs when one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment." *Swinton Home Care, LLC v. Tayman*, 264 Md. App. 487, 496 (2025) (cleaned up).

To show "fraud, or 'fraudulent inducement,'" a plaintiff must establish, by clear and convincing evidence:

> (1) that the defendant made a false representation to the plaintiff;
>
> (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;
>
> (3) that the misrepresentation was made for the purpose of defrauding the plaintiff;
>
> (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and
>
> (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Bennett v. Ashcraft & Gerel, LLP*, 259 Md. App. 403, 452 (2023); *see also Swinton Home Care*, 264 Md. App. at 496; *Access Funding*, 482 Md. at 654.

### 4. "Evade or Avoid" Provision under ERISA and MPPAA

The "Evade or Avoid" provision, added to ERISA under the MPPAA, states:

> If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

29 U.S.C. § 1392(c). Further, in *Cuyamaca Meats, Inc. v. San Diego & Imperial Counties Butchers' & Food Employers' Pension Trust Fund*, 827 F.2d 491 (9th Cir. 1987), the Ninth Circuit quoted the following legislative history:

> [T]he bill provides that transactions undertaken to evade or avoid withdrawal liability may not be used as a method of escaping withdrawal liability that would otherwise be imposed. It is intended that the plan sponsor, the arbitrator, and the courts follow the substance rather than the form of such transactions in determining, assessing, and collecting withdrawal liability.
>
> Furthermore, we intend that the term "employer" be construed in a manner consistent with the bill and its purposes. We intend that employers not be able to evade or avoid withdrawal liability through changes in identity, form, or control, or through transactions which are less than bona fide and arm's length. Hence, for example, a building and construction industry employer—or for that matter any employer contributing to a plan—will not be able to evade withdrawal liability by going out of business and resuming business under a different identity.

*Id.* at 499 (quoting 126 Cong. Rec. 23038 (1980) (statement of Rep. Frank Thompson) (alteration in original)); *see also Resilient Floor*, 801 F.3d at 1094 (explaining that "[s]ection 1392 is essentially punitive" and "imposes withdrawal liability for '*any*' purposely evasive or devious transaction" (emphasis in original)).

"[A]s both the legislative history and statutory text make clear, § 1392(c) 'requires only that *a* principal purpose of the sale be to escape withdrawal liability.'" *Bd. of Trs. of PAMCAH-UA Loc. 675 Pension Fund v. SMAC Haw., Inc.* (hereinafter "*SMAC Hawaii*"), 2026 WL 523752, at *16 (D. Haw. Feb. 25, 2026) (quoting *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994)) (emphasis in *Santa Fe Pac. Corp.*). "So long as evasion or avoidance is 'one of the factors that weighed heavily in the seller's

thinking,' § 1392(c) applies." *Id.* (quoting *Santa Fe*, 22 F.3d at 727); *see also* 126 Cong. Rec. 23038 ("This rule is to apply when evasion of liability is a principal purpose of a transaction, whether or not the transaction has other purposes as well." (statement of Rep. Frank Thompson)).

Section 1392(c) itself does not contain any statutory presumption or designated burden of proof. When an employer disputes withdrawal liability determinations within the statutory period and proceeds to mandatory arbitration, "any determination made by a plan sponsor under [29 U.S.C. §§ 1381-1399 and 1405 (1988 ed. and Supp. III)] is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." *Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 611 (1993) (alteration in original) (quoting 29 U.S.C. § 1401(a)(3)(A)). The Court agrees with U.S. District Judge Micah W.J. Smith, "that nothing in the MPPAA suggests that Congress intended to invert the traditional burden of proof for § 1392(c) disputes that were never submitted to arbitration. As a result, the court applies the default presumption and concludes that plaintiffs bear the burden of proof on their § 1392(c) claims." *SMAC Hawaii*, 2026 WL 523752, at *18. This requires proof by a preponderance of the evidence. *See Lopresti v. Pace Press, Inc.*, 868 F. Supp. 2d 188, 201 (S.D.N.Y. 2012) (concluding that "the plan sponsor shall have the burden to establish, by a preponderance of the evidence, the elements of the claim under section 1392(c) of this title that a principal purpose of the transaction was to evade or avoid withdrawal liability under this subtitle" (quoting 29 U.S.C. § 1401(e)(2)(A)(ii)[163]).

[163] Although § 1401(e)(2)(A)(ii) may not apply under the circumstances of this case, the Court sees no "reason to deviate from the 'default' burden of proof in civil litigation—preponderance of the evidence." *See In re Crain Walnut Shelling, LP*, 175 F.4th 1069, 1076 (9th

## B. Analysis

### 1. Withdrawal Liability

#### a. Whether Defendants Took Over Svenhard's with "Substantial Continuity" of Operations

Defendants did not dispute in their closing brief that they took over with "substantial continuity" of operations from Svenhard's. Additionally, counsel for Defendants declared during opening statement at trial that Defendants "probably" took over operations in a manner that showed substantial continuity. Tr. 39:5-8 (Wright).

The stipulated facts and evidence at trial show that all of the continuity factors are met and there was substantial continuity of operations after Defendants took over Svenhard's on November 3, 2019, with many operations remaining unchanged for one to three years. As shown in the Joint Stipulation and other evidence, described in Section E above, Defendants operated the business out of the same plant; had a workforce consisting mostly of employees that had worked for Svenhard's, including supervisory employees; recognized the same Local as the employees' bargaining unit; used the same temporary staffing agency; used the same recipes; produced the same products; used the same product packaging; used the same marketing and brand imaging; sold to the same customers and distributors; and used the same email domain. This is more than enough to show substantial continuity. *See Heavenly Hana*, 891 F.3d at 843 (relying on similar, but fewer, facts showing continuity).

#### b. Whether Defendants Received Adequate Notice

Defendants argue in their closing brief that "assuming" USB is a successor employer under *Resilient Floor* and *Heavenly Hana*—meaning it engaged in operations of substantial

---

Cir. 2026); *see also Campbell v. City of Los Angeles*, 903 F.3d 1090, 1118 (9th Cir. 2018) ("A preponderance of the evidence is . . . the default standard in a civil case.").

continuity and received adequate notice of Svenhard's *original* withdrawal liability—that does not end the inquiry. Defendants contend that under the Settlement Agreement the Pension Fund needed to give Defendants *actual* notice of Svenhard's default of the Settlement Agreement so that Defendants would have the opportunity to cure under the agreement. Defendants contend that under those circumstances, as a successor to Svenhard's, Defendants also would be a successor to Svenhard's notice and right to cure under the Settlement Agreement, and the Pension Fund did not give Defendants fair notice *after* default. As described below, however, the Court agrees with the Pension Fund's contentions that the Settlement Agreement is voidable because of fraud and also must be disregarded under ERISA's "Evade and Avoid" provision; thus, the Court rejects Defendants' argument on this point.

Because Defendants do not unequivocally concede that they received adequate notice of Svenhard's original withdrawal liability, the Court makes that express finding. The evidence at trial was overwhelming that USB had actual notice of Svenhard's pending withdrawal liability, both before and after entering into the transactions with Svenhard's. Indeed, Defendants actively participated in Svenhard's settlement negotiations with the Pension Fund with the goal of reducing that liability, and Defendants received actual notice of the intended reduction in liability by receiving several drafts of the Settlement Agreement, among other communications.

Further, before Svenhard's had even shut down the Oakland facility, Bob Albers explained to Svenhard's that Svenhard's would incur significant withdrawal liability upon moving production to Exeter, requested that Svenhard's forward all communications from the Pension Fund to Defendants, and demanded that Defendants' transactions with Svenhard's relating to the asset purchase be kept confidential. And it was Bob Albers who suggested to

Svenhard's that it attempt to negotiate a substantially lower withdrawal liability with the Pension Fund.

As requested, Svenhard's sent Defendants the Pension Fund's March 1, 2016 demand letter. This letter detailed that the Pension Fund calculated Svenhard's withdrawal liability at $50,150,043, but that Svenhard's would only be required to satisfy that liability through 240 monthly payments of $162,941, which totals $39,105,840. This letter also explained Svenhard's right to challenge the Pension Fund's method of calculation or amount calculated. Svenhard's did not challenge anything related to withdrawal liability or claim any inaccuracy.

After the March 1st letter, Defendants held meetings with Svenhard's to discuss withdrawal liability strategy. Defendants continued to require Svenhard's to forward to Defendants all communications from the Pension Fund relating to the settlement of withdrawal liability. Svenhard's did so. Defendants were active, albeit secret, participants in the settlement negotiations regarding a reduction of the withdrawal liability and were on actual notice of Svenhard's withdrawal liability.

**c. Whether it Would be Fair to Impose Successor Liability on Defendants**

Defendants argue that it would be unfair to impose liability as a successor employer, mainly because they did not receive notice and an opportunity to cure after Svenhard's default under the Settlement Agreement. The Court already has rejected Defendants' contention that such notice was required. Defendants also assert that it would be unfair because Svenhard's income was insufficient to cover its withdrawal liability. Defendants contend that the Pension Fund reached the same conclusion after reviewing Svenhard's financial documents, and that is why the Pension Fund agreed in the Settlement Agreement to accept significantly lower payments.

Defendants argue that *Resilient Floor* suggests that part of the fairness evaluation is whether the customer base is sufficient to cover the withdrawal liability. Defendants misconstrue that portion of *Resilient Floor*. The Ninth Circuit in *Resilient Floor* first established that for the continuity analysis, a successor must consciously take over the predecessor's customer base. 801 F.3d at 1095-96. Before the trial court in that case, the parties had disagreed on the approach to evaluating the significance of the customer base that the putative successor had consciously taken. The pension fund in *Resilient Floor* argued that a court should consider the percentage of total revenue from former customers, and the company argued that a court should consider how many customers were old versus new, regardless of the purchase volume of an individual customer or level of repeat business. *Id.* at 1097. The Ninth Circuit agreed with the pension fund that the best approach is for a court to consider the "relative amount of revenue generation by [the former employer's] former customers, rather than on a simple head count of all customers, including one-time customers." *Id.* The Ninth Circuit explained that this approach was "pertinent to the statutory concern with continuity of contribution rates when business changes take place" and that "a measure of the billings on the jobs worked for continuing customers by the old and new companies is more useful" than "a simple headcount." *Id.*

This discussion about "customer base" has nothing to do with protecting the putative successor by analyzing whether the income generated from the former customer base was sufficient to pay the withdrawal liability. It simply established how to compare the relative volume of the customer base that was taken over with the volume contributed by new customers, when analyzing this factor of the *continuity* test.

The Court will, however, consider Defendants' argument that Svenhard's did not generate enough revenue to pay its withdrawal liability as a general fairness argument in

evaluating this factor. But as the Ninth Circuit has explained, fairness primarily turns on notice, because the purchaser can structure its asset purchase agreement with that potential liability in mind. *See id.* at 1093. Additionally, "[t]he primary reason for making a successor responsible for its predecessor's delinquent ERISA contributions is that, absent the imposition of successor liability, present and future employer participants in the union pension plan will bear the burden of the predecessor's failure to pay its share, which will threaten the health of the plan while the successor reaps a windfall." *Id.* (cleaned up).

Defendants had notice of Svenhard's withdrawal liability. Permitting Defendants to avoid successor liability to Svenhard's pension obligation would result in harm to the pensioners and other employers and a windfall to Defendants, contrary to the purpose of ERISA and the MPPAA. Indeed, from the beginning, Defendants intended to purchase Svenhard's in a manner structured to avoid the risk of withdrawal liability. Bob Albers' first communication to the USB Board on March 28, 2014, described a plan for a "potential bakery purchase" that USB would "end up in the future owning . . . outright, without ensuing any of their financial issues." Ex. 1. The purchase, however, had to be done through a complicated "route" so that Defendants would "not be liable for [Svenhard's] unfunded Bakers pension amount," which they thought Svenhard's would "trigger when they closed the Oakland plant and moved to Exeter." *Id.* Defendants then put together a five-year plan to take over Svenhard's, as stated in the term sheet signed by the parties on April 2-3, 2014. Defendants crafted "convoluted" transactions with Svenhard's, and strung those deals along for years, until after the Settlement Agreement was signed, to reduce the risk of being responsible for Svenhard's withdrawal liability. The risk of Defendants' gambit in attempting secretly to purchase Svenhard's assets in this convoluted manner is better placed on Defendants than on the Pension Fund. *See, e.g.*, *EEOC v. Phase 2*

*Invs. Inc.* ("*Phase 2*"), 310 F. Supp. 3d 550, 571 (D. Md. 2018) ("[T]he lengths to which Mister went to protect itself from liability . . . actually demonstrate the fairness of holding Mister liable as a successor.").

Additionally, Defendants had other options to protect themselves if they did not believe that Svenhard's had sufficient assets or income to pay the withdrawal liability. For one thing, they could have negotiated an even steeper price discount.[164] *See, e.g.*, *Phase 2*, 310 F. Supp. 3d at 571 n.11 (emphasizing that there was no unfairness in holding the company liable when it "had the opportunity to negotiate for a lower price, and the sophistication to uncover the possible need to do so"). "Shielding a successor employer from liability when the company had knowledge of the potential liability and still had bargaining power with regard to the transaction runs counter to the policies underlying the doctrine of successor liability." *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 849 (7th Cir. 2015).

Defendants also could have purchased Svenhard's through bankruptcy. But Defendants worked hard to avoid Svenhard's filing bankruptcy, even instructing Kunkel not to file bankruptcy, having experienced the "downsides" of doing so when it purchased the assets of Hostess through bankruptcy. Rewarding Defendants' machinations to avoid having to participate in an auction through bankruptcy or avoid a possible devaluation of the product (if Svenhard's production were to go offline during bankruptcy) does not outweigh the interest of innocent

---

[164] The Pension Fund argues that Defendants actually received a discount in the price of the Exeter real and personal property that "paralleled" the discount USB negotiated in its purchase of Unified Bakery, in which USB expressly accepted its predecessor's withdrawal liability. *See* Stip. ¶¶ 155-56. The Pension Fund points to the value of those assets estimated in October 2019 as compared to the price Defendants paid. *See id.* ¶¶ 159-63. Defendants disagree that they received a discount. Regardless of whether Defendants agree with the Pension Fund's characterization of the valuation and purchase price, it is undisputed that USB could have attempted to negotiate a *further* discount if it believed such a discount was necessary.

pensioners, whom ERISA and MPPAA are intended to protect. The Court is mindful that "ERISA (and the MPPAA) are remedial statutes, [and] they should be liberally construed in favor of protecting the participants in employee benefit plans." *Heavenly Hana*, 891 F.3d at 845 (quoting *IUE AFL-CIO Pension Fund v. Barker & Williamson*, *Inc.*, 788 F.2d 118, 127 (3d Cir. 1986)). These concerns support the fairness of imposing successor liability.

Additionally, Defendants engaged in questionable business practices and other conduct during their dealings with Svenhard's and the asset purchase process. Defendants required Svenhard's to keep Defendants' involvement a secret throughout the multi-year process, both through instructions by Bob Albers and clauses in various agreements with Svenhard's. In furtherance of this secret plan, Bob Albers instructed Svenhard's "[i]n the beginning" to "keep the emails to a minimum and have mainly phone calls instead" due to the "looming possibility of the unfunded pension liability." Ex. 6 at 3. This forced secrecy resulted in Svenhard's making material misrepresentations and omissions to the Pension Fund and others.

USB also instructed a consultant to misrepresent who employed that consultant to avoid disclosure to City of Exeter officials. USB additionally instigated false or misleading statements on Svenhard's financial documents, including having the "going concern" item removed and having Svenhard's declare that it was solvent when USB knew that Svenhard's was not. Defendants also insisted on full participation relating to Svenhard's withdrawal liability and continued heavily to finance Svenhard's, despite its many financial defaults, but only until Svenhard's Settlement Agreement with the Pension Fund was finalized. All of this conduct, among others, further supports the fairness of imposing successor liability.

**d. Conclusion**

Defendants took over Svenhard's with sufficient "continuity" to qualify as a successor employer under *Resilient Floor* and *Heavenly Hana*. Defendants also received sufficient notice

of potential liability. Finally, it is fair to impose liability on Defendants. Therefore, Defendants are a successor employer under ERISA and subject to Svenhard's withdrawal liability. Further, It is undisputed that all Defendants are under the same common control. *See note* 2, *supra*. Thus, all Defendants are jointly and severally liable for Svenhard's withdrawal liability as a "single employer," *see, e.g.*, 29 U.S.C. § 1301(b)(1); 26 C.F.R. § 1.414(c)-2; *Bd. of Trs. of W. Conf. of Teamsters Pension Tr. Fund v. Lafrenz*, 837 F.2d 892, 893 (9th Cir. 1988), unless Defendants are successful in their affirmative defense, to which the Court turns next.

**2. Whether the Settlement Agreement Precludes Successor Liability**

Defendants argue that through the Settlement Agreement, the Pension Fund waived its ERISA claims because the Settlement Agreement was a novation that effectively discharged Svenhard's ERISA liabilities and replaced them with Maryland contract liabilities. The Pension Fund disputes that the Settlement Agreement was a novation, arguing that instead it was an unsatisfied accord. But more importantly, the Pension Fund contends that Defendants are precluded from relying on the Settlement Agreement as a defense because it is voidable due to fraud and, alternatively, must be disregarded under ERISA's "Evade or Avoid" provision. Because the Court agrees with these contentions, it declines to reach whether the Settlement Agreement was an accord or a novation.

**a. Voidable Based on Fraud**

The Settlement Agreement contains a choice-of-law provision that states that Maryland law governs. Under Maryland law, fraudulent inducement and the remedy of rescission must be proven by clear and convincing evidence. *See Swinton Home*, 264 Md. App. at 497-98. The Pension Fund argues that Svenhard's engaged in fraud in the inducement by misrepresenting facts in the Settlement Agreement regarding Svenhard's ability to remain an ongoing business and make the monthly payments for the 240-month term. The Pension Fund also contends that

Svenhard's failed to disclose its relationship with USB, knowing that USB's purchase of Svenhard's assets would be material to the Pension Fund. Defendants argue in their final trial brief that the Court should not set aside the Settlement Agreement because the Pension Fund did not reasonably rely on any purported misrepresentation and affirmed the Settlement Agreement.[165] The Court addresses Defendants' arguments below.

**i. Reliance**

Defendants argue that the Pension Fund could not reasonably have relied on the alleged statements by Svenhard's based on two clauses in the Settlement Agreement. The first is Paragraph 17, in which the parties agreed that the Settlement Agreement was their "sole and complete record of their understandings and agreements of the Settling Parties with respect to the matters covered herein." Ex. 8 at 5. The second is Paragraph 24, titled "Waiver of Rights Under California Civil Code Section 1542." *Id.* at 6. This section is "in furtherance of the release provisions" and in response to the California law. *Id.* It quotes the California statute, which provides that a general release does not release unknown claims that might have materially changed a settlement. Paragraph 24 then provides:

> The parties acknowledge that except for matters expressly represented or recited in this Agreement, the facts and law in relation to this matter and the claims released by the terms of this Agreement may turn out to be different from the facts or law as now known to each party and/or his or its agents or counsel. Each party expressly assumes the risk of the existence of different or

---

[165] Defendants also raised in their trial brief the argument, which the Court rejected at summary judgment, that the Pension Fund failed to plead a claim for rescission of the Settlement Agreement. As the Court previously explained, the Pension Fund asserted its claims under ERISA. It did not assert claims under common law based on the Settlement Agreement. *Defendants* raised the Settlement Agreement in their *affirmative defenses* to argue that the Pension Fund had replaced Svenhard's ERISA liabilities with contractual liabilities. The Federal Rules of Civil Procedure do not require that a party file a pleading in response to an affirmative defense. Thus, the Pension Fund was under no obligation to file a pleading explaining why the Settlement Agreement did not replace ERISA's liabilities and remedies.

> presently unknown facts or law and agrees that this Agreement shall in all respects be effective and binding as to each party despite the possibility of the existence of different or new facts or law.

*Id.* Defendants contend that this clause governs because the Pension Fund's "allegations of Svenhard's fraud are based solely on alleged *representations not listed expressly in the contract*." ECF 232 at 13 (emphasis added). Assuming without deciding that this clause applies as Defendants contend, the Court disagrees that the Pension Fund's claims rely on representations not expressly recited in the Settlement Agreement.

The Settlement Agreement opens with factual recitations, including that: (1) Svenhard's provided extensive financial information to the Pension Fund showing their limited assets that were mostly pledged to other creditors; (2) based on the review of the financial data, the Pension Fund determined that pressing its entire claim likely would result in the secured creditors asserting their rights to the assets, leaving the Pension Fund with little or nothing; and (3) the Pension Fund therefore agreed to "accept . . . a stream of payments that Svenhard['s] is likely to be able to pay while continuing to operate its business." Ex. 8 at 2. Svenhard's then agreed to make specific monthly payments for its two obligations, the contribution liability until paid off (approximately seven years), and the withdrawal liability for 20 years. *Id.* at 3.

The Pension Fund's claims arise from alleged fraud based on material misrepresentations and half-truths in the factual recitation and in Svenhard's promise *in the Settlement Agreement* to make ongoing monthly payments. These statements include that Svenhard's needed the significant reduction in payment to remain an ongoing business and still make the monthly payments, and that Svenhard's will make the monthly payments for withdrawal liability for 20 years and delinquent contributions for about seven years. The material omissions include that at the time Svenhard's signed the Settlement Agreement, it had sold all its intellectual property, it

knew USB shortly was planning to take over and Svenhard's would cease operating as a business, and thus it further knew that Svenhard's would soon be unable to make these continuing payments. The Pension Fund does not rely on alleged misrepresentations or omissions from *other documents previously exchanged between the parties*. The Pension Fund later learned new facts that showed the falsity or misleading nature of the representations in the Settlement Agreement. But the claims are that the Pension Fund relied on the truth of the representations expressly made in the Settlement Agreement, both the factual recitations and the payment obligation, all while Svenhard's knew those were false or materially misleading.

As the Ninth Circuit stated in holding that the Settlement Agreement was a financial accommodation under bankruptcy law, "the Pension Fund agreed to that arrangement expressly because of Svenhard's poor financial condition." *In re Svenhard's Swedish Bakery*, 154 F.4th 1100, 1105 (9th Cir. 2025), *cert. denied sub nom. Svenhard's Swedish Bakery v. Bakery & Confectionery Union*, 2026 WL 1463180 (U.S. May 26, 2026). Indeed, the Ninth Circuit rejected that the Settlement Agreement was designed to settle a dispute about the amount owed, and instead held that its "purpose was to accommodate Svenhard's inability to pay its withdrawal liability . . . by requiring payment only of a much lower amount." *Id.* at 1105 n.4. It is Svenhard's representations in the Settlement Agreement relating to its financial condition, its need for that financial accommodation, and its ability and intention to remain an ongoing business and make long term payments that the Pension Fund contends are fraudulent.

The Pension Fund's claims are unlike those in the cases Defendants cite. In *Central Truck Center, Inc. v. Central GMC, Inc.*, the counterclaim-plaintiff (a purchaser) sued the seller based on financial records that had been submitted during the negotiation of a purchase agreement, because after the agreement was entered, a key client contract was cancelled and the

plaintiff was left with a dealership with much less income than anticipated. 194 Md. App. 375, 380-81 (2010). The court held that the purchaser could not have reasonably relied on past financial data as a guarantee of future performance. *Id.* at 390-91. The court also held that the purchaser could not rely on those financial statements because the contract contained an integration clause and the financial statements were not integrated into the contract. *Id.* at 391.

In making the latter conclusion, the Maryland Court of Appeals quoted as being "[p]articularly cogent," *id.* at 392, the D.C. Court of Appeals, then-Judge Ginsburg, in stating:

> We have here the case of "a party with the capacity and opportunity to read a written contract, who [has] execute[d] it, not under any emergency, and whose signature was not obtained by trick or artifice"; such a party, if the parol evidence rule is to retain vitality, "cannot later claim fraud in the inducement."

*One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) (quoting *Mgmt. Assistance, Inc. v. Comput. Dimensions, Inc.,* 546 F. Supp. 666, 671-72 (N.D. Ga. 1982), *aff'd sub nom. Comput. Dimensions v. Basic Four,* 747 F.2d 708 (11th Cir. 1984)) (alterations in *One-O-One*). The plaintiffs in *One-O-One* similarly were relying on representations from *other documents* (an unsigned related agreement and an earlier letter agreement that was a precursor to the final signed agreement and about which allegedly oral promises had been made). *Id.* at 1284.

The Pension Fund's claims are different from those in *Central Truck* and *One-O-One* in two key respects. First, as discussed above, the Pension Fund is not relying on documents *other* than the Settlement Agreement in claiming material misrepresentations and omissions. In other words, the Pension Fund does not point to representations made in other documents as the basis for their reliance, but instead points to the representations made in the Settlement Agreement. Second, the evidence shows that the Pension Fund *was* subjected to "trick and artifice" to get its signature on the Settlement Agreement. These cases thus do not apply.

Defendants also cite *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008), and *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35 (Del. Ch. 2015), arguing that their treatment of "waiver-of-release" clauses comports with Maryland law and the Court should apply their reasoning. These cases, however, only enforce such clauses "that identify the specific information on which a party has relied and which foreclose reliance on other information." *Prairie Cap.*, 132 A.3d at 50. "[M]urky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations." *Id.* (alteration added in *Prairie Cap.*) (quoting *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006)). The type of acceptable clauses are those that state, for example, that the parties conducted their own independent investigation, were represented by counsel, and reviewed particular documents or conducted a certain type of research. And, most importantly, acceptable clauses state, in effect, that there have been no promises, agreements, or warranties not expressed in the contract made in executing the contract and that the parties are not relying on any statement, representation, or warranty of any agent of the parties but are instead relying on their own judgment. *Id.* at 50-51; *Forest Oil*, 268 S.W.3d at 54 n.4.

The clauses in the Settlement Agreement do not describe what the parties reviewed or relied on in signing the Settlement Agreement, disclaim any *promises*, *agreements*, or *warranties*, or state that the parties relied on their own judgment. At most, Paragraph 24 speaks to the possibility of discovering new *facts and law* in the future and that the parties agree the Settlement Agreement remains binding despite that possibility, but it does not describe what the parties relied on in the present. Paragraphs 17 and 24 do not constitute "explicit anti-reliance representations" and thus *Prairie Capital* and *Forest Oil* are unpersuasive authority, even

assuming they would apply under Maryland law. Defendants' arguments against reliance are unavailing.

Finally, the Court notes that under Maryland law, which is materially similar to many states' common law of fraud, if a person makes a promise having, at the time the promise is made, no intention to perform, the making of that promise is fraud. *See Dynacorp Ltd v. Aramtel Ltd.*, 208 Md. App. 403, 458, 56 A.3d 631, 664 (2012) ("A plaintiff satisfies the elements of false representation and knowledge of falsity where circumstantial evidence establishes that a defendant makes a promise without intending to perform.").

**ii. Affirmance**

Defendants also argue that even if there were material misrepresentations that the Pension Fund relied on to their detriment in entering the Settlement Agreement, such that the Pension Fund could set aside the Settlement Agreement, the Pension Fund has waived that remedy by affirming the Settlement Agreement through conduct after the Pension Fund discovered the fraud. Defendants contend that the Pension Fund affirmed the Settlement Agreement by filing its bankruptcy proof of claim, filing its Complaint in this lawsuit, and regularly making demands for damage measures that can be recovered only under the Settlement Agreement.

Under Maryland law, after a party to a contract, including a settlement agreement, discovers fraud in the inducement, there are "[t]wo courses" available: "First, to repudiate the settlement; and, secondly, with full knowledge of the facts to ratify it and recover in an action at law the damages she has suffered." *Brager v. Friedenwald*, 97 A. 515, 524 (Md. 1916); *see also Access Funding*, 482 Md. at 659 ("[U]nder Maryland law, when a party to a contract discovers that the contract has been procured by fraud, the party may elect to rescind the contract or to ratify it and claim damages, and that ratification of the contract precludes seeking rescission of the contract." (gathering cases)). The questions here are whether the Pension Fund had "full

knowledge of the facts" when it engaged in the purported ratification, and whether the acts asserted actually constituted ratification.

The key alleged fraud is Svenhard's assertion in the Settlement Agreement that it would continue as a business if provided with the reduced pension liability. The contracts between Svenhard's and USB, which were available to the Pension Fund from the bankruptcy proceeding, do not show that at the time of the Settlement Agreement in 2016, Svenhard's could not continue as an ongoing business. Svenhard's sold its intellectual and real property in 2014 and continued as a business for years under sales and license/leaseback arrangements. The lease was set to expire, but that did not necessarily mean the lease would not be renewed or extended. Simply seeing those agreements did not apprise the Pension Fund that Svenhard's *knew* it would not continue as a business when it signed the Settlement Agreement. That information was first disclosed to the Pension Fund in Kunkel's deposition, which occurred after the purported ratifying events. Thus, although the Pension Fund knew something about the relationship between Svenhard's and USB from the bankruptcy proceedings, the Pension Fund did not have "full knowledge" of that relationship or Svenhard's viability as an ongoing concern; thus, Defendants' ratification argument fails. *See Brager*, 97 A. at 524.

Additionally, the parties dispute that the dollar amount requested by the Pension Fund for withdrawal liability is only recoverable under the Settlement Agreement and not under the Pension Fund's ERISA remedies. Regardless of which party is legally correct, the evidence shows that the Pension Fund *believed* that its requested dollar amount also was available under ERISA. Brock testified that the Pension Fund calculated the "full amount" due by Svenhard's in the event of default using 240 months x $162,941, which is how the Pension Fund routinely

calculates defaulted sums, although persons who seek to accelerate without a default obtain the benefit of a present value discount. *See* Tr. 1007:6-1012:25 (Brock).[166]

Finally, Defendants argue that the Pension Fund ratified the Settlement Agreement by failing to refund the amounts paid by Svenhard's under the Settlement Agreement. Instead, the Pension Fund retained those payments in its accounts, offering a credit against future damages.

Under Maryland law,

> Equity will in an appropriate case order rescission without restoration if: (1) the performance by the one against whom rescission is sought has become worthless, or (2) the respondent has prevented its return, or (3) the performance conferred only an intangible benefit upon the complainant, or (4) only a promise was given, or (5) the complaint can properly retain it irrespective of the voidable transaction, or (6) it is in possession of or is subject to the order of a person having a right superior to the complainant, or (7) restoration is impossible for some reason not hereinbefore mentioned and the clearest and strongest equity demands that rescission be granted (sometimes with a monetary substitute for restoration).

---

[166] Defendants also argue that the Pension Fund ratified the Settlement Agreement by claiming damages for the contribution claim only recoverable under the Settlement Agreement. The Court agrees that the complaint and original disclosure relating to damages appears to request the amount from the Settlement Agreement for the delinquent contributions. The Pension Fund contends that the Settlement Agreement "conveniently described Svenhard's undisputed ERISA liabilities." ECF 130 at 36 n.11. It turns out, however, that the amount calculated in the Settlement Agreement for Defendants' contribution liability is different than damages under ERISA, because the Settlement Agreement included a flat interest rate set based on the interest rate at the time for defaulted withdrawal liability. For contribution liability, ERISA sets out a different method for calculating interest, and the interest amount regularly changes. The Pension Fund later amended its damages disclosure to more clearly assert ERISA remedies. The Court does not find the Pension Fund's original mistake that the Settlement Agreement damages amounts could be referenced for easy calculation of ERISA remedies to be material, nor does it constitute ratification of the Settlement Agreement as the only basis for Defendants' liability, particularly when the Settlement Agreement specifically referenced ERISA damages as the collectible amount in the event of a default. *See* Ex. 8 ¶ 16(c).

*Funger v. Mayor & Council of Town of Somerset*, 244 Md. 141, 151 (1966); *see also Lazorcak v. Feuerstein*, 273 Md. 69, 77-78 (1974) (same); *Maslow v. Vanguri*, 168 Md. App. 298, 330 (2006) (same).

Under the circumstances of this case, equity supports relieving the Pension Fund of its obligation to tender back the funds paid by Svenhard's. The Pension Fund was owed the "default" amounts (as calculated by the Pension Fund) in the Settlement Agreement irrespective of that agreement. The obligations arose under ERISA. In other words, if the Settlement Agreement is voided, the Pension Fund retains the right to collect those sums under ERISA.[167] The Settlement Agreement is not the source of the funds owed or damages requested. Thus, the fifth equitable exception under Maryland law applies. The Court therefore rejects Defendants' argument that the Pension Fund may not set aside the Settlement Agreement because of its failure to tender back the sums received.

**iii. Defendants' Other Arguments**

There are two other arguments that Defendants may be attempting to assert, although that is unclear. First, Defendants raised in their opening trial brief, although not in their final trial brief, that Svenhard's could not have committed fraudulent inducement because Kunkel, who executed the Settlement Agreement, genuinely believed that *USB* would continue to make the monthly payments after it took over operations. This argument is unpersuasive because, as discussed above, there are numerous factual recitals, in addition to Svenhard's promises to make ongoing monthly payments for years, that are specific to *Svenhard's* financial predicament and material. Svenhard's dire financial situation is why the Pension Fund agreed to such a drastically

[167] Although the dollar amount might change slightly for the delinquent contributions based on applicable interest rates and discount value, what is owed under ERISA is far greater than the amount already paid by Svenhard's for the delinquent contribution liability.

reduced amount over 20 years. Such an accommodation would not be necessary for a billion-dollar corporation (like USB) that was set imminently to take over, or at least not to the same extreme. Kunkel knew at the time he signed the agreement that USB was preparing to do just that. Thus, even if Kunkel genuinely believed that USB was going to make the payments that Svenhard's owed the Pension Fund under the Settlement Agreement, that would not cure the material misrepresentations and omissions in the Settlement Agreement.

Moreover, the evidence does not show that Kunkel held a genuine belief that USB was going to assume Svenhard's payments. Kunkel knew the lengths that Defendants had taken to *avoid* withdrawal liability, and he offers no evidence that Defendants only wanted to avoid full liability but not reduced liability. USB and Svenhard's had many meetings, telephone conferences, and emails relating to the Settlement Agreement, and yet there is no evidence that Kunkel or anyone else at Svenhard's raised the topic of USB taking over a reduced liability, or the negotiated lower monthly payments. Indeed, the evidence shows the opposite, that Defendants told Kunkel "over time," although not specifically before taking over, that Defendants would not make the payments owed by Svenhard's to the Pension Fund, and never heard differently from Kunkel. Tr. 1266:5-1267:18. Pettit testified that Defendants "*always*" knew that they "would not be responsible for [Svenhard's liability under the Settlement Agreement], and [they] would not be making those payments." Tr. 1267:1-3 (emphasis added). Pettit believed that Kunkel knew this, based on their communications, and thus was "perplexed when [Kunkel] came back and said that he never understood that." Tr. 1267:20-22.

USB *never* had any intention of taking over the payments. Regardless of whether Kunkel remembered or believed Defendants' statements to that effect, it is incredulous to believe that Svenhard's would not raise the topic of such an important obligation, the subject of years of

discussions with the Pension Fund, if Svenhard's genuinely believed it to be part of USB's takeover. Nor did Kunkel disclose to the Pension Fund, during negotiations when he knew the takeover was imminent, or even after the Settlement Agreement was signed and Svenhard's was making the monthly payments, that Kunkel believed USB shortly would be taking over. The Court concludes by clear and convincing evidence that neither Kunkel nor anyone else at Svenhard's believed that USB would be making Svenhard's payments to the Pension Fund required under the Settlement Agreement.

Second, although not raised in either trial brief, counsel for Defendants argued during trial that, in relation to the "reliance" factor, the Pension Fund was on "inquiry notice" of USB's purchase of Svenhard's assets. Defendants based this argument on public filings in the U.S. Patent and Trademark Office of the change in registration of Svenhard's intellectual property and Svenhard's documentation that showed that USB had purchased Exeter and leased it back and, later, loaned money to Svenhard's.

Regarding Defendants' first argument on this point, the U.S. Supreme Court, relying on the RESTATEMENT (SECOND) OF TORTS, has rejected a similar argument that a party's reliance on a statement can be defeated by a public filing showing the contrary. *See, e.g.*, *Field v. Mans*, 516 U.S. 59, 70 (1995) (stating that reliance on the factual assertion that a parcel of land is free of encumbrances "is justifiable, even if [a buyer] could have 'walk[ed] across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage") (quoting RESTATEMENT (SECOND) OF TORTS § 540, Illustration 1 (Am. L. Inst. 1976))). Nor was there conduct that would have placed the Pension Fund on notice to check such public filings.

The Court also rejects Defendants' second argument, that the documents submitted by Svenhard's would have placed the Pension Fund on inquiry notice. Svenhard's completed the

Pension Fund's Basic Questionnaire, reporting that Svenhard's withdrawal liability was triggered by closing its facility and relocating. Ex. 28 at 45-47. This was technically true (although misleading)—Svenhard's had closed its Oakland facility and moved to Exeter, triggering the withdrawal liability. It was reasonable for this form as completed by Kunkel not to have raised any question for the Pension Fund that some other entity had made a secret deal and bought Svenhard's intellectual property and planned to buy Svenhard's Exeter facility immediately after the move. To hold otherwise would require all pension funds to research possible asset sales whenever a company closes a facility, which is unreasonable and foreclosed by *Heavenly Hana*. Pension funds "cannot be asked to investigate sales rumors, track down the identity of all potential purchasers, avoid confidentiality or contract interference concerns, and send notice of its (publicly-available) funding status directly to potential purchasers." *Heavenly Hana*, 891 F.3d at 847 (cleaned up).

Moreover, later documentation provided by Svenhard's similarly would not have placed a reasonable investigator on notice that Svenhard's sold its intellectual property. Svenhard's 2016 and 2017 financial statements disclosed USB as a lender and guarantor, and Kunkel eventually disclosed that USB was the entity that bought the Exeter facility and leased it back to Svenhard's, after that information became publicly available. As Brock testified, that information provided no red flag that Svenhard's intellectual property was at risk. Bakeries lease facilities and borrow money. Additionally, at the same time, Svenhard's financial statements removed the "going concern" note, which made Svenhard's appear to be in a stronger financial position than it had been in years.

In sum, the fact that a bakery leases its facility is not sufficient to put the Pension Fund on "inquiry notice" that the bakery would be unable to make payments for 20 years. Nor was the

fact that USB was a lender to Svenhard's. Indeed, as Brock testified, USB's actions in ensuring the "going concern" note was removed bolstered Svenhard's appearance in its later financial statements, which provided a false sense of security to the Pension Fund.

**iv. Remaining Elements of Fraud**

Although not disputed by Defendants, the Court specifically finds that the Pension Fund has proven by clear and convincing evidence the remaining elements of fraud under Maryland law. This includes a showing that Defendants made false and misleading statements in the Settlement Agreement. As discussed above, those statements included that: (1) "little or nothing" would be left for the Pension Fund if it pushed for more than the amount in the Settlement Agreement, because Svenhard's knew that USB was potentially responsible as a successor and could afford more than the reduced amount; (2) Svenhard's could pay the "stream of payments . . . while continuing to operate as a business," when Svenhard's knew it had sold its intellectual property and USB was preparing to take over; (3) Svenhard's could make monthly payments for its delinquent contributions for slightly more than seven years, when Svenhard's knew it had sold its intellectual property and was about to close its business after USB took over; and (4) Svenhard's could make monthly payments for its withdrawal liability for 20 years, when Svenhard's knew it had sold its intellectual property and was about to close.

Svenhard's made these materially false and misleading statements with knowledge or with reckless indifference to the truth. At the time Svenhard's signed the Settlement Agreement, all Svenhard's assets had been sold. Its lease and licensing agreements were set to expire within a few months. There is no evidence of discussions to extend these agreements long term. Instead, USB and Svenhard's had begun discussions regarding USB's takeover.

Svenhard's also made these false and misleading statements for the purpose of defrauding the Pension Fund. Before Svenhard's even incurred the withdrawal liability, Svenhard's and

USB had begun working together to strategize how USB could avoid the withdrawal liability and how to keep the Pension Fund ignorant of USB's interactions with Svenhard's. Kunkel understood this was to reduce the risk that USB would be held liable as a successor, as did Pettit. Svenhard's and Defendants continued to work together to that end, through the signing of the Settlement Agreement. Indeed, as USB demanded, Svenhard's kept USB informed of every step of the settlement process including sending drafts of the Settlement Agreement. Svenhard's made the false and misleading statements in the Settlement Agreement for the purpose of getting the Pension Fund to sign the Settlement Agreement and lose its chance to negotiate an agreement or otherwise proceed with full knowledge of the actual facts. Finally, as discussed above, the Pension Fund had a right to rely on Svenhard's representations and such reliance was reasonable. The Pension Fund suffered compensable injury, in its lost withdrawal liability and delinquent contributions.

**b. The MPPAA's "Evade or Avoid" Provision**

As a separate basis for the Court to disregard the Settlement Agreement, the Pension Fund argues that it should be set aside under the MPPAA's "Evade or Avoid" provision because it was not a bona fide transaction to settle the payment obligations of Svenhard's, but was "executed on the false premise that [Svenhard's] induced—likely with USB's knowledge—that it could remain in operation to make reduced payments." ECF 231 at 65. The Pension Fund contends that the Settlement Agreement was "tainted" by the type of "deceptive" conduct the "Evade or Avoid" provision is intended to target. *See Cuyamaca*, 827 F.2d at 499 (concluding that a transaction did not run afoul of the "Evade or Avoid" provision because "[e]very indication is that it was a bona fide, arm's-length offer" that "was not deceptive in any way, and it in no way frustrated the purposes of the MPPAA").

As the Court already has concluded, Svenhard's engaged in false and misleading conduct to induce the Pension Fund to sign the Settlement Agreement. Svenhard's did not intend to *pay* its withdrawal liability under the Settlement Agreement. Instead, this agreement was the culmination of a years-long plan by Defendants and Svenhard's to keep the Pension Fund in the dark about Defendants' purchase of Svenhard's assets to avoid the Pension Fund having the chance of imposing successor liability on USB. This is the type of deceptive conduct the "Evade or Avoid" clause is intended to prevent. *See Resilient Floor*, 801 F.3d at 1094 (explaining that the provision "imposes withdrawal liability for '*any*' purposely evasive or devious transaction" (emphasis in original)).

Additionally, the Court finds that a principal purpose of the Settlement Agreement was to avoid withdrawal liability.[168] It is doubtful that there was any other reason for Svenhard's to sign the Settlement Agreement on April 15, 2019. At that time Svenhard's knew it would be out of business within a matter of months and thus did not need a financial accommodation that would allow it to keep its doors open. Svenhard's also knew that shortly it would not be able to pay its debt to the Pension Fund. If the Settlement Agreement was not for USB's benefit in its goal of avoiding liability, then Svenhard's could have stalled negotiations with the Pension Fund for another few months until it was out of business. But USB would not finalize the takeover until

[168] "[T]he Ninth Circuit has not articulated a test to determine whether a transaction's principal purpose was to avoid liability under the MPPAA." *SMAC Hawaii*, at *16 (quoting *Carpenters Pension Tr. Fund for N. Cal. v. Lindquist Fam. LLC*, 2014 WL 2601648, at *2 (N.D. Cal. June 10, 2014)). Courts have looked at a range of factors, including "(1) the consideration exchanged in the transaction, (2) the relationship between the parties involved, . . . (3) the timing of the transaction; . . . (4) the size of the withdrawal liability relative to the value of the transaction in question"; and (5) "intent or knowledge," including the intent of the employer as well as "other parties' intentions." *Id.* (citations omitted). Here, the main factors are the relationship between the Pension Fund, Svenhard's, and Defendants; the timing of the transaction, in light of Svenhard's transactions with Defendants; and the intent of Svenhard's and Defendants.

after the Settlement Agreement was signed. This was part of USB's plan to avoid the risk of becoming responsible for Svenhard's withdrawal liability. There is no evidence that USB intended to pay the reduced amount negotiated by Svenhard's with the Pension Fund. To the contrary, USB had never indicated an intention to pay *any* amount of withdrawal liability, and instead had clearly expressed its intention entirely to avoid withdrawal liability.

Even if Svenhard's intended the Settlement Agreement to resolve its outstanding withdrawal and delinquent contribution liability with the Pension Fund, that would have been only one purpose. The testimony and documents here show that *a* principal purpose of the Settlement Agreement was to avoid any entity (Svenhard's or USB) paying withdrawal liability, and that is all that is required. *See Santa Fe*, 22 F.3d at 727. Thus, the "Evade or Avoid" provision applies to the Settlement Agreement, and "the MPPAA shall be applied without regard to such transaction." *Herrmann*, 9 F.3d at 1056 (quotation marks omitted). This is a separate and independent basis on which the Court rejects Defendants' assertion that the Settlement Agreement limits Svenhard's liability.

**CONCLUSION**

For the reasons provided, the Court finds that USB is a successor employer to Svenhard's under ERISA. All Defendants, however, are jointly and severally liable for Svenhard's withdrawal liability and delinquent contributions. The Court rejects Defendants' assertion that the Settlement Agreement replaces or otherwise limits Svenhard's withdrawal liability. The Court concludes that the Settlement Agreement is void as induced by fraud and, alternatively and independently, shall be disregarded under 29 U.S.C. § 1392(c). The parties shall confer and

propose to the Court by December 7, 2026, a schedule for Phase II of this litigation, the damages phase.

**IT IS SO ORDERED**.

DATED this 10th day of October, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge